RECEIVED
FOR THE D.C. CIRCUIT

2024 MAR 24  AM 7: 40

# UNITED STATES DISTRICT COURT
## for the FILING DEPOSITORY
## DISTRICT OF COLUMBIA

STEVEN P. ENDRES
4338 Hillside Drive
Ann Arbor, Michigan 48105

*Plaintiff,*

v.

AIR CANADA, INC.
7373 Côte-Vertu Boulevard West
Saint-Laurent, Quebec, Canada H4S 1Z3

AIR FRANCE-KLM S.A.
7 Rue du Cirque
75008 Paris, France

ALASKA AIR GROUP, INC.
19300 International Boulevard
Seattle, Washington 98188

AMAZON.COM, INC.
410 Terry Avenue North
Seattle, Washington 98109-5210

AMERICAN AIRLINES GROUP INC.
1 Skyview Drive
Fort Worth, Texas 76155

ATLAS AIR WORLDWIDE HOLDINGS, INC.
2000 Westchester Avenue
Purchase, New York 10577

DELTA AIR LINES, INC.
1030 Delta Boulevard
Atlanta, Georgia 30354

DEUTSCHE LUFTHANSA AG
Venloer Street 151 – 153
50672 Cologne Germany

Case: 1:24−cv−00883
Assigned To : Kollar−Kotelly, Colleen
Assign. Date : 3/24/2024
Description: Pro Se Gen. Civ. (F-DECK)

Judge:

COMPLAINT,
REQUEST FOR
INJUNCTION,
AND REQUEST FOR
MANDATE TO ISSUE
PATENT

i

FEDEX CORPORATION
942 South Shady Grove Road
Memphis, Tennessee 38120

FRONTIER GROUP HOLDINGS, INC.
4545 Airport Way
Denver, Colorado 80239

HAWAIIAN HOLDINGS, INC.
3375 Koapaka Street, Suite G-350
Honolulu, Hawaii 96819

INTERNATIONAL CONSOLIDATED AIRLINES
GROUP S.A.
El Caserío
Iberia Zona Industrial n° 2
Camino de La Muñoza
28042 Madrid, Spain

JETBLUE AIRWAYS CORPORATION
27-01 Queens Plaza North
Long Island City, New York 11101

LATAM AIRLINES GROUP S.A.
Avenida Presidente Riesco 5711
Las Condes, Santiago, Chile

RAND PARENT, L.L.C.
c/o Apollo Management Holdings, L.P.
9 West 57th Street, 43rd Floor
New York, New York 10019

SOUTHWEST AIRLINES, CO.
2702 Love Field Drive
Dallas, Texas 75235

SPIRIT AIRLINES, INC.
2800 Executive Way
Miramar, Florida 33025

UNITED AIRLINES HOLDINGS, INC.
233 S. Wacker Drive
Chicago, Illinois 60606

UNITED PARCEL SERVICE, INC.
55 Glenlake Parkway, N.E.
Atlanta, Georgia 30328

ASHLEY MOODY, *in her official role as Attorney*
*General of the State of Florida*
PL-01, The Capitol
Tallahassee, Florida 32399

CITY OF NEW YORK, NEW YORK
City Hall
New York, New York 10007

CITY OF NEWARK, NEW JERSEY
920 Broad Street
Newark, New Jersey 07102

METROPOLITAN WASHINGTON AIRPORTS
AUTHORITY
1 Aviation Circle
Washington, District of Columbia 20001

PORT AUTHORITY OF NEW YORK AND NEW
JERSEY
4 World Trade Center
150 Greenwich Street
New York, New York 10007

And

UNITED STATES OF AMERICA
450 Fifth Street NW, Suite 8000
Washington, DC 20530

*Defendants.*

Plaintiff Endres brings this action under the Clayton Act, 15 U.S.C. § 26, the

Organized Crime Control Act of 1970, 18 U.S.C. §1964(c), and the U.S. Constitution

to redress Defendants boycott of his competitive market-clearing process to allocate airspace reservations to the public.

Endres' competitive multi-sided market allocation of reservations to use the public's airspace has been blocked by a carrier cartel's conspiracy to restrain trade by price fixing and market allocating reservations to land and takeoff at airports, and by a group boycott of the reservation market. The restraint of trade has usurped the market competition for price, route, and service required by the Airline Deregulation Act of 1978 and to which the United States has committed in air transport agreements with over 100 of its trading partners. The lost commerce exceeds $30,000,000,000 per year.

Endres has a particularized injury from the boycott of the market because he is the only person to invent and offer the market a lawful competitive multi-sided market-clearing process. Endres also solely developed the multi-sided market-clearing service, based on the market-clearing process, to provide exclusive access to takeoff and landing reservations to both suppliers and consumers of air transportation. Endres has a constitutional right to the collection of demand-calibrated multi-sided market-clearing premiums for airspace reservations as offered to carriers. Endres' market-clearing process was issued a patent by the Canadian government on December 12, 2023.

Exceptional circumstances warrant the exercise of this Court's injunctive powers because the right claimed by each Defendant Carrier to own scarce public airspace resources contradicts long-established property rights regarding the

public's title to the navigable airspace — thus undermining the statutory framework and affecting passengers and shippers in over 800 million annual enplanements across the U.S. on domestic and foreign carriers. [1]

Endres brings the parties that have orchestrated and joined this conspiracy to restrain trade and boycott the competitive market allocation of U.S. airspace reservations — domestic and foreign air carriers and their owners, airport owners, airport operators, and a state Attorney General — before this Court to establish traceability and redressability.

---

[1]   *See* Bureau of Transportation Statistics of the Department of Transportation, Transportation Statistics Annual Report 2022, 1-18, Doc. 302, PE-A2 254.

# TABLE OF CONTENTS

I.      INTRODUCTION .................................................................................. 1

II.     STATEMENT OF JURISDICTION AND VENUE ..................................... 6

III.    THE PLAINTIFF AND HIS INVENTIONS.................................................. 9

    A.  The Plaintiff ....................................................................................... 9

    B.  The Plaintiff's Inventions ................................................................ 11

    C.  Market Rollout - Winter 2018 Seasonal Reservations ............................. 17

IV.    THE DEFENDANTS ............................................................................... 18

    A.  Air Canada ........................................................................................ 18

    B.  Air France-KLM ............................................................................... 19

    C.  Alaska Air ......................................................................................... 20

    D.  Amazon ............................................................................................. 22

    E.  American Airlines ............................................................................. 23

    F.  Atlas ................................................................................................. 24

    G.  Delta ................................................................................................. 25

    H.  Lufthansa ......................................................................................... 27

    I.  FedEx ............................................................................................... 28

    J.  Frontier ............................................................................................ 29

    K.  Hawaiian .......................................................................................... 30

    L.  ICAG ................................................................................................. 31

    M.  JetBlue ............................................................................................. 32

    N.  LATAM ............................................................................................. 33

    O.  Rand ................................................................................................. 34

P.  Southwest .................................................................................. 35

Q.  Spirit ....................................................................................... 35

R.  United Airlines ......................................................................... 36

S.  UPS .......................................................................................... 37

T.  Government Defendants .......................................................... 38

    1.  Ashley Moody, Attorney General of Florida........................ 38

    2.  City of New York, NY......................................................... 39

    3.  City of Newark, NJ ............................................................ 40

    4.  MWAA ............................................................................... 40

    5.  PANYNJ ............................................................................ 42

    6.  The United States of America............................................ 44

U.  Defendant Carriers, IATA Carriers, and Passenger Carriers .................. 44

V.      THE CONSPIRACY OF DEFENDANT CARRIERS TO RESTRAIN TRADE IN AIRSPACE RESERVATIONS ................................................. 45

A.  The IATA and the WSG Agreement ......................................... 45

    7.  The IATA Ownership Structure ......................................... 45

    8.  The IATA Governance Structure........................................ 46

    9.  The IATA Annual General Meeting .................................... 52

    10. The IATA WSG.................................................................. 53

    11. The IATA WSG Process to Allocate Airspace Reservations in the U.S. ............................................................................ 54

    12. No Non-Party Co-Conspirators.......................................... 61

    13. Relevant Air Transportation Service Providers................. 61

    14. Monetization of Grandfathered Allocation to use the Public's Airspace .......................................................................... 72

VI.     DEFENDANTS' BOYCOTT OF THE MARKET....................................... 84

A.  Exhaustless v. FAA ................................................................. 84

B.  COVID Pandemic............................................................... 85

C.  Delta/WestJet Alliance Agreement.................................... 89

D.  U.S. Airport Operators Join the IATA WSG Agreement ......................... 90

    1.  Members of Airports Council International........................ 90

    2.  SFOTEC................................................................ 91

E.  Airport Owners and Operators Block the Market's Access to the U.S. Air Transportation System ............................. 92

    1.  Access to a Washington, D.C. Airport ............................. 92

    2.  Access to a New York Airport ...................................... 94

    3.  Access to Airspace at a New Jersey Airport......................... 96

    4.  Access to New York City Metropolitan Airspace .................... 97

    5.  Access to U.S. Airports.............................................. 97

    6.  Control of U.S. Airports ............................................ 99

F.  Winter 2019 and Summer 2020 Seasonal Reservations ......................... 101

    1.  Allocation with the IATA WSG...................................... 101

    2.  Slot Usage Waiver – Reduced Passenger Demand.................... 103

G.  USPTO Denies Market-Clearing Patent ................................. 104

H.  The Public's Access to the Public's Airspace at a NJ Airport ................. 105

I.  Winter 2020 Seasonal Reservations .................................... 106

    1.  Competitive Market Allocation Boycott ............................. 106

    2.  Allocation with the IATA WSG...................................... 107

    3.  Slot Usage Waiver – Reduced Passenger Demand.................... 108

J.  American/JetBlue Northeast Alliance (NEA) .......................... 109

    1.  The making of the NEA agreement.................................. 109

2. The complaint against the NEA ........................................................ 111

3. The trial of the NEA ....................................................................... 113

4. Permanent injunction of the NEA .................................................... 119

5. American Airlines appeal of the permanent injunction of the NEA ........................................................................................ 120

K. Summer 2021 Seasonal Reservations ...................................................... 121

1. Allocation with the IATA WSG ....................................................... 121

2. Slot Usage Waiver – Reduced Passenger Demand ............................ 122

L. American/oneworld Alliance Amendment .............................................. 123

M. Delta/LATAM Alliance Agreement ....................................................... 125

N. Winter 2021 Seasonal Reservations ...................................................... 126

1. Competitive Market Allocation Boycott .......................................... 126

2. Allocation with the IATA WSG ....................................................... 127

3. Slot Usage Waiver – Reduced Passenger Demand ............................ 128

O. Summer 2022 Seasonal Reservations ..................................................... 129

1. Competitive Market Allocation Boycott .......................................... 129

2. Allocation with the IATA WSG ....................................................... 129

3. Slot Usage Waiver – Reduced Passenger Demand ............................ 130

P. Winter 2022 Seasonal Reservations ...................................................... 131

1. Competitive Market Allocation Boycott .......................................... 131

2. Allocation with the IATA WSG ....................................................... 132

3. Slot Usage Waiver – Reduced Passenger Demand ............................ 133

Q. PTAB Denial of Market-Clearing Patent ............................................... 134

R. United/Air Canada Alliance Agreement ................................................ 134

S. Access to South Africa's Airspace ........................................................ 135

T. Access to Cuba's Airspace ........................................................ 135

U. JetBlue/Spirit Merger Agreement .......................................... 137

V. Summer 2023 Seasonal Reservations ...................................... 141

    1. Competitive Market Allocation Boycott ............................ 141

    2. Allocation with the IATA WSG ........................................ 142

    3. Slot Usage Waiver – Reduced Airport Runway Capacity ................. 143

    4. Slot Usage Waiver – Reduced Airspace Capacity ........................... 145

W. Winter 2023 Seasonal Reservations ....................................... 148

    1. Competitive Market Allocation Boycott ............................ 148

    2. JetBlue Complaint Against The Netherlands .................... 148

    3. Allocation with the IATA WSG ........................................ 151

    4. Slot Usage Waiver – Reduced Airspace Capacity ........................... 153

X. JetBlue/Frontier LaGuardia "Divestiture" Agreement ........................... 153

Y. Summer 2024 Seasonal Reservations ...................................... 154

    1. Air Carrier Complaints against the Kingdom of the Netherlands and the E.U ........................ 154

    2. Competitive Market Allocation Boycott ............................ 155

    3. Carriers Respond to their Own Complaint ....................... 156

    4. The United States Approves Countermeasures Against Carrier-Citizens of the Netherlands ........................ 156

    5. Allocation with the IATA WSG ........................................ 157

    6. Slot Usage Waiver – Reduced Airspace Capacity ........................... 158

    7. Slot Usage Waiver – Reduced Airport Runway Capacity ................. 158

VII. PATENT ISSUED FOR ENDRES' MARKET-CLEARING PROCESS BY CANADA ........................................ 159

VIII. ALLOCATION OF FUTURE SEASONAL RESERVATIONS .............. 159

A. Winter 2024 Seasonal Reservations ........................................................ 159

IX. VIOLATIONS ALLEGED .............................................................. 161

A. Agreements between Horizontal Competitors ................................. 161

B. Racketeering .............................................................................. 164

    1. Primary Allocation of Public Airspace Reservations ...................... 164

    2. Management of the Primary Allocation of Public Airspace
    Reservations ...................................................................... 166

C. Money Laundering ..................................................................... 167

    3. Secondary Allocation of Supplier Airspace Reservations ................. 167

    4. Allocation of Consumer Airspace Reservation ................................ 170

    5. Unallocated Supplier Airspace Reservations ................................... 172

    6. Unallocated Consumer Airspace Reservations ................................ 174

D. Carrier Agreements with Government Agency or Other Employers ..... 179

    1. Agreement with United States Government Agency ........................ 179

    2. Agreement with State Agency .......................................................... 180

    3. Contracts for Scheduled Air Service ................................................ 187

E. Separation of Powers ................................................................... 188

F. Unconstitutional Statutes ............................................................. 189

X. REQUEST FOR RELIEF ............................................................... 190

A. Carrier Antitrust Remedies ......................................................... 190

B. RICO Remedies .......................................................................... 193

    1. Monetary Remedy ........................................................................... 193

    2. Structural Remedies ........................................................................ 195

    3. Civil Forfeiture of Private Assets ..................................................... 198

    4. Civil Forfeiture of Public Assets ...................................................... 202

C.   Unlawful Economic Regulation of Air Transportation ........................... 206

D.   Remedies to the U.S. Constitution............................................................. 207

E.   Patents ........................................................................................................ 208

F.   Other ........................................................................................................... 209

XI.       OATH ............................................................................................................ 209

# TABLE OF AUTHORITIES

## Cases

*Air Pegasus of D.C., Inc. v. U.S.*, 424 F.3d 1206 (Fed. Cir. 2005) .................... 112, 119

*Alitalia v. ATPCO*, Case 1:07-cv-00756, ECF 42, Memorandum and Order
(SDNY Sep. 5, 2008), Doc. 442, PE-N1 119 ........................................................ 61

*Exhaustless Inc. v. FAA*, Case 19-1158, Judgment, ECF 1835740 (D.C. Cir.
2020), Doc. 225, PE-G1 236 .................................................................................. 87

*Exhaustless v. FAA*, 931 F.3d. 1209 (D.C. Cir. 2019) ............................................... 118

*Morales v. Trans World Airlines*, 504 U.S. 374 (1992) .............................................. 95

*National Soc'y of Prof. Engineers v. U.S.*, 435 U.S. 679 (1978) .............................. 122

*Spirit Airlines, Inc. v. DOT*, No. 19-1248 (D.C. Cir. 2021), Doc. 82, PE-G1 218 ..... 105

*U.S. Airways v. Sabre*, Case No. 1:11-cv-02725, Opinion and Order, ECF 882
(SDNY Mar. 21, 2017), Doc. 429, PE-N1 31 (remanded on different
grounds No. 17-960 (2d Cir. 2019) ..................................................................... 115

*U.S. et al v. American Airlines and JetBlue Airways*, D. Mass. 1:21-cv-11558,
Findings of Fact and Conclusions of Law, ECF 344 (May 19, 2023),
Doc. 224, PE-I2 320 ............................................................ 21, 24, 111, 119

*U.S. et al v. JetBlue Airways and Spirit Airlines*, Case 1:23-cv-10511-WGY,
Findings of Fact and Conclusions of Law, ECF 461 (Jan. 16, 2024) ............ 141

*U.S. v. Causby*, 328 U.S. 256 (1946) ............................................................. 1, 112, 119

*U.S.A. v. Airline Tariff Publishing Company, et al*, Case 1:92-cv-02854, Order
and Final Judgment (D.D.C. Aug. 10, 1994), Doc. 460, PE-N2 254 ............... 63

*U.S.A. v. American Airlines Inc.*, Case 1:92-cv-02854, Settlement Agreement
and Order, ECF 147 (D.D.C. Sep. 23, 2004), Doc. 459, PE-N2 247 ............... 63

## Statutes

5 U.S.C. § 5702 note, Retention of Travel Promotional Items .......................... 76, 118

15 U.S.C. § 15 ................................................................................................. 6

15 U.S.C. § 15(a) ...................................................................................... 7, 191

15 U.S.C. § 15b ............................................................................................... 6

15 U.S.C. § 26 ................................................................................................. 6

18 U.S.C. § 1001 ......................................................................... 179, 201, 206

18 U.S.C. § 1503 ......................................................................... 181, 182, 204

18 U.S.C. § 1952 ......................................................................... 165, 166, 167

18 U.S.C. § 1956(a) ...............................170, 171, 173, 178, 181, 186, 199, 204

18 U.S.C. § 1956(b)(2) ................................................................................... 7

18 U.S.C. § 1956(c) ......165, 168, 170, 172, 173, 175, 181, 182, 183, 184, 185, 203, 204

18 U.S.C. § 1956(h) ............................................................... 181, 186, 203, 204

18 U.S.C. § 1956(j) ......................................................................................... 7

18 U.S.C. § 1961.................................166, 167, 169, 170, 171, 173, 176, 178, 193

18 U.S.C. § 1962...........166, 167, 171, 172, 174, 177, 179, 193, 195, 196, 198, 199, 200

18 U.S.C. § 1964(a) .................................................................. 6, 7, 195, 196, 197

18 U.S.C. § 1964(c) ................................................................................. 6, 194

18 U.S.C. § 1965 .............................................................................................. 8

18 U.S.C. § 641.................................165, 172, 175, 183, 184, 185, 199, 202

18 U.S.C. § 981...................................................................... 200, 203, 205

28 U.S.C. § 1331 .............................................................................................. 7

28 U.S.C. § 1337 .............................................................................................. 7

28 U.S.C. § 1338(b) ......................................................................................... 7

28 U.S.C. § 1346(a)(2) .................................................................................... 7

28 U.S.C. § 1361.............................................................................................. 8

28 U.S.C. § 2202 ......................................................................... 6

33 U.S.C. § 1251 et seq. .............................................................. 5

42 U.S.C. § 7401 et seq. .............................................................. 5

49 U.S.C. §  5501 ....................................................................... 5

49 U.S.C. § 40101(a) .............................8, 13, 180, 184, 187, 188, 201, 206, 208

49 U.S.C. § 40102(a) ................................................................. 115

49 U.S.C. § 40103(a)(1) ........................................................... 8, 85

49 U.S.C. § 40103(a)(2) ............................................................... 1

49 U.S.C. § 40117 ..................................................................... 182

49 U.S.C. § 41101(c) .................................................................... 8

49 U.S.C. § 41713 ........................................... 180, 184, 186, 187, 206

49 U.S.C. § 41714(h)(4) .......................................................... 2, 12

49 U.S.C. § 41718 ..................................................................... 144

49 U.S.C. § 41722 ................................................................ 106, 143

49 U.S.C. § 47101(d) ........................................................... 185, 187

49 U.S.C. § 49101 et seq. ............................................................ 41

49 U.S.C. § 49104(a)(4) ................................................. 92, 189, 207

49 U.S.C. § 49109 ........................................................ 92, 190, 207

51 U.S.C. § 20102(e) .................................................................... 5

Code of Virginia, §5.1-153 ......................................................... 40

Code of Virginia, Chapter 10, § 5.1-156 ..................................... 41

Coronavirus Aid, Relief, and Economic Security (CARES) Act, Pub. L. 116-
   136, Title IV, Subtitle A, 134 Stat. 281, 469 (Mar. 27, 2020)......................... 87

District of Columbia Regional Airports Authority Act of 1985, as amended ........... 40

Patent Number US9,156,564 (2015) ...................................... 5, 208

Patent Number US9,920,695 (2018) ............................................................ 5, 12, 208

Port Authority of New York, Pub. Res. No. 17, S.J. Res. 88 (Aug. 23, 1921) ............ 42

## Other Authorities

A4A Consolidated Reply, Dkt. DOT-OST-2023-0148-0008 (Oct. 18, 2023), Doc.
    418, PE-M 173 ....................................................................................... 156

A4A Industry Review: Allocating Capital to Benefit Customers, Employees,
    and Investors (Jan. 11, 2024), Doc. 446, PE-N2 12 ........................................ 118

A4A Letter to FAA re Slot Usage Waiver (Aug. 7, 2023), Doc. 342, PA-J 172 ........ 147

A4A Protect Our Points, Doc. 451, PE-N1 182 ............................................... 69

A4A Supplemental Information, Dkt. DOT-OST-2023-0148-0011 (Nov. 2,
    2023), Doc. 417, PE-M 165 ...................................................................... 156

A4A Unaddressed, Unsigned Letter (Jul. 13, 2023), Doc. 450, PE-N1 181 .............. 69

A4A Who We Are, Doc. 470, PE-N3 23 ................................................... 60, 65

A4A, Job Posting for Airline Traffic Management Coordinator (Oct. 5, 2022),
    Doc. 195, PE-D3 1 ................................................................................ 117

A4A, Job Posting for Director, Air Traffic Management (Mar. 22, 2023), Doc.
    196, PE-D3 3 ....................................................................................... 117

Abraham Lincoln, Gettysburg Address (Nov. 19, 1863). ................................... 44

ACI-NA Leadership, Doc. 493, PE-N4 14 ..................................................... 43

Agreement with the U.S. Department of Transportation Regarding Northeast
    Alliance Between American Airlines, Inc. and JetBlue Airways
    Corporation, dated January 10, 2021, Doc. 75, PE-D1 204 ............................... 110

Air France-KLM Website, Shareholding Structure, Doc. 473, PE-N3 82 ................. 26

Airline associations statement on benefit of global alignment of airport slot
    regulations (Jun. 15, 2023), Doc. 314, PE-D3 411 ......................................... 152

Airlineinfo.com, OST Docket Filings for December 26, 2019, Doc. 39, PE-E 54 ..... 107

Airlines Clearinghouse Board of Directors, Doc. 435, PE-N1 90 ........................... 66

Airlines Clearinghouse Members, Doc. 432, PE-N1 78 .............................................. 65

Airlines Clearinghouse Net Settlement Website, Doc. 436, PE-N1 93 ............... 65, 77

Airlines Reporting Corporation - About ARC, Doc. 461, PE-N1 207 ......................... 63

Airports Council International-North America Members (printed Aug. 8, 2023), Doc. 343, PE-J 174 ................................................................... 91

Alaska Air SEC Form 10-K (Feb. 14, 2024) ................................................ 21, 31, 88

All Direct Travel Services Inc. et al v. Delta Air Lines Inc. et al, Case 8:01-cv-00902, Delta Statement, ECF 127 (Apr. 29, 2003), Doc. 479, PE-N3 91 ...... 115

Amazon SEC Form 10-K (Feb. 2, 2024) ..................................................... 23

American Airlines Answer, Dkt. DOT-OST-2023-0148-0004 (Oct. 13, 2023), Doc. 414, PE-M 141 .................................................................................. 156

American Airlines *et al* Motion for Antitrust Immunity for Amended Joint Business Agreement, Dkt. DOT-OST-2008-0252 (Dec. 21, 2018), Doc. 325, PE-D2 152 ................................................................................. 124

American Airlines Group, Inc. SEC Form 10-K (Feb. 28, 2014) ............................... 82

American Airlines letter to FAA re system constraints (Mar. 22, 2023), Doc. 384, PE-J 237 ............................................................................... 146

American Airlines SEC Form 10-K (Feb. 21, 2024) ........................................ 76, 88

American Airlines SEC Form 8-K, Investor Presentation (Mar. 4, 2024), Doc. 495, PE-N4 25 ................................................................................. 76, 120

AMR Corporation SEC Form 10-K (Feb. 15, 2012) ............................................. 82

Answer of the Dutch Government, Ministry of Infrastructure and Water Management, Dkt. DOT-OST-2023-0028 (Mar. 7, 2023), Doc. 345, PE-J 203 ........................................................................................... 149

ARC Board of Directors, Doc. 430, PE-N1 69 .............................................. 64

ARC Corporate Intelligence, Doc. 465, PE-N2 421 ........................................ 63

Atlas Air Worldwide Holdings, Inc. SEC Form 10-K (Feb. 23, 2023) ...................... 83

Atlas Air Worldwide Holdings, Inc. SEC Form 8-K (Aug. 4, 2022) ........................ 34

Atlas Air Worldwide Holdings, Inc. SEC Form 8-K (Mar. 17, 2023) ................... 34, 83

ATPCO Directors, Doc. 443, PE-N2 1 .......................................................... 62

ATPCO Owners, Doc. 439, PE-N1 111............................................................ 62

Bureau of Transportation Statistics of the Department of Transportation,
    Transportation Statistics Annual Report 2022, 1-18, Doc. 302, PE-A2
    254 ........................................................................................................... v

Cargo Airlines Ass'n Answer, Dkt. DOT-OST-2023-0148-0006 (Oct. 13, 2023),
    Doc. 416, PE-M 162 ................................................................................ 156

Centre for Aviation, "Recovery for All of Us: Mayor de Blasio, Representative
    Meeks, Borough President Richards Announce Foundation for JFK
    Airport Construction, Over 20,000 Jobs" (Feb. 23, 2021), Doc. 485, PE-
    N3 165....................................................................................................... 96

Charles E. Schumer, et al., Your Flight Has Been Delayed, Report by the
    Joint Economic Committee Majority Staff (May 2008), Doc. 1, PE-A1 1 ......... 9

Clarification of Departmental Position on American Airlines - JetBlue
    Airways Northeast Alliance Joint Venture, Dkt. DOT-OST-2021-0001-
    0023 (Sep. 21, 2021), Doc. 108, PE-D1 229 ...................................... 112

Complaint of JetBlue Airways Corporation, Dkt. DOT-OST-2023-0028 (Sep.
    28, 2023) Doc. 406, PE-M 16 .............................................................. 155

Conyers Dill & Pearman Press Release (Mar 2023), Doc. 500, PE-N4 347 ............. 82

Delta Air Lines letter to FAA re system constraints (Mar. 21, 2023), Doc. 383,
    PE-J 235 ................................................................................................ 146

Delta Air Lines, Inc. and LATAM Airlines Group, S.A., Joint Application for
    Approval of and Antitrust Immunity for Alliance Agreements, Dkt.
    DOT-OST-2020-0105-0001 (Jul. 8, 2020), Doc. 151, PE-D1 243................... 125

Delta Air Lines, Inc. SEC Form 10-K (Feb. 10, 2023)................................... 26, 77, 78

Delta Air Lines, Inc. SEC Form 10-K (Feb. 15, 2008).................................... 81

Delta Air Lines, Inc. SEC Form 10-K (Mar. 27, 2006).................................... 81

Delta SEC Form 10-K (Feb. 12, 2024) .................................................... 88, 98, 100

Delta-WestJet Application for Antitrust Immunity for Alliance Agreements,
    Dkt. DOT-OST-2018-0154 (Oct. 10, 2018), Doc. 326, PE-D2 261 at 265 ........ 89

DOJ Email, Notice of Production to Defendants in U.S. v JetBlue and Spirit (Mar. 13, 2023), Doc. 380, PE-I1 668................................................................. 140

DOJ Email, Notice of Protective Order (Jan. 14, 2022), Doc. 125, PE-I1 43 .......... 112

DOJ Email, Notice of Stipulated Protective Order (Apr. 20, 2022), Doc. 379, PE-I1 666......................................................................................................... 113

DOJ Email, Notice of Stipulated Protective Order (Mar. 22, 2023), Doc. 381, PE-I1 670......................................................................................................... 140

DOJ Press Release, "Senior Operations Executive Pleads Guilty To Defrauding International Cargo Airline Employer" (Jan. 16, 2024), Doc. 498, PEN4 322 ....................................................................................... 25

DOJ Press Release, "Chief Operating Officer And Vice President Of International Cargo Airline Plead Guilty To Defrauding Their Employer" (Feb. 29, 2024), Doc. 497, PE-N4 319 ............................................. 25

DOT List of Active Antitrust Immunized Alliances (Oct. 19, 2022), Doc. 287, PE-D3 380.................................................................. 18, 20, 24, 26, 27, 31, 34, 37

Email from ATPCO (Dec. 10, 2019), Doc. 501, PE-N4 350 ..................................... 62

Email from ATPCO (Nov. 11, 2019), Doc. 502, PE-N4 352....................................... 62

Email to ATPCO (Nov. 19, 2019), Doc. 503, PE-N4 354 .......................................... 62

Endres v. Moody et al, Case 1:23-cv-12051, Defendants' Memorandum of Law, ECF 121 (D.Mass. Dec. 8, 2023), Doc. 425, PE-N1 1.. 19, 20, 22, 24, 27, 28, 29, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 42, 44, 53

Excerpts from CAB Reports Economic Cases Dec 1969 to Apr 1970, OMB Control 2120-0524, ICR 202108-2120-002 (Sep. 20, 2021), Doc. 98, PE-H 121 ........................................................................................................... 57

Exhaustless Airport Slot Auction Notice for Summer 2023, Dkt. DOT-OST-2001-9849-0193 (Jul. 29, 2022), Doc. 177, PE-E 158 ..................................... 142

Exhaustless Airport Slot Auction Notice for Winter 2023, Dkt. DOT-OST-2001-9849-0195 (Feb. 17, 2023), Doc. 203, PE-E 171 .................................... 148

Exhaustless Announcement of Slot Auction for Summer 2022, Dkt. DOT-OST-2001-9849-0187 attachment 1/6 (Aug. 19, 2021), Doc. 94, PE-E 101 .......................................................................................................... 129

Exhaustless Announces Auction of Frequencies for Scheduled Services to Havana, Dkt. DOT-OST-2016-0021-1427 (May 5, 2022), Doc. 160, PE-E 153 ................................................................................................................ 136

Exhaustless Announces Auction of Frequencies to Cuba, Dkt. DOT-OST-2001-9849-0190 (Apr. 19, 2022), Doc. 158, PE-E 148 ..................................... 136

Exhaustless Attached Auction Documents, Dkt. DOT-OST-2001-9849-0187 (Aug. 19, 2021) .................................................................................................. 129

Exhaustless Auction of Airspace Reservations to South Africa, Dkt. DOT-OST-2001-9849-0188 (Mar. 30, 2022), Doc. 141, PE-E 144 ........................... 135

Exhaustless Aviation 2.0 Explained, Dkt. DOT-OST-2019-0144-0019 attachment 4/5 (Dec. 24, 2019), Doc. 37, PE-E 4 ............................................. 107

Exhaustless Aviation 2.0 Licensing Agreement – Carrier (v8.1), Dkt. DOT-OST-2001-9849-0195 (Feb. 17, 2023), Doc. 204, PE-E 178 ............................ 148

Exhaustless Comment, Dkt. FAA-2001-9854-0127 (Jan. 7, 2022), Doc. 124, PE-E 103 .............................................................................................................. 131

Exhaustless Comment, Dkt. FAA-2020-0862-0354/0351 (Mar. 7, 2022), Doc. 136, PE-B1 161 ............................................................................................... 130

Exhaustless Documentation of IATA WSG Calendar of Coordination History, Doc. 14, PE-D1 1 .......... 17, 56, 101, 107, 114, 121, 127, 129, 132, 141, 142, 151

Exhaustless Email to DOJ (May 10, 2022), Doc. 149, PE-I2 7 ................................. 112

Exhaustless FOIA Request for Information from Schedule Reduction Meetings Held in Private, Dkt. DOT-OST-2021-0103-0049 (Jul. 14, 2022), Doc. 147, PE-B2 195 ...................................................................................... 106

Exhaustless FOIA Request Use of Government Aircraft (Mar. 6, 2023), Doc. 21, PE-B2 73 ..................................................... 18, 102, 121, 127, 130, 132, 143

Exhaustless Inc. Objection, Dkt. FAA-2020-0862-0018 (Sep. 16, 2020), Doc. 54, PE-B1 37 ................................................................................................. 108

Exhaustless Inc. Objection, Dkt. FAA-2020-0862-0321 (Sep. 27, 2021), Doc. 104, PE-B1 122 .............................................................................................. 128

Exhaustless Inc. Petition for Rulemaking, Dkt. FAA-2018-0481-0001 (May 21, 2018), Doc. 12, PE-B2 66 ...................................................................................... 17

Exhaustless Inc. Unsolicited Proposal Aviation 2.0 – NYC Market Trial (Sep. 19, 2017), Doc. 10, PA-C Offer 33 ...................................................................... 16

Exhaustless Inc. Unsolicited Proposal Aviation 2.0 (Jan. 15, 2016), Doc. 5, PA-C Offer 1 ........................................................................................................ 15

Exhaustless Inc. v. FAA, D.C. Cir. Case 18-1303, Brief for Respondent, ECF 1778181 (Mar. 18, 2019), Doc. 26, PE-G1 87 .................................................... 85

Exhaustless Inc. v. FAA, D.C. Cir. Case 18-1303, Joint Appendix, ECF 1771626 (Feb. 1, 2019), Doc. 243, PE-G3 1 ...................................................... 84

Exhaustless Inc. v. FAA, D.C. Cir. Case 18-1303, Petitioner's Amended Opening Brief, ECF 1773615 (Feb. 15, 2019), Doc. 25, PE-G1 1 ................... 84

Exhaustless Inc. v. FAA, D.C. Cir. Case 18-1303, Petitioner's Reply Brief, ECF 1780513 (Apr. 1, 2019), Doc. 242, PE-G1 503 .......................................... 84

Exhaustless Inc. v. FAA, D.C. Cir. Case 19-1158, Joint Appendix, ECF 1815348 (Nov. 12, 2019), Doc. 227, PE-G2 1 .................................................... 17

Exhaustless Inc. Workpaper IATA BOGs, Doc. 402, PE-L 26 ................................... 47

Exhaustless Internal Transcript of Oral Argument, D.C. Cir. Case 18-1303, Doc. 255, PE-G1 709 ........................................................................................ 84

Exhaustless Notice of Claim (May 8, 2020), Doc. 350, PE-J 220 .............................. 97

Exhaustless Notice of Results of Auction of Airport Schedules for Summer 2023, Dkt. DOT-OST-2001-9849-0194 (Aug. 24, 2022), Doc. 178, PE-E 165 ...................................................................................................................... 142

Exhaustless Notice of Results of Auction of Airport Schedules for Summer 2024, Dkt. DOT-OST-2023-0148-0010 (Oct. 30, 2023), Doc. 420, PE-M 188 ...................................................................................................................... 156

Exhaustless Notice of Results of Auction of Airport Schedules for Winter 2023, Dkt. DOT-OST-2001-9849-0196 (Mar. 17, 2023), Doc. 209, PE-E 219 ...................................................................................................................... 148

Exhaustless Objection to the Delta-LATAM Alliance, Dkt. DOT-OST-2020-0105-0045 (Feb. 7, 2022), Doc. 152, PE-D1 366 .............................................. 126

Exhaustless Objection, Dkt. DOT-OST-2008-0252 (Nov. 30, 2020), Doc. 65, PE-D1 110 ........................................................................................................ 125

Exhaustless Objection, Dkt. DOT-OST-2018-0154-0053 (Nov. 9, 2020), Doc.
60, PE-D1 52................................................................................................ 90

Exhaustless Objection, Dkt. DOT-OST-2020-0037 (Apr. 2, 2020), Doc. 340,
PE-B1 405.................................................................................................. 88

Exhaustless Objection, Dkt. DOT-OST-2021-0001, 3 (Oct. 7, 2021), Doc. 106,
PE-D1 218................................................................................................. 112

Exhaustless Objection, Dkt. FAA-2013-0259-2815 (Mar. 28, 2020), Doc. 42,
PE-B2 111................................................................................................. 104

Exhaustless Objection, Dkt. FAA-2020-0862-0255 (Dec. 28, 2020), Doc. 71,
PE-B1 69.................................................................................................. 122

Exhaustless Response, Dkt. DOT-OST-2023-0028 (Mar. 13, 2023), Doc. 346,
PE-J 207 ................................................................................................. 150

Exhaustless Slot Auction Design Winter 2023, Dkt. DOT-OST-2001-9849-
0195 (Feb. 17, 2023), Doc. 205, PE-E 193 ...................................... 148

Exhaustless Slot Auction Notice for Summer 2024, Dkt. DOT-OST- 2023-
0148-0003 (Oct. 12, 2023), Doc. 408, PE-M 82................................ 155

Exhaustless Slot Auction Rules and Procedures Winter 2023, Dkt. DOT-OST-
2001-9849-0195 (Feb. 17, 2023), Doc. 206, PE-E 201 ..................... 148

Exhaustless Update to DOJ (May 10, 2022), Doc. 148, PE-I2 3 ........................... 112

Exhaustless Winter 2023 Airport Slot Auction Prepayment Form, Dkt. DOT-
OST-2001-9849-0195 (Feb. 17, 2023), Doc. 208, PE-E 218 ........................ 148

Exhaustless Winter 2023 Auction Registration doc ver. 1.1, Dkt. DOT-OST-
2001-9849-0195 (Feb. 17, 2023), Doc. 207, PE-E 215 .................................... 148

Expedia Group, Inc. SEC Form 10-K (Feb. 10, 2023) ........................................... 115

Exploring Industry Practices on Distribution and Display of Airline Fare,
Schedule, and Availability Information, 81 Fed. Reg. 75481 (Oct. 31,
2016), Doc. 7, PE-B2 35 ........................................................... 68

FAA Construction Related Relief Concerning Operations at [DCA, JFK, LGA,
EWR], 87 Fed. Reg. 79245 (Dec. 27, 2022), Doc. 201, PE-B1 187................. 144

FAA Construction Related Relief Concerning Operations at [DCA, JFK, LGA,
EWR], 89 Fed. Reg. 4802 (Jan. 25, 2024), Doc. 452, PE-N2 59..................... 159

FAA COVID–19 Related Relief Concerning Operations at [ORD, JFK, LAX, EWR, LGA, DCA SFO] for the Summer 2022 Scheduling Season, 87 Fed. Reg. 11805 (proposed Mar. 2, 2022), Doc. 135, PE-B1 155 ................... 130

FAA COVID–19 Related Relief Concerning Operations at [ORD, JFK, LAX, EWR, LGA, DCA SFO] for the Summer 2022 Scheduling Season, 87 Fed. Reg. 18057 (Mar. 29, 2022), Doc. 137, PE-B1 166 ................................. 131

FAA COVID-19 Related Relief Concerning Operations at [ORD, JFK, LAX, EWR, LGA, DCA, SFO] for the Summer 2021 Scheduling Season, 85 Fed. Reg. 83672 (proposed Dec. 22, 2020), Doc. 70, PE-B1 65 ...................... 122

FAA COVID-19 Related Relief Concerning Operations at [ORD, JFK, LAX, EWR, LGA, DCA, SFO] for the Winter 2020/2021 Scheduling Season, 85 Fed. Reg. 57288 (proposed Sep. 15, 2020), Doc. 53, PE-B1 32 ................ 108

FAA COVID-19 Related Relief Concerning Operations at [ORD, JFK, LAX, EWR, LGA, DCA, SFO] for the Winter 2020/2021 Scheduling Season, 85 Fed. Reg. 63335 (Oct. 7, 2020), Doc. 55, PE-B1 39 ................................... 109

FAA COVID-19 Related Relief Concerning Operations at [ORD, JFK, LAX, EWR, LGA, DCA, SFO] for the Winter 2021/2022 Scheduling Season, 86 Fed. Reg. 52114 (proposed Sep. 20, 2021), Doc. 103, PE-B1 115 ............. 128

FAA COVID–19 Related Relief Concerning Operations at [ORD, JFK, LAX, EWR, LGA, DCA, SFO] for the Winter 2021/2022 Scheduling Season, 86 Fed. Reg. 58134 (Oct. 20, 2021), Doc. 121, PE-B1 132 .............................. 128

FAA COVID–19 Related Relief Concerning Operations at [ORD, JFK, LAX, EWR, LGA, DCA, SFO] for the Winter 2022/2023 Scheduling Season, 87 Fed. Reg. 65282 (Oct. 28, 2022), Doc. 180, PE-B1 178 .............................. 134

FAA FOIA Responsive Records for FOIA 2022-09917 (Feb. 23, 2024), Doc. 476, PE-O 4.............................................................................................. 133

FAA High Density Traffic Airports; Slot Allocation and Transfer Methods, 50 Fed. Reg. 52180 (Dec. 20, 1985), Doc. 232, PE-B1 200 .................................. 144

FAA Information Collection Request, OMB Control No: 2120-0524, ICR Reference No: 202108-2120-002, Supporting Statement A (Aug. 26, 2021), Doc. 261, PE-H 283 ....................................................................... 55, 160

FAA Notice of limited waiver of the minimum slot usage requirement, 85 Fed. Reg. 15018, 15019 (Mar. 16, 2020), Doc. 40, PE-B2 106 .......................... 86

FAA Notice of limited waiver of the minimum slot usage requirement, 85
Fed. Reg. 16989 (proposed Mar. 25, 2020), Doc. 41, PE-B2 109 ....... 59, 86, 103

FAA Notice of limited waiver of the minimum slot usage requirement., 85
Fed. Reg. 21500 (Apr. 17, 2020), Doc. 43, PE-B2 116 .................................... 104

FAA Notice of Limited Waiver of the Slot Usage Requirement (Mar. 22,
2023), Doc. 387, PE-J 243 .................................................................................. 146

FAA Notice of Submission Deadline for Schedule Information for [ORD, JFK
LAX, EWR, SFO] for the Winter 2023/2024 Scheduling Season, 88 Fed.
Reg. 22514 (Apr. 13, 2023), Doc. 218, PE-B1 194 ............................................. 56

FAA Notice of Submission Deadline for Schedule Information for [ORD, JFK,
LAX, EWR, SFO] for the Summer 2024 Scheduling Season, 88 Fed.
Reg. 64964 (Sep. 20, 2023), Doc. 427, PE-N1 17 ...................................... 56, 157

FAA Notice of Submission Deadline for Schedule Information for [ORD, JFK,
LAX, SFO] for the Summer 2020 Scheduling Season, 84 Fed. Reg.
51222 (Sep. 27, 2019), Doc. 34, PE-B2 85 ............................................. 59, 93, 95

FAA NYC_Waiver_Extension_FAA_8-8-23, Doc. 353, PA-J 224 ............................. 147

FAA Part 139 Airport Certification Status List (ACSL) (Feb. 22, 2024), Doc.
486, PE-N3 167 ............................................................................................. 42, 43

FAA PFC Approved Locations, Collections, and Expiration Dates (as of
January 30, 2024), Doc. 466, PE-N2 432 ......................................................... 98

FAA Policy Statement: COVID-19 Related Relief at [ORD, JFK, LAX, EWR,
LGA, DCA, SFO] for the Summer 2021 Scheduling Season, Dkt. FAA-
2020-0862-0302 (Jan. 14, 2021), Doc. 72, PE-B1 71 ...................................... 123

FAA PR, Fed. Reg. Notice of Limited Waiver of Slot Usage Requirement for
Summer 2023 (Mar. 22, 2023), Doc. 386, PE-J 241 ...................................... 146

FAA Press Release, FAA Aviation Safety Summit Breakout Panels (Mar. 15,
2023), Doc. 382, PA- J 232 .............................................................................. 145

FAA Press Release, FAA Extends Flexibility for Airlines (Aug. 9, 2023), Doc.
352, PA-J 223 ................................................................................................... 147

FAA Slot Administration Email (Jan. 29, 2021), Doc. 20, PE-B1 19 ......................... 58

FAA Staffing Related Relief Concerning Operations at [DCA, JFK, LGA,
EWR], 88 Fed. Reg. 18032 (Mar. 27, 2023), Doc. 210, PE-B1 190 ............... 146

FAA Staffing-Related Relief Concerning Operations at [DCA, JFK, LGA, EWR] Through October 26, 2024, 88 Fed. Reg. 64793 (Sep. 20, 2023), Doc. 489, PE-N3 187 ................................................................... 153

Frequent Flyer Redemption Example, Doc. 438, PE-N1 109 ..................................... 78

Frontier Press Release, JetBlue and Frontier Announce Divestiture Agreement in Connection with JetBlue's Combination with Spirit (Jun. 1, 2023), Doc. 324, PE-D2 150 ...................................................... 153

Frontier SEC Form 10-K (Feb. 20, 2024)......................................................... 88

Graham Newton, IATA Airlines Magazine, v2024-01, "Giving airline data back to the airlines," Doc. 482, PE-N3 147 ...................................... 161

GSA Federal Travel Regulation; Using Promotional Materials and Frequent Traveler Programs, 67 Fed. Reg. 17946 (Apr. 12, 2002), Doc. 197, PE-B2 208 ........................................................................................ 118

GSA Federal Travel Regulation; Using Promotional Materials; Conference Planning, 68 Fed. Reg. 27936 (May 22, 2003), Doc. 198, PE-B2 210............ 118

GSA FY23 CPP Request for Proposal (Feb. 17, 2022), Doc. 185, PE-H 153...... 74, 116

GSA Press Release, FY23 City Pair Contracts Awarded for Official Government Travel (Jul. 12, 2022), Doc. 186, PE-H 273 ............................... 74

Hawaiian SEC Form 10-K (Feb. 15, 2024) ..................................... 22, 30, 88

Hawaiian SEC Form 8-K (Oct. 20, 2022)................................................... 23

IATA 150th Slot Conference – Organizations attending (Jun. 13, 2022), Doc. 231, PE-D3 10........................................................................... 58, 133

IATA 152nd Slot Conference – Organizations attending (Jun. 11, 2023), Doc. 254, PE-D3 18................................................... 58, 91, 97, 120, 152

IATA 153rd Slot Conference (Dubai, United Arab Emirates, 14 - 17 November 2023) Program (Nov. 6, 2023), Doc. 422, PE-M 207 ................... 158

IATA Act of Incorporation, Doc. 400, PE-L 11............................................. 46

IATA Articles of Association (undated, unsigned), Doc. 399, PE-L 1........................ 46

IATA Business Registration Quebec (July 2023), Doc. 403, PE-L 40........................ 49

IATA Calendar of Coordination (Nov. 2023), Doc. 426, PE-N1 16 .......... 157, 158, 160

IATA Code Share Example, Doc. 440, PE-N1 115 ........................................ 79

IATA Exchange Rates File Comparison, Doc. 454, PE-N1 194 ................................ 70

IATA Industry restart: Forming new interline partnerships within the
multilateral interline framework (May 19, 2020), Doc. 312, PE-J 4 ............ 109

IATA ISPG Block Space Agreement Invoice Example, Doc. 444, PE-N1 136 .......... 73

IATA Joint Venture Invoice Example, Doc. 462, PE-N1 209 .................................... 79

IATA Managing Scarce Airport Capacity: Airport Slots & Worldwide Slot
Guidelines (WSG) Fact Sheet (Dec. 2019), Doc. 305, PE-D3 403 .................... 54

IATA Membership Dues, Doc. 441, PE-N1 118 .......................................... 46

IATA Press Release, Airline Associations Join Together to Call for Global
Alignment of Slot Regulations (Jun. 15, 2023), Doc. 313, PE-D3 410 .......... 152

IATA Press Release, Aviation Leaders Assemble in Istanbul for IATA's 79th
AGM (Jun. 2, 2023), Doc. 316, PE-J 12 ................................................ 52

IATA Press Release, Industry Collaboration Brings New Era for Airport Slot
Allocation (June 3, 2019), Doc. 32, PE-D1 12 .................................... 90

IATA Resolution on Slot Policy, 75th Annual General Meeting (Jun. 2, 2019),
Doc. 304, PE-D3 401 ........................................................ 52

IATA Rules and Regulations of the Board of Governors (undated), Doc. 401,
PE-L 14 ........................................................................ 46

IATA Slot Conference, Form 1 - Accreditation of Head Delegate, Doc. 404,
PE-L 53 ........................................................................ 58

IATA TACT Air Cargo Solutions, Doc. 448, PE-N1 154 ................................ 68, 71

IATA Website, Annual General Meeting (printed Aug. 1, 2023), Doc. 329, PE-
J 13 ............................................................................ 52

IATA Worldwide Airport Slots Fact Sheet (Apr. 2023), Doc. 306, PE-D3 405 .......... 54

IATA Worldwide Slot Guidelines, 9th Edition (Effective Jan. 1, 2019), Dkt.
FAA-2020-0862 (Dec. 17, 2020),
Doc. 69, PE-D1 136 .................................... 53, 55, 57, 58, 60, 90, 122, 143, 149

IATA, How to get the most out of attending the Slot Conference (March
2022), Doc. 338, PE-J 168 .......................................................... 56, 143

ICH IATA Member Airlines Application (Aug. 2015), Doc. 437, PE-N1 97 ........ 70, 77

JetBlue Airways Complaint, Dkt. DOT-OST-2023-0028 (Feb. 14, 2023), Doc. 344, PE-J 182 .................................................................................................. 149

JetBlue Airways Corporation SEC Form 10-K (Feb. 27, 2023) ............. 75, 76, 77, 138

JetBlue Airways Corporation SEC Form 10-Q (Aug. 1, 2023)................................. 138

JetBlue Airways Corporation SEC Form 10-Q, Exhibit 10.3, Northeast Alliance Agreement between American Airlines, Inc. and JetBlue Airways Corp. (Nov. 9, 2020), Doc. 322, PE-D2 1 ............................................ 109

JetBlue Airways Corporation SEC Form 8-K (Oct. 24, 2022)................................. 150

JetBlue Comment, Dkt. FAA-2020-0862 (Sep. 23, 2020), Doc. 334, PA-J 144........ 161

JetBlue Reply, Dkt. DOT-OST-2023-0028-0031 (Oct. 20, 2023), Doc. 419, PE-M 177 ................................................................................................................. 156

JetBlue request to withdraw complaint, Dkt. DOT-OST-2023-0028 (Jun. 5, 2023), Doc. 347, PE-J 216 ............................................................................... 150

JetBlue SEC Form 10-K (Feb. 12, 2024)................................................................ 88

Joint Complaint of Members of Airlines for America, Inc., Dkt. DOT-OST-2023-0148-0001 (Sep. 25, 2023), Doc. 405, PE-M 1 ................................. 59, 154

JPMorgan Chase & Co., 2022 SEC Form 10-K (Feb. 21, 2023)................................ 77

KLM Airlines Answer, Dkt. DOT-OST-2023-0148-0005 (Oct. 13, 2023), Doc. 415, PE-M 147 ................................................................................................ 156

LATAM Airlines Group S.A., Case 1:20-bk-11254, Debtor's Motion, ECF 5669-2 (SDNY Jun. 24, 2022), Doc. 463, PE-N2 272 ....................................... 82

LATAM Airlines Group S.A., Case 1:20-bk-11254, Exhibit B Omnibus Commitment Letter, ECF 5669-2, Doc. 464, PE-N2 292................................. 82

Lease of the Metropolitan Washington Airports between the U.S.A. acting by and through the Secretary of Transportation and the Metropolitan Washington Airports Authority (Mar. 2, 1987), amend. 1 (1991), amend. 2 (1998), amend. 3 (2003) and amend. 4 (2013), Doc. 308, PE-A1 295 ............................................................................................................... 41

Letter from PANYNJ Claims Division (Jul. 17, 2020), Doc. 351, PE-J 222............. 97

Michael Ball, et al., Total Delay Impact Study, National Center of Excellence for Aviation Operations Research ("NEXTOR") (Nov. 3, 2010), Doc. 2, PE-A1 35 ............................................................................................ 10, 194

Mike Robuck, *AT&T targets $10M airport connectivity deal* Mobile World Live (May 5, 2023), Doc. 458, PE-N1 204 ........................................... 67

MWAA 2022 Annual Comprehensive Financial Report (Mar. 29, 2023) ................. 93

MWAA Comment re ACIP, Dkt. ID. FAA-2022-1204-0011 (Apr. 4, 2023), Doc. 468, PE-N3 15 .......................................................................................... 99

MWAA Press Release, Airports Authority and United Airlines Execute Long-Term Lease at Dulles International (Sep. 13, 2017), Doc. 483, PE-N3 149 ...................................................................................................... 98

National Assoc. of Attorneys General, Letter to Congress Re: Support for Reforming Pharmacy Benefit Managers (Feb. 20, 2024), Doc. 491, PE-N4 6 ......................................................................................................... 39

National Assoc. of Attorneys General, Letter to Congress Re: Support for the State Antitrust Enforcement Venue Act of 2021 (Jun. 18, 2021), Doc. 490, PE-N4 1 ........................................................................................... 39

National League of Cities, "The City of Newark Solves a Big Problem" (Feb. 23, 2018), Doc. 494, PE-N4 21 ........................................................... 40

New York State Office of the State Comptroller, Division of State Government Accountability, Report 2014-S-28 at 1 (April 2017), Doc. 480, PE-N3 124 ................................................................................... 96

New York Transportation Development Corporation, Director's Meeting (Aug. 18, 2020), Doc. 471, PE-N3 34 ................................................ 99, 100

Newark Liberty International Airport, Airline Competition Plan Update (Feb. 1, 2013), Doc. 484, PE-N3 151 .................................................... 98

Notice of Action Taken re: American Airlines, Inc. and JetBlue Airways Corp., Dkt. DOT-OST-2016-0021-1436 (Sep. 19, 2022), Doc. 162, PE-F 94 ........................................................................................................ 137

Notice of Action Taken re: Delta Air Lines, Dkt. DOT-OST-2016-0021-1442 (Oct. 18, 2022), Doc. 164, PE-F 100 ................................................... 137

Notice of Action Taken re: JetBlue Airways Corp., Dkt. DOT-OST-2016-0021-1447 (Mar. 17, 2023), Doc. 165, PE-F 104 ................................... 137

Notice of Action Taken re: Mesa Airlines, Inc., Dkt. DOT-OST-2016-0021-1435 (Sep. 19, 2022), Doc. 163, PE-F 97.......................................................... 137

Notice of Market-based Actions to Relieve Airport Congestion and Delay, 66 Fed. Reg. 43947 (proposed Aug. 21, 2001), Doc. 337, PE-B1 225...................... 3

Notice Suspending US-Cuba Scheduled Services via Non-Havana Points, Dkt. DOT-OST-2016-0021-1410 (Oct. 25, 2019), Doc. 156, PE-F 75............. 135

NY Contract Award (Feb. 15, 2022), Doc. 187, PE-H 274........................................ 115

NYC Council, "National League of Cities Convening" (Apr. 28, 2017), Doc. 492, PE-N4 12 ...................................................................... 39

OneAlpha Technologies Webpage, Doc. 477, PE-N3 83 .......................................... 133

OneAlpha Technologies, Our Difference webpage, Doc. 478, PE-N3 87 ................. 133

Open Skies Partners, Bureau of Economic and Business Affairs (Sep. 1, 2020), Doc. 303, PE-A1 289.................................................................. 14

Order 2017-4-6 (Apr. 10, 2017), Doc. 9, PE-B2 43......................................................... 3

Order 2020-10-13 (proposed Oct. 23, 2020), Doc. 59, PE-D1 14 ................................ 89

Order 2020-11-14 (Nov. 17, 2020), Doc. 157, PE-F 78................................................ 135

Order 2020-11-9 (proposed Nov. 16, 2020), Doc. 64, PE-D1 92 ............................... 124

Order 2020-12-17 (Dec. 21, 2020), Doc. 63, PE-D1 90................................................. 90

Order 2020-3-10 (proposed Mar. 27, 2020), Doc. 339, PE-B1 229 ............................. 87

Order 2020-4-2 (Apr. 7, 2020), Doc. 341, PE-B1 407.................................................... 88

Order 2022-5-17 (May 19, 2022), Doc. 159, PE-F 81.................................................. 136

Order 2022-6-1 (Jun. 1, 2022), Doc. 161, PE-F 89...................................................... 136

Order 2022-7-1, (Jul. 5, 2022), Doc. 134, PE-F 58...................................................... 106

Order 2022-7-18 (Jul. 26, 2022), Doc. 174, PE-F 115................................................. 135

Order 2022-9-20 (Sep. 30, 2022), Doc. 155, PE-D1 413............................................. 126

Order 2023-11-6 at 4 (Nov. 2, 2023), Doc. 421, PE-M 196 ....................................... 157

Order 2023-6-21 (Jun. 27, 2023), Doc. 348, PE-J 218 ............................................... 151

Order Extending Order Limiting Operations at John F. Kennedy
International Airport, 83 Fed. Reg. 46865 (Sep. 17, 2018), Doc. 22, PE-
B1 23 ................................................................................................... 60, 84

Order Extending Order Limiting Operations at New York Laguardia (*sic*)
Airport, 83 Fed. Reg. 47065 (Sep. 18, 2018), Doc. 23, PE-B1 26 .................... 84

PANYNJ Comment re ACIP, Dkt. ID. FAA-2022-1204-0012 (Apr. 4, 2023),
Doc. 469, PE-N3 20 ............................................................................... 99

PANYNJ Comment, Dkt. FAA-2020-0385-0004 (Aug. 23, 2023) .............................. 56

PANYNJ Press Release, "Newark Liberty International Airport's Terminal A
Celebrates One-Year Anniversary (Jan. 12, 2024)," Doc. 472, PE-N3 78..... 100

PANYNJ, Press Release Number: 131-2021 (Dec. 15, 2021), Doc. 487, PE-N3
177 ...................................................................................................... 99

Patent Application US15/789,585 (Aug. 19, 2016) ..................................................... 15

Request for Information from Sen. Ted Cruz, ranking member of the Senate
Committee on Commerce, Science, and Transportation, to John Potter,
CEO of MWAA (Dec. 19, 2023), Doc. 428, PE-N1 20 ........................................ 94

Royal Schiphol Group, Corporate Governance Website, Doc. 488, PE-N 184........... 99

San Francisco Board of Supervisors, Notification of Contract Approval (Aug.
3, 2012), Doc. 392, PE-J 261 ............................................................... 91

San Francisco International Airport, Competition Plan Update (Aug. 2001),
Doc. 391, PE-J 250 ............................................................................. 91

Settlement Agreement among Spirit Airlines, Inc., JetBlue Airways Corp.,
and the Attorney General of Florida (Mar. 6, 2023), Doc. 214, PE-I2
266 .................................................................................................... 139

SITA Activity Report 2022, Doc. 455, PE-N2 62 ................................................. 66, 67

SITA Annual Financial Report for 2022 (Jun. 27, 2023), Doc. 456, PE-N2 148 ....... 68

SITA Membership, Doc. 457, PE-N1 197 ................................................................... 66

Slot Management and Transparency for LaGuardia Airport, John F. Kennedy
International Airport, and Newark Liberty International Airport, 80
Fed. Reg. 1274 (proposed Jan. 8, 2015), Doc. 3, PE-B2 1 .......................... 12, 13

Southwest Airlines Comment, Dkt. FAA-2020-0862 (Dec. 29, 2020), Doc. 332, PA-J 129 .................................................................................................... 161

Southwest SEC Form 10-K (Feb. 6, 2024) ................................................... 88

Spirit Airlines Comment, Dkt. FAA-2020-0862 (Dec. 29, 2020), Doc. 333, PA-J 134 ......................................................................................................... 161

Spirit Airlines Complaint, Attachment 1/2, Dkt. DOT-OST-2021-0001 (Jan. 7, 2021), Doc. 328, PE-D2 503 .................................................................... 110

Spirit Airlines Supplement to Complaint, Dkt. DOT-OST-2021-0001 (May 12, 2021), Doc. 327, PE-D2 366 .................................................................... 137

Spirit Airlines, Inc. SEC Form 10-K (Feb. 6, 2023).................................... 153

Spirit Airlines, Inc. SEC Form 8-K/A, Agreement and Plan of Merger, Exhibit 2.1 (filed Aug. 16, 2022), Doc. 323, PE-D2 39 .................................... 138

Spirit Airlines, Inc. v. DOT, D.C. Cir. No. 19-1248, Petition for Review, ECF 1818212 (Nov. 25, 2019), Doc. 234, PE-G1 239.................................... 105

Spirit Airlines, Inc. v. DOT, D.C. Cir. No. 19-1248, Petitioner's Final Opening Brief, ECF 1849058 (Jun. 26, 2020), Doc. 235, PE-G1 247 .................... 105

Spirit SEC Form 8-K (Feb. 22, 2024) .......................................................... 88

Steve Endres, Congestion-free Flights for NYC Now, LinkedIn (May 28, 2018), Doc. 13, PE-E 1 .............................................................................. 17

Testimony of JetBlue CEO, Robin Hayes, D. Mass. Case 1:21-cv-11558, ECF 299, pp. 1-90 (Sep. 28, 2022), Doc. 377, PE-I1 511 .......................... 113

Testimony of JetBlue Corporate Sales Manager, Barry McMenamin, D. Mass. Case 1:21-cv-11558, ECF 299 pp. 1-4 and 204-242 (Sep. 28, 2022), Doc. 184, PE-I1 208 ......................................................................................... 116

Testimony of JetBlue Pricing Manager, Evan Jarashow, D. Mass. Case 1:21-cv-11558, ECF 300 pp 1-4 and 29-102 (Sep. 29, 2022), Doc. 291, PE-I1 433 ......................................................................................................... 62

Testimony of Spirit Airlines VP Network Planning, John Kirby, D. Mass. Case 1:21-cv-11558, ECF 301 (Sep. 30, 2022), Doc. 378, PE-I1 601 ............. 114

The Port Authority of New York and New Jersey, Airport Rules and Regulations, Chapter VIII Aircraft Operations (Jul. 27, 2022), Doc. 335, PE-J 146 ................................................................................................. 95

TRN Aviation Transportation Analyst Email (May 6, 2016), Doc. 6, PA-C Offer 32 ................................................................................... 15

TRN Letter to United Airlines, Dkt. DOT-OST-2008-0234-0336 (posted Jul. 21, 2022), Doc. 176, PE-D1 424 ....................................................... 134

TRN Procurement Analyst Letter (Feb. 28, 2018), Doc. 11, PA-C Offer 68 .............. 16

U.S. – E.U. Air Transport Agreement of April 30, 2007, Doc. 319, PE-A1 373 ......... 2

U.S. et al v. AMEX et al, Case 1:10-cv-04496, Affidavit of [employee of] Starwood Hotels and Resorts, ECF 393 (EDNY Jun. 2, 2014), Doc. 467, PE-N3 1 ....................................................................................... 75

U.S. et al v. American Airlines and JetBlue Airways, D. Mass. Case 1:21-cv-11558, American Airlines and JetBlue Response to Plaintiff's Motion for Entry of Final Judgment and Permanent Injunction, Exhibit A, ECF 359-1 (Jun. 14, 2023), Doc. 315, PE-I2 730 ........................................... 119

U.S. et al v. American Airlines and JetBlue Airways, D. Mass. Case 1:21-cv-11558, Complaint, ECF 1 (Sep. 21, 2021), Doc. 105, PE-I1 1 ........................ 111

U.S. et al v. American Airlines and JetBlue Airways, D. Mass. Case 1:21-cv-11558, Plaintiff's Proposed Findings of Fact, ECF 332 (Dec. 2, 2022), Doc. 200, PE-I1 255 .................................................................... 118

U.S. et al v. American Airlines Group Inc., 1st Cir. Case 23-1802, Brief of Defendant-Appellant American Airlines (Dec. 6, 2023), Doc. 496, PE-N4 148 ............................................................................... 120

U.S. et al v. JetBlue Airways and Spirit Airlines, Inc., D. Mass. Case 1:23-cv-10511, Complaint, ECF 1 (Mar. 7, 2023), Doc. 215, PE-I2 279 .................... 139

U.S. General Accounting Office Report to Congress, GAO-02-36 Metropolitan Washington Airports Authority (March 2002) ................................................ 93

U.S. v. Sabre et al, Case 1:19-cv-01548, Complaint, ECF 1 (D. Del. Aug. 20, 2019), Doc. 449, PE-N1 160 ............................................................... 68

U.S.A. v. Winkelbauer et al, SDNY Case 23-crim-133, Sealed Indictment, ECF 3 (Mar. 13, 2023) (unsealed Apr. 12, 2023), Doc. 499, PE-N4 324 ......... 25

UAL Corporation SEC Form 10-K (Mar. 16, 2007) ..................................................... 81

UAL Corporation SEC Form 10-K (Mar. 28, 2003) ..................................................... 81

UATP One Merchant Services, ACH Conference (May 16, 2023), Doc. 445, PE-N1 138 ................................................................................. 65, 68, 71, 77

UATP Products and Solutions, Doc. 431, PE-N1 76 .................................................. 64

UATP Shareholder Airlines (2002), Doc. 453, PE-N1 190 ........................................ 64

United Airlines Comment, Dkt. DOT-OST-2021-0103 (Sep. 27, 2021) Doc. 330, PA-J 15 .......................................................................................... 160

United Airlines Comment, Dkt. FAA-2020-0862 (Dec. 29, 2020), Doc. 331, PA-J 122 .......................................................................................... 161

United Airlines Holdings, Inc. SEC Form 10-K for 2022 (Feb. 16, 2023) ................. 98

United Airlines letter to FAA re system constraints (Mar. 22, 2023), Doc. 385, PE-J 238 .......................................................................................... 146

United Airlines SEC Form 10-K (Feb. 29, 2024)....................................................... 88

United Airlines SEC Form 8-K (Feb. 22, 2024)........................................................ 83

United Airlines Ventures Sustainable Flight Fund partners, Doc. 447, PE-N1 151 ........................................................................................ 19, 30, 32, 37

US Airways Group, Inc. SEC Form 10-K (Mar. 12, 2004) ........................................ 81

US Airways Group, Inc. SEC Form 10-K (Mar. 27, 2003) ........................................ 80

USPTO, Decision on Appeal, Application 15/789,585 (Feb. 8, 2022), Doc. 139, PE-B2 167...................................................................................... 134

USPTO, Office Action Summary, Application 15/789,585 (Nov. 25, 2019), Doc. 36, PE-B2 92.......................................................................... 105

USTRANSCOM Award - Alaska Airlines, Doc. 357, PE-H 320................................. 74

USTRANSCOM Award - American Airlines, Doc. 358, PE-H 322 ............................ 74

USTRANSCOM Award – Atlas Air, Doc. 360, PE-H 326 .......................................... 74

USTRANSCOM Award - Delta Air Lines, Doc. 361, PE-H 328................................. 74

USTRANSCOM Award - Hawaiian Airlines, Doc. 364, PE-H CarrierInfo 334 ........ 74

USTRANSCOM Award - JetBlue Airways, Doc. 365, PE-H CarrierInfo 336 ........... 74

USTRANSCOM Award - United Airlines, Doc. 374, PE-H CarrierInfo 354 ............. 74

USTRANSCOM Award - UPS, Doc. 375, PE-H CarrierInfo 356 ................................ 74

## Regulations

14 C.F.R. § 212.2 ..................................................................................................... 116

14 C.F.R. § 303.03 ................................................................................................... 134

14 C.F.R. Part 93, Subpart S, § 93.215(a), Doc. 202, PE-B2 216 ............................. 144

## Constitutional Provisions

U.S. Const. amend. I ................................................................. 180, 189, 204, 206, 207

U.S. Const. art. I, §   8, cl. 3 ................................................................ 8, 189, 201, 207

U.S. Const. art. I, §   8, cl. 8 ............................................................................ 9, 180, 208

U.S. Const. art. I, § 10, cl. 2 ....................................................................................... 207

U.S. Const. art. I, § 10, cl. 3 ......................................................................................... 42

U.S. Const. art. IV, § 3, cl. 2 .................................................................................. 8, 201

## Treaties

Air Transport Agreement Between the Government of the United States and
   the Government of Canada, T.I.A.S. No. 07-312, (Mar. 12, 2007), Doc.
   4, PE-A1 124 ........................................................................................................ 14

Patent No. CA2,995,867 ............................................................................................ 159

Patent Number EU2948375 ....................................................................................... 11

U.S. – E.U. (Iceland, Norway) Air Transport Agreement of June 21, 2011,
   Doc. 321, PE-A1 489 ............................................................................................. 5

U.S. – E.U. Air Transport Agreement of June 24, 2010, Art. 15 § 6(a), as
   amended by Art. 3, Doc. 320, PE-A1 461 ............................................................ 5

# GLOSSARY OF ACRONYMS

| | |
|---|---|
| A4A | Air Transport Association of America, Inc. d/b/a Airlines for America, a domestic airline trade association |
| ACH | Airlines for America's Airlines Clearinghouse |
| ACIP | Air Carrier Incentive Plan of an airport |
| AGM | IATA Annual General Meeting |
| ARC | Airline Reporting Corporation |
| ATPCO | Air Tarriff Publishing Company |
| CAB | Civil Aeronautics Board |
| CPP | City Pair Program of the GSA |
| DCA | Reagan National Airport in Washington, D.C. |
| DOJ | Department of Justice |
| DOT | Department of Transportation (abbreviation used by the Secretary), a.k.a. TRN |
| EA | Carrier-currency abbreviation for unknown carrier. |
| EWR | Newark Liberty Airport in New Jersey |
| FAA | Federal Aviation Administration under the Secretary of Transportation |
| FOIA | Freedom of Information Act |
| GDS | Global Distribution Service |
| GSA | General Services Administration, an executive branch agency |
| IATA | International Air Transport Association, an airline trade association incorporated in Canada |
| ICAG | International Consolidated Airlines Group S.A. |
| ICH | IATA Clearing House |
| IROE | IATA Rates of Exchange |

| JFK | John F. Kennedy Airport in New York |
|---|---|
| LAX | Los Angeles Airport in California |
| LGA | LaGuardia Airport in New York |
| NPIAS | National Plan of Integrated Airport Systems published by the Secretary of Transportation |
| NYC | New York City, New York |
| ORD | Chicago O'Hare Airport in Illinois |
| OST | Office of the Secretary of Transportation |
| PFC | Passenger Facility Charge tax per 49 U.S.C. § 40117 |
| PTAB | Patent Trial and Appeal Board of the USPTO |
| RICO | Racketeering Influenced and Corrupt Organizations |
| SF | Unknown provider of IATA carrier-currency rates of exchange |
| SFO | San Francisco Airport in California |
| SIS | IATA Simplified Invoicing and Settlement |
| SITA | Société Internationale de Télécommunications Aéronautiques SCRL |
| TACT | The Air Cargo Tariff |
| TRN | Department of Transportation (abbreviation used by Fed. Cl.), also abbreviated as DOT |
| UATP | Universal Air Travel Plan |
| USPTO | U.S. Patent and Trademark Office |
| WSG, WASG | Worldwide Slot Guidelines, a.k.a. Worldwide Airport Slot Guidelines, an agreement among member-airlines of the IATA |

## GLOSSARY OF IATA ACRONYMS AND TERMINOLOGY

| | |
|---|---|
| Acquiring Partner | A government or corporation that has a Contract for Scheduled Service with an airline for future scheduled air transportation |
| BSP | IATA Billing and Settlement Plan |
| CASS | IATA Cargo Accounts Settlement Systems |
| CC | Credit Card |
| CSI | Credit Sales Invoicing |
| CSP | Card Settlement Plan |
| Customer | An employee of a government or company that has a Contract for Scheduled Service with an airline for future scheduled air transportation |
| FOP | Form of Payment |
| GDS | Global Distribution Service |
| HOT | Travel Agent Billing |
| IBS | IBS Software, a software provider |
| IBS OPS WG | IATA Interline Billing and Settlement Operations Working Group |
| ICER | IATA Consolidated Exchange Rates (source: bank) |
| IROE | IATA Rates of Exchange (source: IATA) |
| OMS | Order Management System |
| PNR | Passenger Name Record |
| RET | Travel Agent Report |
| SC | IATA Slot Conference |
| TA | Travel Agent/Agency, also known as Sales Agent |
| TI | Ticket Inventory |
| TMC | Travel Management Company |

## TABLE OF PLAINTIFF'S EXHIBITS

| PLAINTIFF'S EXHIBITS[2] | ABBREVIATION |
|---|---|
| A: Communication with Congress | PE-A InfoCongress |
| B: Rulemaking | PE-B Rulemaking |
| C: Unsolicited Proposal | [N/A to District Court] |
| D: Agreements between Airlines | PE-D Agreement |
| E: Exhaustless Auction Announcement | PE-E Auction |
| F: Administrative Reservation Allocation | PE-F MarketFail |
| G: Court Documents | PE-G Court |
| H: Agency Information Collection | PE-H CarrierInfo |
| I: U.S. Antitrust Cases | PE-I Antitrust |
| J: Other | PE-J Other |
| K: Table of Documents Referenced to Exhibits | [N/A to District Court] |
| L: IATA Corporation Documents | PE-L Cartel |

---

[2]    To comply with the PDF size limit of 50MB in the local court, Plaintiff split several exhibits into smaller files.  The exhibits are referenced as, *e.g.*, PE-A1, PE-A2, PE-A3 in the case at bar, and are referenced as, *e.g.*, PA-A in the U.S. Court of Federal Claims.  The document number will be the same for both courts, but the page number referenced to the exhibit will be different between the two courts.

| M: Summer 2024 Carrier Scheduling Season | PE-M Summer-2024 |
| N: [No description given.] | PE-N |
| O: [No description given.] | PE-O |

## I.     INTRODUCTION

1.      In 1938, the Congress "recognized and declared to exist in behalf of any

citizen of the United States a public right of freedom of transit in air

commerce through the navigable air space of the United States."[3]   The

Supreme Court upheld this right in 1946:

> The air is a public highway, as Congress has
> declared. Were that not true, every
> transcontinental flight would subject the operator
> to countless trespass suits. Common sense revolts
> at the idea. To recognize such private claims to the
> airspace would clog these highways, seriously
> interfere with their control and development in the
> public interest, and transfer into private ownership
> that to which only the public has a just claim.[4]

2.      In 1978, in deregulating air transportation, the Congress delegated those

decisions related to price, route, or service to be determined by market

competition.  The Supreme Court found the law unambiguous.[5]  The

remaining economic regulations were structured to ensure that carriers

comply with the terms of use of the National Airspace System — embodied in

the requirements of the economic certificate — including compliance with

antitrust laws.

---

[3]     Civil Aeronautics Act of 1938, Pub. L. 75-706, sec. 3, 52 Stat 973, 980, *codified as amended at* 49 U.S.C. § 40103(a)(2).

[4]     *U.S. v. Causby*, 328 U.S. 256 (1946).

[5]     *See Morales v. Trans World Airlines*, 504 U.S. 374 (1992).

3.     The Congress searched for a competitive method to allocate to carriers the scarce seasonal supplier reservations required for the use of the public's airspace at those airports with excess market demand.  When a competitive method did not emerge, the Secretary of Transportation accepted the Title of *"Slot Coordinator,"* an arbiter of carrier disputes over the rights of access to the reservations,[6] pursuant to an agreement among carriers to allocate the reservation market with grandfathering, called the International Air Transport Association's (IATA) Worldwide Slot Guidelines[7] (WSG).  The Congress has acted several times to correct the market failure in airspace reservations; yet, forty-six years into the deregulated era, domestic and foreign carriers still allocate the supplier airspace reservation market according to the IATA WSG agreement.

4.     During this deregulated era, the Executive branch has negotiated and signed treaties with foreign nations agreeing to allow a fair and equal opportunity for the airlines of each country to compete to provide service;[8] it has issued notices seeking a permanent solution to the allocation of airspace

---

[6]    The reservation by an air carrier for an aircraft to enter and exit the navigable airspace is also known as a "slot"; *see* 49 U.S.C. § 41714(h)(4).

[7]    Also known as Worldwide Scheduling Guidelines and Worldwide Airport Slot Guidelines (WASG).

[8]    *See e.g.,* U.S. – E.U. Air Transport Agreement of April 30, 2007, Doc. 319, PE-A1 373, Article 2 at 868.

reservations;[9] and it has justified its administrative allocation of market

access because of a market failure.[10]   This market failure is sustained by the

IATA WSG, which both declares exclusive rights to grandfathered carriers

and recruits regulators to confer those exclusive rights through enforcement

of the private agreement.

5.   Relying on the statutory framework, Endres developed his competitive multi-

sided market allocation — which upgrades the supplier-carrier, the

consumer-passenger, and the consumer-cargo reservation systems to allocate

the congestion-free capacity of airspace reservations with a demand-

calibrated premium that is designed to ensure that prices meet market

clearing levels.

6.   Endres offered his market-clearing service to carriers, but every Defendant

Carrier continued to obtain its grandfathered supplier reservations for free

rather than bid; and continued to not compete for supplier reservations

claimed by other carriers.   Exhaustless challenged the orders that require an

administrative allocation of supplier airspace reservations by the Federal

---

[9]   *See* Notice of Market-based Actions to Relieve Airport Congestion and Delay, 66 Fed. Reg. 43947 (proposed Aug. 21, 2001), Doc. 337, PE-B1 225.

[10]   *See* Order 2017-4-6 (Apr. 10, 2017), Doc. 9, PE-B2 43 at 47 ("[N]on-incumbent carriers have had a difficult time acquiring viable slot times at both airports, and that it is unlikely that a market solution will present itself. . . Our decision to condition the grant of ATI with a slot divestiture remedy was not novel, but was instead consistent with our prior rulings in other cases, in which we employed this mechanism as a means of ensuring that the benefits of the transaction are realized by providing the means for sufficient competition[.]")

Aviation Administration ("FAA") of the Department of Transportation ("DOT" or "TRN").  The circuit court ruled that the FAA could withdraw its orders at will and found no hurdles that would preclude carriers from adopting the competitive allocation.  But the court needed either more information to determine traceability to regulators, or it needed carriers present before taking further action.  So, Endres again offered the service to carriers.  Each Defendant Carrier instead voted to continue to grandfather the public's reservations for free — worldwide —rather than bid in the supplier reservation market.

7.  Endres offered his market-clearing service in multiple proceedings in DOT public dockets, notifying carriers that they are risking antitrust exposure by boycotting the reservation market.

8.  Carriers have continued to claim exclusive and proprietary rights to airspace reservations and have *de facto* received that privilege with the aid of an illegal subsidy from the DOT at seven airports at which it limits the volume of flight reservations, which it then 'grants' to carriers for free every scheduling season pursuant to the IATA WSG.  Most of the Defendants have since admitted in a dismissed case in the U.S. District Court for the District of Massachusetts that the IATA WSG is a market allocating agreement among carrier-members of the trade association the IATA.

9.  This breakdown in the separation of powers has substituted Defendant Carriers' self-declared 'grandfathered rights' in supplier airspace reservations

4

in place of long-established public property rights to the navigable airspace and has usurped the Congress' clear intent for market competition to determine price, route, and service quality in air transportation.

10.   Further, Endres has patented solutions to increase flight capacity at constrained airports, and solutions to allocate reservations across the National Intermodal Transportation System — while decreasing noise, pollution, and greenhouse-gas emissions,[11] as sought by the Congress (*e.g.*, Clean Air Act,[12] Clean Water Act,[13] air transport agreements,[14] the National Aeronautics and Space Act,[15] and the Intermodal Surface Transportation Efficiency Act of 1991[16]). But the anticompetitive allocation has interfered with the Congress' policy for maximum market competition for transportation — while squandering Endres' limited time to the exclusive use of his intellectual property.

11.   Endres now files this complaint against the perpetrators of the conspiracy to restrain trade in U.S. airspace reservations for monetary damages, a

---

[11]   *See* Patent Number US9,156,564 (2015) and Patent Number US9,920,695 (2018).

[12]   *See* 42 U.S.C. § 7401 et seq.

[13]   *See* 33 U.S.C. § 1251 et seq.

[14]   *See e.g.,* U.S. – E.U. Air Transport Agreement of April 30, 2007, Doc. 319, PE-A1 373; U.S. – E.U. Air Transport Agreement of June 24, 2010, Art. 15 § 6(a), as amended by Art. 3, Doc. 320, PE-A1 461 at 468; and U.S. – E.U. (Iceland, Norway) Air Transport Agreement of June 21, 2011, Doc. 321, PE-A1 489.

[15]   *See* Pub. L. 111–314, §3, 124 Stat. 3328, 3331, *codified at* 51 U.S.C. § 20102(e).

[16]   *See* Pub. L. 102-240, §2, 105 Stat. 1914, *codified at* 49 U.S.C. § 5501.

permanent injunction of the Defendant Carrier's agreement to grandfather supplier reservations, the issuance of Endres' patent for the market-clearing process, and other structural remedies.

## II.   STATEMENT OF JURISDICTION AND VENUE

12.   Plaintiff Endres brings this action to enforce his individual right to treble damages under section 4 of the Clayton Act, 15 U.S.C. § 15; to enforce his individual right to a permanent injunction under section 16 of the Clayton Act, 15 U.S.C. § 26; to enforce his right to monetary remedies under section 901, Racketeering Influenced and Corrupt Organizations ("RICO") of the Organized Crime Control Act of 1970, 18 U.S.C. § 1964(c); to seek structural remedies under section 901, RICO of the Organized Crime Control Act of 1970, 18 U.S.C. § 1964(a), and to seek "further necessary or proper relief" based on the D.C. Circuit's declaratory judgment regarding his market-clearing service, which uses his market-clearing process to which Canada recently issued a patent, pursuant to the law of June 14, 1934, chapter 512, 28 U.S.C. § 2202. Endres also brings this action under articles I and IV and the first amendment of the U.S. Constitution.

13.   This complaint is timely filed. The constitutional claims have no statute of limitation; the antitrust claims are filed "within four years after the cause of action accrued," section 4 of the Clayton Act, 15 U.S.C. § 15b, which was on March 25, 2020; and the claims under 18 U.S.C. §§ 1956 and 1957 are filed

within seven years, section 5904 of the James M. Inhofe National Defense Authorization Act for Fiscal Year 2023 (2022), 18 U.S.C. §1956(j).[17]

14.    This Court has jurisdiction pursuant to **(i)** section 9(a) of Pub. L. 95-486 (1978), 28 U.S.C. § 1337 because this complaint arises under acts of the Congress regulating commerce and protecting trade and commerce against restraints; **(ii)** the law of June 25, 1948, ch. 646, 62 Stat. 931, 28 U.S.C. § 1338(b) because the claim of unfair competition is related to a claim under the patent laws; **(iii)** section 4 of the Clayton Act, 15 U.S.C. § 15(a); **(iv)** section 901 of the Organized Crime Control Act of 1970, 18 U.S.C. § 1964(a); and **(v)** section 24, par.1 of the law of March 3, 1911, ch. 231, 28 U.S.C. § 1331 for claims arising under the U.S. Constitution, laws and treaties.

15.    This Court has jurisdiction over the foreign defendants pursuant to section 317 of the USA PATRIOT Act of 2001, 18 U.S.C. § 1956(b)(2).

16.    This Court has jurisdiction, concurrent with the U.S. Court of Federal Claims, section 24, par. 20 of the law of March 3, 1911, ch. 231, 28 U.S.C. § 1346(a)(2) because the U.S. is a defendant in a claim founded on the U.S. Constitution.  Plaintiff has filed a complaint in the U.S. Court of Federal Claims, Case No. 1:23-cv-01536, regarding the federal government's related actions, which culminated in a regulatory taking of Endres' market clearing

---

[17]    Prior to Dec. 23, 2022, the statute of limitations was 5 years pursuant to 18 U.S.C. § 3282. *See* 18 U.S.C. § 1956 note ("The amendments made by this section shall apply to conduct that occurred before the date of enactment of this Act for which the applicable statute of limitations has not expired[.]").

premiums, violating his constitutional right to conduct commerce and requiring compensation under the fifth amendment.

17. This Court has jurisdiction over the action related to mandamus to compel action of an officer of the U.S. pursuant to section 1(a) of Pub. L. 87-748 (1962), 28 U.S.C. § 1361.

18. Venue is proper under sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15(a) and 22 because each Defendant Carrier obtains and maintains its certificate of public convenience and necessity or its foreign air carrier permit from the Secretary of Transportation in this district; and each Defendant Carrier also obtains the primary allocation of its airspace reservations for scheduled air transportation service at seven U.S. airports from the Secretary of Transportation in this district. Venue is proper under section 901(a) of the Organized Crime Control Act of 1970, 18 U.S.C. § 1965(a) because each Defendant Government either resides or has an agent in this district.

19. This complaint will aid the Court's jurisdiction because it involves the Congress' constitutional authority over the regulation of the use of the public's airspace,[18] domestic and foreign commerce,[19] and the public's right to

---

[18]  *See* U.S. Const. art. IV, § 3, cl. 2.  *See also*, 49 U.S.C. §§ 40103(a)(1) ("The United States Government has exclusive sovereignty of airspace of the United States") *and* 41101(c) (an air carrier certificate "does not confer a proprietary or exclusive right to use airspace, an airway of the United States, or an air navigation facility").

[19]  *See* U.S. Const. art. I, § 8, cl. 3.  *See also*, 49 U.S.C. § 40101(a)(12)(B).

patents.[20]  It will also aid the Court's jurisdiction by reliance upon Art. III.'s
separate power to interpret the law in conflicts.

## III.    THE PLAINTIFF AND HIS INVENTIONS

### A.    The Plaintiff

20.    <u>Endres' Background:</u>  Endres earned a Master of Business Administration
degree and a Bachelor of Science degree in electrical engineering, both from
universities in the U.S.  His work in other industries involved knowledge of,
*inter alia*, wireless technology, wireless spectrum allocated by auction,
enterprise software development, and satellite navigation.

21.    <u>The Congestion Delay Problem:</u> In 2012, Endres read a news article that the
U.S. Navy was converting its assisted takeoff system from steam to electric
power (jet pilots use the system to takeoff from the short runway of an
aircraft carrier).  That led Endres to research the use of the launch system in
commercial aviation.  Endres discovered a U.S. Congress Joint Economic
Committee study from 2008 that estimated that a portion of flight delays cost
the economy $41 billion in 2007.[21]  A follow-on study commissioned by the
FAA estimated that the cost of domestic passenger service delays was $31
billion in 2007 and determined that most of these delays were due to

---

[20]    *See* U.S. Const. art. I, § 8, cl. 8.

[21]    Charles E. Schumer, et al., *Your Flight Has Been Delayed*, Report by the Joint
Economic Committee Majority Staff (May 2008), Doc. 1, Plaintiff's Exhibit A1 -
("<u>PE-A1</u>") 1 at 5.

overscheduling by airlines and therefore avoidable.[22]  Moreover, the study

suggested that the actual market opportunity was likely higher than its cost-

based estimates.[23]  Endres saw the economic opportunity of reducing

congestion delays and founded a company to address this market need.

22.    The Company:  Endres, the sole incorporator, created a company he named

Exhaustless, and incorporated it in the State of Delaware in December 2012.

Endres retained ownership of 95.129% of the issued shares of Exhaustless.

Endres hired an employee to which he bestowed the title of Chief Financial

Officer (CFO), and as an incentive to retain the employee-CFO until the

company obtained financing or began earning revenues from which cash

compensation could be paid, he issued the employee the remaining shares of

the company.  The incentive shares vested over three years, with the

company retaining the right to repurchase any unvested shares.  The

employee-CFO had no involvement in the inventions.  The employee-CFO

took medical leave from the company from mid-2013 to mid-2017, during

which time Endres worked unassisted.

---

[22]    Michael Ball, et al., Total Delay Impact Study, National Center of Excellence for
Aviation Operations Research ("NEXTOR") (Nov. 3, 2010), Doc. 2, PE-A1 35 at 46.
*See also*, *id*. at 49 ("Such flight delay . . . reflects excess travel time much of which is
related to congestion in the air transportation system.").

[23]    *See id*. at 54 ("In general, passengers are willing to pay a higher price for less
delayed flights[.]").

**B.   The Plaintiff's Inventions**

23.   <u>The Assisted Takeoff System:</u>  In early 2012, Endres began researching and designing systems to increase flight throughput at constricted urban airports to alleviate chronic-congestion delays.  Endres developed the grid-assisted takeoff system for commercial aircraft, using, *inter alia*, his own prior knowledge, the prior art of the system developed for the U.S. Navy, information from jet engine manufacturers, and research from many U.S. universities —such as information on computational fluid dynamics and open-source state of the art for aerospace design.  Endres disclosed the invention of the takeoff system to the public in a provisional patent application in 2013 and assigned the invention to Exhaustless.  In 2015, The U.S. Patent and Trademark Office (USPTO) issued Patent Number US9,156,564 for the assisted takeoff system, and the European Union issued Patent Number EU2948375 under the Patent Cooperation Treaty.  Endres began seeking venture capital to complete the research and development of the takeoff system.

24.   <u>The UK Airports Commission:</u>  In 2013 the Airports Commission of the Department for Transport of the United Kingdom issued a request for proposals for making best use of existing capacity and on adding new capacity in the longer term.  On July 16, 2013, Endres submitted his company's proposal, which involved incorporating his takeoff system into the Heathrow airport system and the London/U.K. airspace and airway system.

The consortium that performed the sifting process rejected the proposal at the first sifting stage because the takeoff system required further research and development and because "*[t]he extent to which the proposal fits within international aviation legislative framework and <u>guidelines</u> is unclear.*"[24]

25. <u>Reduced-Throttle Descent System:</u>  The information Endres learned from developing the assisted takeoff system led to insights in how to increase capacity in landings.  Endres developed a reduced-throttle descent aircraft system that increases landing throughput and assigned this innovation to Exhaustless.  The innovation was disclosed in a patent filing in 2015, and in 2018 the USPTO issued Patent Number US9,920,695 (2018).

26. <u>The Market Allocation Problem:</u>  In early 2015, the FAA proposed a rule to provide a "*comprehensive approach to slot management*" to replace its "*current temporary Orders*" limiting operations at the three New York City ("NYC") area airports;[25] "*slot*" means a reservation for the use of the airspace needed by an aircraft for each takeoff and landing conducted under instrument flight rules.[26]  The history of the reservation allocation problem as presented in the proposed rule showed the failure of the industry to

---

[24]   Airports Commission: Interim Report, Appendix 2: Assessment of Long-term Options at 12 (December 2013) (emphasis added).

[25]   Slot Management and Transparency for LaGuardia Airport, John F. Kennedy International Airport, and Newark Liberty International Airport, 80 Fed. Reg. 1274 (proposed Jan. 8, 2015), Doc. 3, PE-B2 1 at 2 and 24.

[26]   Federal Aviation Administration Authorization Act of 1994, Pub. L. 103-305, §206(a)(1), 108 Stat. 1569, 1587 (1994), <u>*codified at*</u> 49 U.S.C. § 41714(h)(4).

establish a primary market, leading to the intervention of regulators to allocate the market. The proposed rule stated that the *"Secretary is required to consider several objectives as being in the public interest, including, . . . placing maximum reliance on competitive market forces and on actual and potential competition."*[27] However, per the proposal, the FAA's stated authority contradicted this requirement, because rather than placing maximum reliance on market competition, *"the FAA believes it must strike a balance between (1) promoting competition and permitting access to new entrants and (2) recognizing historical investments in the airport and the need to provide continuity for allocation based on historical rights."*[28] Endres then began researching the statutory framework for the market allocation.

27.  The Statutory Framework:  The statutory framework requires *"placing maximum reliance on competitive market forces and on actual and potential competition to provide the needed air transportation system . . . [and] to decide on the variety and quality of, and determine prices for, air transportation services."*[29] Competitive markets are also required in bilateral air transport

---

[27]  Slot Management and Transparency for LaGuardia Airport, John F. Kennedy International Airport, and Newark Liberty International Airport, 80 Fed. Reg. 1274 (proposed Jan. 8, 2015), Doc. 3, PE-B2 1 at 2.

[28]  *Id.* at 3.

[29]  Airline Deregulation Act of 1978, Pub. L. 95-504, § 102(a), 92 Stat. 1705, 1706 (Oct. 24, 1978), *codified at* 49 U.S.C. § 40101(a)(6), (12).

agreements between the U.S. and over 100 of its trading partners.[30]  Endres

began researching and formulating a private market solution to the

reservation allocation.  This research included, *inter alia*, watching all

relevant historical Congressional hearings; learning the statutory economic

regulations of carriers and their evolution; and learning the disconnects

between the law and the executive branch regulations.

28.   The Market Clearing Process:  Endres developed a method to calculate the

congestion-free Instrument-Flight-Rule flight capacity of an airport that is

part of a coordinated, shared airspace, such as the New York City area

airspace, to allocate months prior to each bi-annual carrier scheduled-flight

season.  Endres then developed a multi-sided competitive market allocation,

which upgrades the three separate reservation systems — the supplier-

carrier, the consumer-passenger, and the consumer-cargo — to allocate the

congestion-free airspace capacity of flight reservations with a demand-

calibrated premium.  Because there can only be one market-clearing service

in a market, this creates a natural monopoly; but because it discovers and

broadcasts the market price of exclusivity from bidding participants, it has no

---

[30]  *See* Open Skies Partners, Bureau of Economic and Business Affairs (Sep. 1, 2020), Doc. 303, PE-A1 289.  *See also*, *e.g.*, Air Transport Agreement Between the Government of the United States and the Government of Canada, T.I.A.S. No. 07-312, Preamble and Article 5 (Mar. 12, 2007), Doc. 4, PE-A1 124 at 124, 127 ("DESIRING to promote fair and equal opportunities for airlines to compete in the marketplace with minimum government regulation; * * * Each Party shall allow a fair and equal opportunity for the designated airlines of both Parties to compete in providing the international air transportation governed by this Agreement.").

monopoly pricing power.  In 2015, consequent to the development of the solution and its new commerce, Endres filed a patent application for the competitive market-clearing process in the U.S. and in Canada and assigned the invention to Exhaustless.[31]

29.   <u>The Competitive Market Standard:</u>  Endres then packaged the combination of his inventions in a competitive market standard that he developed called the Exhaustless Aviation 2.0 Operating Standard (the "Competitive Market Standard").  In line with the statutory framework, the standard relied on the competitive market allocation of airspace capacity to fund the development of Endres' inventions that increase capacity at constrained airports.

30.   <u>Unsolicited Proposal 1:</u>  On January 15, 2016, Endres submitted an unsolicited proposal to the Secretary of Transportation, pursuant to the Federal Acquisition Regulation, requesting that the Secretary license Exhaustless' Standard, fund the development of the reservation system, and support the development of the flight technologies.[32]  On May 6, 2016, the Office of the Secretary of Transportation (OST) rejected the proposal, declaring that a *privately owned pricing service* would require new legislation and the support of airlines.[33]

---

[31]   *See* Patent Application US15/789,585 (Aug. 19, 2016).

[32]   *See* Exhaustless Inc. Unsolicited Proposal Aviation 2.0 (Jan. 15, 2016), Doc. 5, PA-C Offer 1.

[33]   TRN Aviation Transportation Analyst Email (May 6, 2016), Doc. 6, PA-C Offer 32.

31.   On March 8, 2017, to recruit the support that the Office of the Secretary required to adopt his proposal, Endres sent information regarding the Competitive Market Standard to the boards of directors of Defendants American Airlines, Delta, and United Airlines — including a copy of the unsolicited proposal it had sent to the DOT in 2016.

32.   <u>Unsolicited Proposal 2:</u>  Endres decided to simplify the unsolicited proposal to focus only on the market failure in the allocation of airspace reservations.  On September 19, 2017, Endres submitted an updated unsolicited proposal which requested support for a one-year trial of the market-clearing service at the major airports serving New York City and explained its compliance with the statutory framework.[34]  On February 28, 2018, The Office of the Secretary of Transportation rejected the proposal.[35]

33.   On September 21, 2017, Endres sent a copy of the updated unsolicited proposal it had sent to the DOT — which showed the increased profit potential from reduced congestion delays — to the chief executive officers of each Defendant American Airlines, Delta, Southwest, and United Airlines.

34.   <u>Rulemaking:  Petition for Rulemaking:</u>  Endres and the other shareholder of his company personally funded the development of the market-clearing service.  Endres solely developed the related enterprise software, and

---

[34]   *See* Exhaustless Inc. Unsolicited Proposal Aviation 2.0 – NYC Market Trial (Sep. 19, 2017), Doc. 10, PA-C Offer 33.

[35]   *See* TRN Procurement Analyst Letter (Feb. 28, 2018), Doc. 11, PA-C Offer 68.

directed the development of the auction design, auction rules, and the licensing agreement of the operating standard.  On May 21, 2018, Endres petitioned the FAA to withdraw its market-allocating rules that interfere with Exhaustless' competitive airspace reservation market.[36]

## C.   Market Rollout - Winter 2018 Seasonal Reservations

35.    On May 28, 2018, Endres announced an auction by Exhaustless for supplier airspace reservations for the Winter 2018 carrier scheduling season.[37]  No carrier joined the Competitive Market Standard.

36.    On June 7, 2018, each Defendant Carrier obtained exclusive reservations for the Winter 2018 season according to the IATA WSG grandfathering rules when the DOT/IATA WSG Slot Coordinator allocated each public reservation — for free — to the carrier claiming entitlement and denied the opportunity to hear the market price or bid on that reservation to other carriers and to consumers.[38]  (To ¶391.)

---

[36]   *See* Exhaustless Inc. Petition for Rulemaking, Dkt. FAA-2018-0481-0001 (May 21, 2018), Doc. 12, PE-B2 66. *Also filed at,* Exhaustless Inc. v. FAA, D.C. Cir. Case 19-1158, Joint Appendix, ECF 1815348 (Nov. 12, 2019), Doc. 227, PE-G2 1 at 131.

[37]   Steve Endres, Congestion-free Flights for NYC Now, LinkedIn (May 28, 2018), Doc. 13, PE-E 1. *Also filed at,* Exhaustless Inc. v. FAA, D.C. Cir. Case 19-1158, Joint Appendix, ECF 1815348 (Nov. 12, 2019), Doc. 227, PE-G Court 239 at 376.

[38]   *See* Exhaustless Documentation of IATA WSG Calendar of Coordination History, Doc. 14, PE-D1 1.

37.   On June 19, 2018, each Defendant Carrier and the DOT/IATA WSG Slot
      Coordinator attended the Slot Conference in Vancouver, Canada to complete
      the airspace reservation market allocation.[39]

## IV.   THE DEFENDANTS

### A.   Air Canada

38.   Defendant Air Canada, Inc. ("Air Canada") is a corporate citizen of Canada
      and an air carrier, and owns another air carrier Air Canada Rouge L.P.  Air
      Canada purportedly holds at least one foreign air carrier permit issued by the
      Secretary of Transportation that permits it to conduct air commerce in the
      U.S. pursuant to Chapter 413 of Title 49 of the U.S. Code.[40]  Air Canada
      provides passenger and cargo air transportation between Canada and the
      United States, including flights originating and terminating at airports from
      this District.

39.   Air Canada has a joint venture agreement with Defendants United Airlines
      and Lufthansa called the Star Alliance.[41]

---

[39]   *See* Exhaustless FOIA Request Use of Government Aircraft (Mar. 6, 2023), Doc.
21, PE-B2 73 at 75.

[40]   *See* Order 98-5-11 (May 15, 1998).

[41]   *See* DOT List of Active Antitrust Immunized Alliances (Oct. 19, 2022), Doc. 287,
PE-D3 380 (referencing Dkt. DOT-OST-2000-7828).

40.   Air Canada has a joint venture agreement with Defendants Hawaiian,

JetBlue, United Airlines, and others, called the United Airlines Ventures

Sustainable Flight Fund.[42]

41.   Air Canada owns a ticket agent, Touram L.P.

42.   Air Canada admitted that the IATA WSG is an agreement among member-

carriers of the IATA to allocate the market of takeoff and landing

reservations.[43]

### B.   Air France-KLM

43.   Defendant Air France-KLM S.A. ("Air France-KLM") is a corporate citizen of

France and owns or controls several air carriers, including Air France (citizen

of France), KLM Royal Dutch Airlines (citizen of Netherlands), and

Transavia (Netherlands).  Air France-KLM purportedly holds a foreign air

carrier permit for each of its carriers, issued by the Secretary of

Transportation, that permits it to conduct air commerce in the U.S. pursuant

to Chapter 413 of Title 49 of the U.S. Code.  Air France-KLM provides

───────────────────

[42]   *See* United Airlines Ventures Sustainable Flight Fund partners, Doc. 447, PE-N1 151   from
https://web.archive.org/web/20240123165130/https://www.united.com/en/us/fly/comp
any/responsibility/united-airlines-ventures.html.

[43]   *See* Endres v. Moody *et al*, Case 1:23-cv-12051, Defendants' Memorandum of
Law, ECF 121 (D.Mass. Dec. 8, 2023), Doc. 425, PE-N1 1 at 2 ([T]he Worldwide Slot
Guidelines ("WSG") [] are global guidelines established by relevant trade
associations setting forth a system by which airlines . . . can allocate reservations
for flight take offs and landings.").

passenger and cargo air transportation between the European Union and the United States, including flights originating and terminating at airports from this District.

44. Air France-KLM is a joint venture between, *inter alia*, the government of France, the government of the Netherlands, the government of China (through its controlling interest of China Eastern Airline), an ocean carrier, and Delta.[44]

45. Air France-KLM has a joint venture agreement with Defendant Delta called the SkyTeam Alliance.[45]

46. Air France-KLM admitted that the IATA WSG is an agreement among member-carriers of the IATA to allocate the market of takeoff and landing reservations.[46]

## C.   Alaska Air

47. Defendant Alaska Air Group, Inc. ("Alaska Air") is a corporate citizen of the U.S. and owns or controls at least two air carriers — Alaska Airlines, Inc. and Horizon Air Industries, Inc. For each owned air carrier, Alaska Air

---

[44] See Air France-KLM Shareholding Structure Screenshot, Doc. 473, PE-N3 82 from
https://web.archive.org/web/20240301195805/https://www.airfranceklm.com/en/fina nce/air-france-klm-capital/shareholding-structure.

[45] *See* DOT List of Active Antitrust Immunized Alliances (Oct. 19, 2022), Doc. 287, PE-D3 380 (referencing Dkt. DOT-OST-2013-0068).

[46] *See* Endres v. Moody *et al*, Case 1:23-cv-12051, Defendants' Memorandum of Law, ECF 121 (D.Mass. Dec. 8, 2023), Doc. 425, PE-N1 1 at 2.

purportedly holds a Certificate of Public Convenience and Necessity issued by the Secretary of Transportation, that permits it to conduct air commerce in the U.S. pursuant to Chapter 411 of Title 49 of the U.S. Code. Alaska Air provides passenger and cargo air transportation in the United States, including flights originating and terminating at airports from this District.

48.   Alaska Air has a partnership, joint venture, alliance, or other combination agreement with American Airlines called the West Coast International Alliance ("WCIA").[47]

49.   Alaska Air has a joint venture agreement with Defendants American Airlines and ICAG called Oneworld Alliance.[48]

50.   Alaska Air has a merger agreement with Defendant Hawaiian.[49]

51.   Alaska Air owns an aircraft engine and aircraft leasing company, AAG Leasing, Inc.; a motor carrier, ASA Beverages LLC, USDOT No. 2831293; and a real estate agent, AAG Real Property, LLC, among other enterprises.[50]

---

[47]   *See U.S. et al v. American Airlines and JetBlue Airways*, D. Mass. 1:21-cv-11558, Findings of Fact and Conclusions of Law, ECF 344 (May 19, 2023), Doc. 224, PE-I2 320 at 335.  *Note that* no party has publicly filed the agreement with the SEC or the DOT.

[48]   *See* Alaska Air SEC Form 10-K (Feb. 14, 2024) at 24 ("Our airlines are parties to marketing agreements with a number of domestic and international air carriers, or "partners," including an expanded relationship with American and other oneworld carriers.")  *Note that* no party has publicly filed the agreement with the SEC or the DOT.

[49]   *See* id. at Exhibit 2.1.

[50]   *See* id. at Exhibit 21.

52.   Alaska Air admitted that the IATA WSG is an agreement among member-carriers of the IATA to allocate the market of takeoff and landing reservations.[51]

**D.   Amazon**

53.   Defendant Amazon.com, Inc. ("Amazon") is a corporate citizen of the U.S. and owns or controls at least one air carrier, Amazon.com Services LLC, *dba* Amazon Prime Air. For each owned air carrier, Amazon purportedly holds a Certificate of Public Convenience and Necessity issued by the Secretary of Transportation, that permits it to conduct air commerce in the U.S. pursuant to Chapter 411 of Title 49 of the U.S. Code. Amazon provides cargo air transportation in the United States, including flights originating and terminating at airports from this District.

54.   Amazon has a joint venture agreement with Defendant Hawaiian called Air Transport Services Agreement ("ATSA").[52]

55.   Amazon has a Contract for Scheduled Passenger Service with Defendant Hawaiian.[53]

---

[51]   *See* Endres v. Moody *et al*, Case 1:23-cv-12051, Defendants' Memorandum of Law, ECF 121 (D.Mass. Dec. 8, 2023), Doc. 425, PE-N1 1 at 2.

[52]   *See* Hawaiian SEC Form 10-K (Feb. 15, 2024) at 4, referenced on the exhibit list as Exhibit 10.44.  *Note that* neither party has publicly filed the agreement with the SEC or the DOT.

[53]   *See id.* at 41 (mentioning Amazon's "commercial passenger service").

56.     Amazon owns a freight forwarder, Amazon.com Services LLC, USDOT

3371498, FF 36211; a freight broker, Amazon  Services LLC, USDOT

2629914, FF 22778; a motor carrier, Amazon Data Services, Inc., USDOT

3375727; an aircraft fleet; an unnamed aircraft leasing operation; and an

insurance carrier, Day One Insurance, Inc. among other enterprises.[54]

### E.     American Airlines

57.     Defendant American Airlines Group Inc. ("American Airlines") is a corporate

citizen of the U.S. and owns or controls at least four air carriers — American

Airlines, Inc., Envoy Air, Inc., PSA Airlines, Inc., and Piedmont Airlines, Inc.

For each owned air carrier, American Airlines purportedly holds a Certificate

of Public Convenience and Necessity issued by the Secretary of

Transportation, that permits it to conduct air commerce in the U.S. pursuant

to Chapter 411 of Title 49 of the U.S. Code. American Airlines provides

passenger and cargo air transportation in the United States, including flights

originating and terminating at airports from this District.

---

[54] *See* Amazon SEC Form 10-K (Feb. 2, 2024), Exhibit 21.1. *See also*, Hawaiian
SEC Form 8-K (Oct. 20, 2022) ("Hawaiian will maintain and fly Amazon's A330s
under Hawaiian's FAA air carrier certificate to move cargo between airports[.]").

58.   American Airlines has a partnership, joint venture, alliance, or other combination agreement with Defendant Alaska Air called the West Coast International Alliance ("WCIA").[55]

59.   American Airlines has a joint venture agreement with Defendants Alaska Air and ICAG called Oneworld Alliance.[56]

60.   American Airlines admitted that the IATA WSG is an agreement among member-carriers of the IATA to allocate the market of takeoff and landing reservations.[57]

**F.   Atlas**

61.   Defendant Atlas Air Worldwide Holdings, Inc. ("Atlas") is a corporate citizen of the U.S. and a wholly owned subsidiary of Defendant Rand.  Atlas owns or controls at least two air carriers, Atlas Air and Polar Air Cargo.  For each owned or controlled air carrier, Atlas purportedly holds a Certificate of Public Convenience and Necessity issued by the Secretary of Transportation, that permits it to conduct air commerce in the U.S. pursuant to Chapter 411 of

_____

[55]   *See U.S. et al v. American Airlines and JetBlue Airways*, D. Mass. 1:21-cv-11558, Findings of Fact and Conclusions of Law, ECF 344 (May 19, 2023), Doc. 224, PE-I2 320 at 335.  *Note that* neither party has publicly filed the agreement with the SEC or the DOT.

[56]   *See* DOT List of Active Antitrust Immunized Alliances (Oct. 19, 2022), Doc. 287, PE-D3 380 (referencing Dkt. DOT-OST-2008-0252).  *See also*, https://www.oneworld.com/members (showing Alaska Air).

[57]   *See* Endres v. Moody *et al*, Case 1:23-cv-12051, Defendants' Memorandum of Law, ECF 121 (D.Mass. Dec. 8, 2023), Doc. 425, PE-N1 1 at 2.

Title 49 of the U.S. Code. Atlas provides passenger and cargo air transportation in the United States, including flights originating and terminating at airports from this District.

62. In July 2021, Polar Air Cargo reported evidence of an internal kickback arrangement to law enforcement. Several people that were executives, sales agents, freight forwarding vendors, ground handling vendors, trucking vendors, and an airline-customer of Polar Air Cargo have since pled guilty to a wire fraud and money laundering conspiracy that operated from 2009 to July 2021, and are awaiting sentencing.[58]

63. Atlas owns Titan Aviation Leasing, an aircraft leasing company.

## G.  Delta

64. Defendant Delta Air Lines, Inc. ("Delta") is a corporate citizen of the U.S., an air carrier, and owns or controls at least one other air carrier, Endeavor Air, Inc. For each owned or controlled air carrier, Delta purportedly holds a Certificate of Public Convenience and Necessity issued by the Secretary of

---

[58] *See, e.g.*, DOJ Press Release, "Chief Operating Officer And Vice President Of International Cargo Airline Plead Guilty To Defrauding Their Employer" (Feb. 29, 2024), Doc. 497, PE-N4 319 ("The fraud they perpetrated — which involved a substantial portion of Polar's senior management and at least 10 customers and vendors of Polar — led to pervasive corruption of Polar's business, touching nearly every aspect of the company's operations for over a decade."); *and* DOJ Press Release, "Senior Operations Executive Pleads Guilty To Defrauding International Cargo Airline Employer" (Jan. 16, 2024), Doc. 498, PEN4 322; *and* U.S.A. v. Winkelbauer et al, SDNY Case 23-crim-133, Sealed Indictment, ECF 3 (Mar. 13, 2023) (unsealed Apr. 12, 2023), Doc. 499, PE-N4 324.

Transportation, that permits it to conduct air commerce in the U.S. pursuant to Chapter 411 of Title 49 of the U.S. Code. Delta provides passenger and cargo air transportation in the United States, including flights originating and terminating at airports from this District.

65. Delta has a joint venture agreement with Defendant Air France-KLM called the SkyTeam Alliance.[59]

66. Delta has a joint venture agreement with Defendant LATAM.[60]

67. Delta owns 10% of Defendant LATAM, 3% of Defendant Air France-KLM, and owns shares of other foreign carriers Virgin Atlantic (UK), Aeroméxico, Korean Air, and China Eastern.[61] Many of these interests represent a joint venture with a foreign sovereign.[62]

68. Delta owns Monroe Energy, LLC, a refinery with storage facilities and pipelines.[63]

─────────────────

[59] *See* DOT List of Active Antitrust Immunized Alliances (Oct. 19, 2022), Doc. 287, PE-D3 380 (referencing Dkt. DOT-OST-2013-0068).

[60] *See id.* (referencing Dkt. DOT-OST-2020-0105).

[61] *See* Delta 2023 SEC Form 10-K, 5 (Feb. 12, 2024).

[62] See, *e.g.*, LATAM 2023 SEC Form 6-K, Note 1 (Feb. 22, 2024) (stating that Qatar Airways is an owner). *See also*, Air France-KLM Website, Shareholding Structure, Doc. 473, PE-N3 82 from https://web.archive.org/web/20240223032723/https://www.airfranceklm.com/en/fina nce/air-france-klm-capital/shareholding-structure (Air France-KLM showing the governments of France, the Netherlands, and China (through its control of China Eastern Airlines) are also owners).

[63] *See* Delta Air Lines, Inc. SEC Form 10-K, 11 (Feb. 10, 2023).

69.    Delta admitted that the IATA WSG is an agreement among member-carriers of the IATA to allocate the market of takeoff and landing reservations.[64]

### H.    Lufthansa

70.    Defendant Deutsche Lufthansa AG ("Lufthansa") is a citizen of Germany, an air carrier, and owner of air carriers Swiss International Air Lines (citizen of Switzerland), Austrian Airlines (citizen of Austria), Brussels Airlines (citizen of Belgium), Eurowings Europe GmbH (citizen of Austria), EW Discover GmbH (citizen of Germany), Lufthansa CityLine GmbH (citizen of Germany), and Air Dolomiti (citizen of Germany). Lufthansa purportedly holds a foreign air carrier permit for certain of its carriers, issued by the Secretary of Transportation, that permits it to conduct air commerce in the U.S. pursuant to Chapter 413 of Title 49 of the U.S. Code.  Lufthansa provides passenger and cargo air transportation between member-states of the European Union and the United States, including flights originating and terminating at airports from this District.

71.    Lufthansa has a joint venture agreement with Defendants Air Canada and United Airlines called the Star Alliance.[65]

---

[64]    *See* Endres v. Moody *et al*, Case 1:23-cv-12051, Defendants' Memorandum of Law, ECF 121 (D.Mass. Dec. 8, 2023), Doc. 425, PE-N1 1 at 2.

[65]    *See* DOT List of Active Antitrust Immunized Alliances (Oct. 19, 2022), Doc. 287, PE-D3 380.

72.   Lufthansa admitted that the IATA WSG is an agreement among member-
      carriers of the IATA to allocate the market of takeoff and landing
      reservations.[66]

**I.   FedEx**

73.   Defendant FedEx Corporation ("FedEx") is a corporate citizen of the U.S. and
      owns at least one air carrier, Federal Express Corporation d/b/a FedEx
      Express.  For each owned air carrier, FedEx purportedly holds a Certificate of
      Public Convenience and Necessity issued by the Secretary of Transportation,
      that permits it to conduct air commerce in the U.S. pursuant to Chapter 411
      of Title 49 of the U.S. Code. FedEx provides cargo air transportation in the
      United States, including flights originating and terminating at airports from
      this District.

74.   FedEx owns or controls several domestic and foreign motor carriers,
      including Federal Express Corporation, USDOT No. 86876; FedEx Freight
      Canada Corp., USDOT No. 1542047; FedEx Freight Inc., USDOT No. 239039;
      and FedEx Ground Package System Inc., USDOT No. 265752.

---

[66]   *See* Endres v. Moody *et al*, Case 1:23-cv-12051, Defendants' Memorandum of
Law, ECF 121 (D.Mass. Dec. 8, 2023), Doc. 425, PE-N1 1 at 2.

75.   FedEx admitted that the IATA WSG is an agreement among member-
      carriers of the IATA to allocate the market of takeoff and landing
      reservations.[67]

### J.   Frontier

76.   Defendant Frontier Group Holdings, Inc. ("Frontier") is a corporate citizen of
      the U.S. and owns at least one air carrier, Frontier Airlines, Inc.  For each
      owned air carrier, Frontier purportedly holds a Certificate of Public
      Convenience and Necessity issued by the Secretary of Transportation, that
      permits it to conduct air commerce in the U.S. pursuant to Chapter 411 of
      Title 49 of the U.S. Code. Frontier provides passenger and cargo air
      transportation in the United States, including flights originating and
      terminating at airports from this District.

77.   Frontier admitted that the IATA WSG is an agreement among member-
      carriers of the IATA to allocate the market of takeoff and landing
      reservations.[68]

---

[67]   *See* Endres v. Moody *et al*, Case 1:23-cv-12051, Defendants' Memorandum of
Law, ECF 121 (D.Mass. Dec. 8, 2023), Doc. 425, PE-N1 1 at 2.
[68]   *See* Endres v. Moody *et al*, Case 1:23-cv-12051, Defendants' Memorandum of
Law, ECF 121 (D.Mass. Dec. 8, 2023), Doc. 425, PE-N1 1 at 2.

**K.    Hawaiian**

78.    Defendant Hawaiian Holdings, Inc. ("Hawaiian") is a corporate citizen of the U.S. and owns at least one air carrier, Hawaiian Airlines, Inc.  For each owned air carrier, Hawaiian purportedly holds a Certificate of Public Convenience and Necessity issued by the Secretary of Transportation, that permits it to conduct air commerce in the U.S. pursuant to Chapter 411 of Title 49 of the U.S. Code. Hawaiian provides passenger and cargo air transportation in the United States, including flights originating and terminating at airports from this District.

79.    Hawaiian has a joint venture agreement with Defendants Air Canada, JetBlue, United Airlines, and others, called the United Airlines Ventures Sustainable Flight Fund.[69]

80.    Hawaiian has a joint venture agreement with Defendant Amazon called the Air Transport Service Agreement ("ATSA").[70]

81.    Hawaiian has a Contract for Scheduled Passenger Service with Defendant Amazon.[71]

---

[69]  *See* United Airlines Ventures Sustainable Flight Fund partners, Doc. 447, PE-N1 151.

[70]  *See* Hawaiian SEC Form 10-K (Feb. 15, 2024) at 4, referenced on the exhibit list as Exhibit 10.44.  _Note that_ neither party has publicly filed the agreement with the SEC or the DOT.

[71]  *See id.* at 41 (mentioning Amazon's "commercial passenger service").

82.   Hawaiian has a merger agreement with Defendant Alaska Air.[72]

83.   Hawaiian admitted that the IATA WSG is an agreement among member-
      carriers of the IATA to allocate the market of takeoff and landing
      reservations.[73]

   **L.   ICAG**

84.   Defendant International Consolidated Airlines Group, S.A. ("ICAG") is a
      citizen of Spain and owns several air carriers including British Airways Plc
      (citizen of U.K.), Iberia Air Lines (citizen of Spain), Vueling (citizen of Spain),
      and Aer Lingus (citizen of Ireland).  ICAG purportedly holds a foreign air
      carrier permit for each of its carriers, issued by the Secretary of
      Transportation, that permits it to conduct air commerce in the U.S. pursuant
      to Chapter 413 of Title 49 of the U.S. Code.  ICAG provides passenger and
      cargo air transportation between member-states of the European Union, the
      U.K. and the United States, including flights originating and terminating at
      airports from this District.

85.   ICAG has a joint venture agreement with Defendants Alaska Air and
      American Airlines called Oneworld Alliance.[74]

---

[72]  *See* Alaska Air SEC Form 10-K (Feb. 14, 2024) at Exhibit 2.1.

[73]  *See* Endres v. Moody *et al*, Case 1:23-cv-12051, Defendants' Memorandum of
Law, ECF 121 (D.Mass. Dec. 8, 2023), Doc. 425, PE-N1 1 at 2.

[74]  *See* DOT List of Active Antitrust Immunized Alliances (Oct. 19, 2022), Doc. 287,
PE-D3 380 (referencing Dkt. DOT-OST-2008-0252).  *See also*,
https://www.oneworld.com/members (showing Alaska Air).

86.   ICAG admitted that the IATA WSG is an agreement among member-carriers of the IATA to allocate the market of takeoff and landing reservations.[75]

**M.   JetBlue**

87.   Defendant JetBlue Airways Corporation ("JetBlue") is a corporate citizen of the U.S. and an air carrier.  JetBlue purportedly holds a Certificate of Public Convenience and Necessity issued by the Secretary of Transportation, that permits it to conduct air commerce in the U.S. pursuant to Chapter 411 of Title 49 of the U.S. Code. JetBlue provides passenger and cargo air transportation in the United States, including flights originating and terminating at airports from this District.

88.   JetBlue owns, has an interest in, or has a joint venture, partnership, alliance, or other combination agreement with AGA Service Company d/b/a Allianz Partners USA, an insurance carrier.

89.   JetBlue has a joint venture agreement with Defendants Air Canada, Hawaiian, United Airlines, and others, called the United Airlines Ventures Sustainable Flight Fund.[76]

---

[75]   *See* Endres v. Moody *et al*, Case 1:23-cv-12051, Defendants' Memorandum of Law, ECF 121 (D.Mass. Dec. 8, 2023), Doc. 425, PE-N1 1 at 2.

[76]   *See* United Airlines Ventures Sustainable Flight Fund partners, Doc. 447, PE-N1 151.

90.   JetBlue admitted that the IATA WSG is an agreement among member-
      carriers of the IATA to allocate the market of takeoff and landing
      reservations.[77]

**N.   LATAM**

91.   Defendant LATAM Airlines Group S.A. ("LATAM") is a corporate citizen of
      Chile that owns or controls several air carriers of different citizenship
      including Transporte Aéreo S.A. (LATAM Airlines Chile), LAN Airlines Perú
      S.A. (LATAM Airlines Peru), Aerolane, Líneas Aéreas Nacionales del
      Ecuador S.A. (LATAM Airlines Ecuador), LAN Argentina S.A. (LATAM
      Airlines Argentina), Aerovías de Integración Regional, Aires S.A. (LATAM
      Airlines Colombia), TAM S.A. (TAM or LATAM Airlines Brazil), Transportes
      Aéreos del Mercosur S.A.(LATAM Paraguay), LAN Cargo S.A. (LATAM
      Cargo, Chile), Línea Aérea Carguera de Colombia S.A. (LANCO or LATAM
      Cargo Colombia), and Aerolinhas Brasileiras S.A. (ABSA or LATAM Cargo
      Brazil). LATAM purportedly holds a foreign air carrier permit for each of its
      carriers, issued by the Secretary of Transportation, that permits it to conduct
      air commerce in the U.S. pursuant to Chapter 413 of Title 49 of the U.S.
      Code.  LATAM provides passenger and cargo air transportation between
      Argentina, Brazil, Chile, Columbia, Ecuador, Paraguay, Peru, and the United

---

[77]   *See* Endres v. Moody *et al*, Case 1:23-cv-12051, Defendants' Memorandum of
Law, ECF 121 (D.Mass. Dec. 8, 2023), Doc. 425, PE-N1 1 at 2.

States, including flights originating and terminating at airports from this District.

92.   LATAM has a joint venture agreement with Defendant Delta.[78]

93.   LATAM admitted that the IATA WSG is an agreement among member-carriers of the IATA to allocate the market of takeoff and landing reservations.[79]

### O.   Rand

94.   Defendant Rand Parent, L.L.C. ("Rand") is a corporate citizen of the U.S. created by a joint venture of investment firms Apollo Global Management, Inc., J.F. Lehman & Company, LLC and Hill City Capital LP, to acquire Defendant Atlas on March 17, 2023.[80]  Rand purportedly received a private list of investments of Atlas Air and information regarding its legal proceedings involving former Polar Air Cargo employees as part of its due diligence prior to its acquisition.[81]

---

[78]   *See* DOT List of Active Antitrust Immunized Alliances (Oct. 19, 2022), Doc. 287, PE-D3 380 (referencing Dkt. DOT-OST-2020-0105).

[79]   *See* Endres v. Moody *et al*, Case 1:23-cv-12051, Defendants' Memorandum of Law, ECF 121 (D.Mass. Dec. 8, 2023), Doc. 425, PE-N1 1 at 2.

[80]   *See* Atlas Air Worldwide Holdings, Inc. SEC Form 8-K (Mar. 17, 2023).

[81]   *See* Atlas Air Worldwide Holdings, Inc. SEC Form 8-K (Aug. 4, 2022), Exhibit 2.1 Merger Agreement, Article III Representations and Warranties of the Company, Sections 3.03 (subsidiaries and joint ventures), 3.08 (legal proceedings), 3.12 (labor), 3.16 (property), 3.17 (contracts), 3.18 (government contracts), 3.26 (vendors and customers), and 3.27 (title to assets).

**P.   Southwest**

95.   Defendant Southwest Airlines, Co. ("Southwest") is a corporate citizen of the U.S., an air carrier, and owns air carrier AirTran Airways, Inc.  For each owned air carrier, Southwest purportedly holds a Certificate of Public Convenience and Necessity issued by the Secretary of Transportation, that permits it to conduct air commerce in the U.S. pursuant to Chapter 411 of Title 49 of the U.S. Code.  Southwest provides passenger and cargo air transportation in the United States, including flights originating and terminating at airports from this District.

96.   On information and belief, Southwest has a partnership, joint venture, alliance, or other combination agreement with National Railroad Passenger Corporation, *dba* Amtrak.[82]

97.   Southwest admitted that the IATA WSG is an agreement among member-carriers of the IATA to allocate the market of takeoff and landing reservations.[83]

**Q.   Spirit**

98.   Defendant Spirit Airlines, Inc. ("Spirit") is a corporate citizen of the U.S., an air carrier, and may own other air carriers.  Spirit purportedly holds a

---

[82]   *See* D. Mass. Case 1:21-cv-11558 docket showing joint representation.

[83]   *See* Endres v. Moody *et al*, Case 1:23-cv-12051, Defendants' Memorandum of Law, ECF 121 (D.Mass. Dec. 8, 2023), Doc. 425, PE-N1 1 at 2.

Certificate of Public Convenience and Necessity issued by the Secretary of Transportation, that permits it to conduct air commerce in the U.S. pursuant to Chapter 411 of Title 49 of the U.S. Code. Spirit provides passenger and cargo air transportation in the United States, including flights originating and terminating at airports from this District.

99. Spirit admitted that the IATA WSG is an agreement among member-carriers of the IATA to allocate the market of takeoff and landing reservations.[84]

### R.   United Airlines

100. Defendant United Airlines Holdings, Inc. ("United Airlines") is a corporate citizen of the U.S. and owns or has an interest in several air carriers of different nationality, including United Airlines, Inc., (citizen of U.S.), CAL Cargo, S.A. de C.V. (citizen of Mexico), Continental Airlines de Mexico, S.A. (citizen of Mexico), Challenge Airlines (IL) Ltd. (citizen of Israel), and ExpressJet Airlines, Inc., f/k/a/ Continental Express, Inc. (citizen of U.S.). For each owned air carrier, United Airlines purportedly holds a Certificate of Public Convenience and Necessity issued by the Secretary of Transportation, that permits it to conduct air commerce in the U.S. pursuant to Chapter 411 of Title 49 of the U.S. Code. United Airlines provides passenger and cargo air

---

[84]  *See* Endres v. Moody *et al*, Case 1:23-cv-12051, Defendants' Memorandum of Law, ECF 121 (D.Mass. Dec. 8, 2023), Doc. 425, PE-N1 1 at 2.

transportation in the United States, including flights originating and terminating at airports from this District.

101.  United Airlines has a joint venture agreement with Defendants Air Canada and Lufthansa called the Star Alliance.[85]

102.  United Airlines has a joint venture agreement with Defendants Air Canada, Hawaiian, JetBlue, and others, called the United Airlines Ventures Sustainable Flight Fund[86] to invest in entities involved in the manufacture of Sustainable Aviation Fuel (SAF), a biofuel.

103.  United Airlines admitted that the IATA WSG is an agreement among member-carriers of the IATA to allocate the market of takeoff and landing reservations.[87]

S.   UPS

104.  Defendant United Parcel Service, Inc. ("UPS") is a corporate citizen of the U.S. and owns at least one air carrier, United Parcel Service Co. (citizen of U.S.). For each owned air carrier, UPS purportedly holds a Certificate of Public Convenience and Necessity issued by the Secretary of Transportation, that permits it to conduct air commerce in the U.S. pursuant to Chapter 411

------

[85]  *See* DOT List of Active Antitrust Immunized Alliances (Oct. 19, 2022), Doc. 287, PE-D3 380.

[86]  *See* United Airlines Ventures Sustainable Flight Fund partners, Doc. 447, PE-N1 151.

[87]  *See* Endres v. Moody *et al*, Case 1:23-cv-12051, Defendants' Memorandum of Law, ECF 121 (D.Mass. Dec. 8, 2023), Doc. 425, PE-N1 1 at 2.

of Title 49 of the U.S. Code. UPS provides cargo air transportation in the United States, including flights originating and terminating at airports from this District.

105. UPS owns, or controls several domestic and foreign motor carriers, including license USDOT No. 21800.

106. UPS admitted that the IATA WSG is an agreement to allocate the market of takeoff and landing reservations.[88]

### T.    Government Defendants

107. "Defendant Government" means one or more of the six government defendants Ashley Moody, City of New York, City of Newark, MWAA, PANYNJ, and the United States.

### 1.   Ashley Moody, Attorney General of Florida

108. Defendant Ashley Moody ("Moody") is and has been the Attorney General of Florida since January 2019, and as such is the highest law enforcement officer of the State's government.  Moody was purportedly employed as a judge in a state court of Florida from 2006-2017 and as an attorney for the U.S. prior to that.

---

[88]   *See* Endres v. Moody *et al*, Case 1:23-cv-12051, Defendants' Memorandum of Law, ECF 121 (D.Mass. Dec. 8, 2023), Doc. 425, PE-N1 1 at 2.

109.   Moody is a member of the National Association of Attorneys General, which

resides in this district, and therefore she or her agent is found in this

district.[89]

110.   Moody admitted that the IATA WSG is an agreement among member-

carriers of the IATA to allocate the market of takeoff and landing

reservations.[90]

### 2.   City of New York, NY

111.   Defendant City of New York is a local government in the State of New York

and is the owner of LaGuardia and John F. Kennedy airports and

purportedly leases both airports to Defendant PANYNJ.

112.   The City of New York is represented in this district by the National League of

Cities, and therefore it or its agent is found in this district.[91]

---

[89]   See, *e.g.,* **(a)** National Assoc. of Attorneys General, Letter to Congress Re: Support for the State Antitrust Enforcement Venue Act of 2021 (Jun. 18, 2021), Doc. 490, PE-N4 1; and **(b)** National Assoc. of Attorneys General, Letter to Congress Re: Support for Reforming Pharmacy Benefit Managers (Feb. 20, 2024), Doc. 491, PE-N4 6.

[90]   *See* Endres v. Moody *et al*, Case 1:23-cv-12051, Defendants' Memorandum of Law, ECF 121 (D.Mass. Dec. 8, 2023), Doc. 425, PE-N1 1 at 2.

[91]   *See* NYC Council, "National League of Cities Convening" (Apr. 28, 2017), Doc. 492, PE-N4 12 from https://council.nyc.gov/news/2017/04/28/national-league-of-cities-convening/.

### 3.  City of Newark, NJ

113.  Defendant City of Newark is a local government in the State of New Jersey and is the owner of Newark Liberty airport and purportedly leases the airport to Defendant PANYNJ.

114.  The City of Newark is represented in this district by the National League of Cities, and therefore it or its agent is found in this district.[92]

115.  The City of Newark admitted that the IATA WSG is an agreement among member-carriers of the IATA to allocate the market of takeoff and landing reservations.[93]

### 4.  MWAA

116.  Defendant Metropolitan Washington Airports Authority ("MWAA") is a bi-state agency, a "public body politic and corporate," created in 1985 by the Commonwealth of Virgina and the District of Columbia[94] *"for the purpose of acquiring, operating, maintaining, developing, promoting and protecting Ronald Reagan Washington National Airport and Washington Dulles*

---

[92]  *See* National League of Cities, "The City of Newark Solves a Big Problem" (Feb. 23, 2018), Doc. 494, PE-N4 21 from https://web.archive.org/web/20240304230718/https://www.nlc.org/post/2018/02/23/the-city-of-newark-solves-a-big-problem/.

[93]  *See* Endres v. Moody *et al*, Case 1:23-cv-12051, Defendants' Memorandum of Law, ECF 121 (D.Mass. Dec. 8, 2023), Doc. 425, PE-N1 1 at 2.

[94]  Code of Virginia, §5.1-153. *See also*, Ch. 598, Virginia Acts of Assembly of 1985, as amended. *See also*, the District of Columbia Regional Airports Authority Act of 1985, as amended.

*International Airport together as primary airports for public purposes serving the metropolitan Washington area.*"[95] In 1987, the Congress hired the MWAA to operate the two metropolitan Washington, D.C. airports for public purposes, 49 U.S.C. § 49106(b)(1)(a); the Congress had previously authorized the FAA to operate these airports. The terms of the operating lease were codified in law[96] and adopted in the federal government's lease agreement with the MWAA.[97] MWAA operates the airports pursuant to the Congress' regulations of aviation programs at Subtitle VII of Title 49 of the U.S. Code.[98] MWAA therefore is found in this district.

117. MWAA leases various airport assets at Reagan National and/or Washington Dulles airports to each Defendant Carrier.

---

[95] Code of Virginia, Chapter 10, § 5.1-156. *See also,* the District of Columbia Regional Airports Authority Act of 1985, as amended, and Ch. 598, Virginia Acts of Assembly of 1985, as amended.

[96] *See* Metropolitan Washington Airports Act of 1986, Pub. L. 99-500, title VI, §6012, 100 Stat. 1783-385 (1986), *codified at* 49 U.S.C. § 49101 *et seq.*

[97] *See* Lease of the Metropolitan Washington Airports between the U.S.A. acting by and through the Secretary of Transportation and the Metropolitan Washington Airports Authority (Mar. 2, 1987), amend. 1 (1991), amend. 2 (1998), amend. 3 (2003) and amend. 4 (2013), Doc. 308, PE-A1 295.

[98] See *id.* at 305 ("[MWAA] shall have the same proprietary powers and be subject to the same restrictions with respect to federal law as any other airport, except as provided herein.").

118. MWAA presumably holds an airport operator certificate issued by the Secretary of Transportation, pursuant to section 51(b)(1) of the Airport and Airway Development Act of 1970, 49 U.S.C. § 44706.[99]

119. MWAA admitted that the IATA WSG is an agreement among member-carriers of the IATA to allocate the market of takeoff and landing reservations.[100]

### 5. PANYNJ

120. Defendant Port Authority of New York and New Jersey ("PANYNJ") is a "body corporate and politic," created by the States of New York and New Jersey to jointly develop the designated port "district," having agreed to "*hold[] in high trust for benefit of the Nation the special blessings and natural advantages thereof.*"[101]   Congress authorized the bi-state agency,[102] as required by the U.S. Constitution.[103]

---

[99]   *Note that* the DOT does not publish the airport operator certificate or a list of operator certificates but it publishes a list of certificated "airports;" *see* FAA Part 139 Airport Certification Status List (ACSL) (Feb. 22, 2024), Doc. 486, PE-N3 167 from https://web.archive.org/web/20240301013255/https://www.faa.gov/sites/faa.gov/files/arp-aas-part139-cert-status-table.xlsx.

[100]   *See* Endres v. Moody *et al*, Case 1:23-cv-12051, Defendants' Memorandum of Law, ECF 121 (D.Mass. Dec. 8, 2023), Doc. 425, PE-N1 1 at 2,

[101]   Port Authority of New York, Pub. Res. No. 17, S.J. Res. 88 (Aug. 23, 1921) Art. 6, Art. 2, and Art. 1, respectively.

[102]   *See id.*

[103]   *See* U.S. Const. art. I, § 10, cl. 3. ("No State shall, without the Consent of Congress, . . . enter into any Agreement or Compact with another State[.]").

121. PANYNJ operates, *inter alia*, LaGuardia, JFK, and Newark Liberty airports pursuant to the Congress' regulation of aviation programs at Subtitle VII of Title 49 of the U.S. Code.  The Congress has delegated the authority to enforce the economic and safety regulations of air commerce, including those of airport operators, to the Secretary of Transportation, whose office resides in this district.

122. PANYNJ purportedly leases LaGuardia and JFK airports from the City of New York, and purportedly leases Newark Liberty airport from the City of Newark.

123. PANYNJ leases various airport assets at LaGuardia, JFK, and/or Newark Liberty airports to each Defendant Carrier.

124. PANYNJ presumably holds an airport operator certificate issued by the Secretary of Transportation, pursuant to section 51(b)(1) of the Airport and Airway Development Act of 1970, 49 U.S.C. § 44706. [104]

125. PANYNJ is a member and a director of Airports Council International North America which is located in this district, therefore [105]

---

[104] *Note that,* as stated *supra,* the FAA does not publish the airport operator certificate or a list of operator certificates but publishes a list of certificated "airports;" *see* FAA Part 139 Airport Certification Status List (ACSL) (Feb. 22, 2024), Doc. 486, PE-N3 167 from https://web.archive.org/web/20240301013255/https://www.faa.gov/sites/faa.gov/files/arp-aas-part139-cert-status-table.xlsx.

[105] *See* ACI-NA Leadership, Doc. 493, PE-N4 14 from https://web.archive.org/web/20240304223749/https://airportscouncil.org/about/aci-na-leadership/.

126. PANYNJ admitted that the IATA WSG is an agreement to allocate the market of takeoff and landing reservations.[106]

### 6. The United States of America

127. Defendant the United States of America ("the United States") is a nation established "of the people, by the people, for the people" pursuant to the U.S. Constitution, as amended.[107]  The people (the "public") own Reagan National (DCA) and Dulles (IAD) airports located in Washington, D.C.  The Congress, as fiduciary of the public's airport assets, authorized the Secretary of Transportation to bind the United States to a lease agreement between Defendant MWAA for the two airports pursuant to 49 U.S.C. § 49104.

128. The United States admitted that the IATA WSG is an agreement to allocate the market of takeoff and landing reservations.[108]

### U.  Defendant Carriers, IATA Carriers, and Passenger Carriers

129. "Defendant Carrier" means one or more of the eighteen Defendants Air Canada, Air France – KLM, Alaska Air, Amazon, American Airlines, Atlas,

---

[106]  *See* Endres v. Moody *et al*, Case 1:23-cv-12051, Defendants' Memorandum of Law, ECF 121 (D.Mass. Dec. 8, 2023), Doc. 425, PE-N1 1 at 2.

[107]  Abraham Lincoln, Gettysburg Address (Nov. 19, 1863). from https://www.loc.gov/exhibits/gettysburg-address/ext/trans-nicolay-copy.html ("[W]e here highly resolve these dead shall not have died in vain; that the nation, shall have a new birth of freedom, and that government of the people by the people for the people, shall not perish from the earth.").

[108]  *See* Endres v. Moody *et al*, Case 1:23-cv-12051, Defendants' Memorandum of Law, ECF 121 (D.Mass. Dec. 8, 2023), Doc. 425, PE-N1 1 at 2.

Delta, Lufthansa, FedEx, Frontier, Hawaiian, ICAG, JetBlue, LATAM, Southwest, Spirit, United Airlines, and UPS.

130.  (From ¶164.) "Defendant IATA Carrier" means one or more of the fourteen Defendants Air Canada, Air France – KLM, Alaska Air, American Airlines, Atlas, Delta, Lufthansa, FedEx, Hawaiian, ICAG, JetBlue, LATAM, United Airlines, and UPS.

131.  "Defendant Passenger Carrier" means one or more of the fifteen Defendants Air Canada, Air France – KLM, Alaska Air, American Airlines, Atlas, Delta, Lufthansa, Frontier, Hawaiian, ICAG, JetBlue, LATAM, Southwest, Spirit, and United Airlines.

## V.   THE CONSPIRACY OF DEFENDANT CARRIERS TO RESTRAIN TRADE IN AIRSPACE RESERVATIONS

### A.   The IATA and the WSG Agreement

#### 7.  The IATA Ownership Structure

132.  The International Air Transport Association (IATA) is a joint venture of Defendants Air Canada, Air France-KLM, Alaska Air, American Airlines, Delta, FedEx, Hawaiian, ICAG, JetBlue, LATAM, Lufthansa, Rand, United Airlines, UPS, and other non-party air carriers and foreign air carriers.[109] (To ¶133.)

---

[109]  *See https://www.iata.org/en/about/members/* accessed on Jan 15, 2024 ("IATA now represents some 320 airlines in over 120 countries.").

133.   (From ¶132.) The IATA joint venture is a revenue sharing agreement.[110] (To

¶395.)

### 8.   The IATA Governance Structure

134.   The IATA is governed by a General Meeting and an executive committee,

known as the Board of Governors.[111]  The Board of Governors approves the

agenda for the General Meeting and determines IATA policy.[112]  To serve on

the Board of Governors, the individual must be chair of the board, chief

executive officer, or president of the member-airline or the entity that is its

majority shareholder.[113]  Each Board member agrees to "*act as a*

---

[110]  *See* IATA Membership Dues, Doc. 441, PE-N1 118 from
https://web.archive.org/web/20240118051711/https://www.iata.org/en/about/member
s/fees/ ("The variable fee is calculated only for members that perform over 5 million
International Revenue Tonne Kilometers (RTKMs) per annum and is paid in
addition to the fixed fee.").

[111]  *See* IATA Articles of Association (undated, unsigned), Doc. 399, PE-L 1, Art.
VIII at 5 from
https://web.archive.org/web/20240224195920/https://www.iata.org/contentassets/01e
197ea66384f27a9e763d151ae2d7d/articles-of-association.pdf.  See also, IATA Act of
Incorporation, Doc. 400, PE-L 11 from
https://web.archive.org/web/20230215210134/https://www.iata.org/contentassets/01e
197ea66384f27a9e763d151ae2d7d/act-of-incorporation.pdf.

[112]  *See* IATA Articles of Association (undated, unsigned), Doc. 399, PE-L 1, Art.
XIV, 8(d) and (i) at 7, 8.

[113]  See IATA Rules and Regulations of the Board of Governors (undated), Doc. 401,
PE-L 14, III (7) at 15 from
https://web.archive.org/web/20230606001013/https://www.iata.org/contentassets/01e
197ea66384f27a9e763d151ae2d7d/rules-regulations-bg.pdf.

*representative of the interests of the membership as a whole and not as a*
*representative of his or her region or Member airline.*"[114]

135.   Below is each Defendant Carrier that has been a member of the IATA Board of Governors as stated in the IATA's Annual Reviews from 2005 to 2022, which are published on its website.[115]

### a.   Air Canada

136.   An executive for Defendant Air Canada has served on the Board of Governors since at least June 2004.

137.   Calin Rovinescu, President and Chief Executive Officer of Air Canada from April 2009 to February 2021, was an IATA Governor from June 2011 to November 2020.

138.   Michael Rousseau, President and Chief Executive Officer of Air Canada from February 2021 to present, has been an IATA Governor since June 2020.

### b.   Air France-KLM

139.   An executive for Defendant Air France-KLM has served on the Board of Governors since at least June 2004.

140.   Alexandre de Juniac, President and Chief Executive Officer of Air France-KLM from 2013 to 2016, was an IATA Governor from June 2013 to June 2014

---

[114]   *Id.*, III (6).

[115]   *See* Exhaustless Inc. Workpaper IATA BOGs, Doc. 402, PE-L 26.  *See also,* IATA's Annual Reviews published at https://www.iata.org/en/publications/annual-review/.

and from June 2015 to June 2016.  Juniac then became IATA's Director

General from August 2016, after the IATA's Board of Governors nominated

him and the voting members ratified his appointment at the June 2016

Annual General Meeting, until he left in April 2021.

141.  Jean-Marc Janaillac, Chairman and Chief Executive Officer Air France-KLM

from July 2016 to June 2018, was an IATA Governor from August 2016 to

June 2018.

142.  Benjamin Smith, Chief Executive Officer of Air France-KLM from August

2018 to present, and Director from December 2018, has been an IATA

Governor since June 2018.

### c.  American Airlines

143.  An executive for Defendant American Airlines has served on the Board of

Governors since at least June 2004.

144.  W. Douglas Parker was an executive officer of various airlines from 1995 to

2022, most recently as Chief Executive Officer of American Airlines Group,

Inc. from December 2013 to March 2022, and was Chairman of the Board

from 2014 to April 2023.  Parker was an IATA Governor from 2015 to

November 2022.

145.  Robert Isom has been an executive officer of American Airlines and its

predecessors since 2007 and has been Director and Chief Executive Officer of

American Airlines Group, Inc. from March 2022, to present.  Isom has been

an IATA Governor since June 2023.

### d.     Atlas

146.   John Dietrich, an attorney, was an executive officer at Atlas Air Worldwide Holdings, Inc. from September 2006, culminating in serving as its President and Chief Executive Officer from January 2020 to June 2023.  Dietrich has been on the Board of Governors from June 2022 to present (see ¶150).

### e.     Delta

147.   An executive for Defendant Delta has served on the Board of Governors periodically since at least June 2004.

148.   Richard Anderson, Chief Executive Officer of Delta from 2007 to 2016 and a former attorney, was an IATA Governor from June 2007 to June 2015.

### f.     FedEx

149.   David Bronczek was an executive officer of FedEx Express from 1998 to 2017 and President and Chief Operating Officer of Defendant FedEx from 2017 through March 1, 2019.  Bronczek was an IATA Governor from at least June 2004 to June 2015 and from June 2016 to June 2019.)

150.   John Dietrich has been Executive Vice President and Chief Financial Officer of Defendant FedEx since July 2023.  Dietrich has been an IATA Governor from June 2022 to present (see ¶146).[116]

---

[116] *See* IATA Business Registration Quebec (July 2023), Doc. 403, PE-L 40 at 47.

### g. Hawaiian

151. Mark Dunkerly, Director, President, and Chief Executive Officer of Defendant Hawaiian from June 2005 to March 2018, was an IATA Governor from June 2016 to March 2018.

152. Peter Ingram, Director, President, and Chief Executive Officer of Hawaiian from March 2018, to present, has been an IATA Governor since June 2023.

### h. ICAG

153. Willie Walsh, Chief Executive Officer of British Airways from 2005 until it merged with Iberia Airlines in 2011 and became International Consolidated Airlines Group (ICAG), was an IATA Governor from June 2005 to June 2007. Walsh was Chief Executive Officer of ICAG from 2011 to September 2020, and was an IATA Governor from June 2011 to June 2020. Walsh has been IATA's Director General since April 2021 to the present, after IATA's Board of Governors nominated him and the voting members ratified his appointment at the November 2020 Annual General Meeting.

154. Luis Gallego Martín, Chief Executive Officer ICAG from September 2020 to present, has been an IATA Governor since June 2018.

### i. JetBlue

155. David Barger, Chief Executive Officer of Defendant JetBlue from 2007 to 2015, was an IATA Governor from June 2012 to June 2015.

156.   Robin Hayes, Chief Executive Officer of JetBlue from 2015 to present, was an IATA Governor from June 2015 to June 2023, and was Chair of the Board of Governors from June 2020 to June 2022.

### j.   LATAM

157.   Enrique Cueto, Chief Executive Officer of LATAM from June 2012 to April 2020, was an IATA Governor from June 2004 to March 2020.

158.   Roberto Alvo, Chief Executive Officer of LATAM Airlines Group S.A. from March 2020 to present, has been an IATA Governor since June 2019.

### k.   Lufthansa

159.   An executive for Lufthansa has served on the Board of Governors since at least June 2004.

160.   Carsten Spohr, Chairman and Chief Executive Officer of Lufthansa from May 2014 to present, has been an IATA Governor since June 2013.

### l.   United Airlines

161.   An executive for Defendant United Airlines has served periodically on the Board of Governors since at least June 2004.

162.   Oscar Munoz, President and Chief Executive Officer of United Airlines Holdings, Inc. from September 2015 to May 2020, and Executive Chairman of the Board from May 2020 to May 2021, was an IATA Governor from June 2018 to June 2020.

163.  J. Scott Kirby has been an executive of three airlines: President of US

Airways from 2006 to 2013, President of American Airlines from 2013-2016,

President of United Holdings from August 2016 to May 2020, and Chief

Executive Officer of United Airlines Holdings, Inc. from May 2020 to present.

Kirby has been an IATA Governor from June 2020 to present.

### 9.   The IATA Annual General Meeting

164.  (From ¶¶134 to 163, and 165 to 167.) The process to manage and carry on the

IATA WSG occurs at the IATA's Annual General Meeting ("AGM") among

airline executive officers.[117] On June 2, 2019, each Defendant Carrier voted

to continue allocating reservations to use the public's airspace according to

the IATA WSG instead of competing for reservations using Endres' market-

clearing service.[118] (To ¶¶130, 388, 406.)

165.  Below are Defendant Carrier members of the IATA, except the members

listed *supra* whose executive serves the IATA as governor, as stated in the

IATA's Annual Reviews from 2005 to 2022, which are published on its

website.

---

[117]  *See, e.g.,* IATA Press Release, Aviation Leaders Assemble in Istanbul for IATA's 79th AGM (Jun. 2, 2023), Doc. 316, PE-J 12.  *See also,* IATA Website, Annual General Meeting (printed Aug. 1, 2023), Doc. 329, PE-J 13.

[118]  *See* IATA Resolution on Slot Policy, 75th Annual General Meeting (Jun. 2, 2019), Doc. 304, PE-D3 401.

### m.    Alaska Air

166.   An Alaska Air executive officer has voted, or has authorized an employee to vote, at the IATA AGM since at least 2004.

### n.    UPS

167.   A UPS executive officer has voted, or has authorized an employee to vote, at the IATA AGM since at least 2004.

### 10. The IATA WSG

168.   (From ¶38 *et seq.*) Defendant Carriers have agreed to allocate the market of seasonal public airspace reservations for scheduled service among horizontal competitors according to the IATA Worldwide Slot Guidelines, which states: *"An airline is* <u>*entitled*</u> *to retain a series of slots for the next equivalent season if they were operated at least 80% of the time during the period for which they were allocated.  This is referred to as historic precedence."*[119]  Each Defendant PANYNJ, MWAA, City of Newark, Florida Attorney General Moody, the United States, and each Defendant Carrier except Amazon and Atlas, neither of which were a party, admitted that the IATA WSG is a market allocation agreement among carrier-members of the IATA.[120] (To ¶¶183, 389.)

--------------------------------------

[119]  IATA Worldwide Slot Guidelines, 9th Edition (Effective Jan. 1, 2019), Dkt. FAA-2020-0862 (Dec. 17, 2020), Doc. 69, PE-D1 136, § 8.1.1(f) at 174 (emphasis added).

[120]  *See* Endres v. Moody *et al*, Case 1:23-cv-12051, Defendants' Memorandum of Law, ECF 121 (D.Mass. Dec. 8, 2023), Doc. 425, PE-N1 1 at 2.

169.   In addition to horizontally allocating the market for routes and service with grandfathering, each Defendant Carrier has agreed to fix the market price of the scarce public airspace reservation to $0.[121] The IATA WSG agreement prohibits bidding for the reservations that are needed to offer scheduled service between city-pair markets and maintains a group boycott of Endres' market among all carriers, which restrains competition throughout the network of 145 domestic public service hub airports served by those carriers — the airports which fall into the IATA WSG 'level 1', 'level 2', or 'level 3' category — that account for 96% of enplanements[122].[123]  (To ¶390.)

   11.  **The IATA WSG Process to Allocate Airspace Reservations in the U.S.**

170.   The twice-a-year process to coordinate the seasonal public reservations for scheduled flight service originating and/or terminating at an airport in the

---

[121]  *See* IATA Managing Scarce Airport Capacity: Airport Slots & Worldwide Slot Guidelines (WSG) Fact Sheet (Dec. 2019), Doc. 305, PE-D3 403 at 404 ("The cost must only cover charges for the slot coordination process and not include discriminatory charges such as for the initial or primary allocation of slots.").

[122]  *See* Secretary of Transportation, National Plan of Integrated Airport Systems (NPIAS) 2023-2027, 5 (Sep. 30, 2022) (showing that there are 30 large hub, 35 medium hub, and 80 small hub airports in the National Airport System).

[123]  *See* IATA Worldwide Airport Slots Fact Sheet (Apr. 2023), Doc. 306, PE-D3 405 at 406 ("Why Not Auction Slots to the Highest Bidder? Auctioning adds costs and uncertainty to the slots process with potentially disastrous outcomes for consumers.").

U.S. is managed by the IATA and closely follows the process as described in the IATA WSG.[124]

### o.  Each carrier stakes its claim to a grandfathered entitlement.

171.  Each Defendant Carrier compares the recently expired season's airspace reservations that it obtained with grandfathering to its actual operated flights; if the carrier operated flights for at least 80% of its allocated airspace reservations, it claims 'entitlement' to 100% of the corresponding reservations at each terminal point for the next equivalent season (for example, Summer 2024 reservations 'entitles' it to Summer 2025 reservations).  This list of 'entitled' reservations is referred to as the "SHL" or Slot Historic List.[125]

172.  For the seven airports at which the FAA currently limits airspace reservations — which the IATA WSG calls "level 2" or "level 3" airports — each Defendant Carrier sends the Slot Historic List to the DOT/IATA WSG Slot Coordinator.[126]  This is called the "Agreed Historics Deadline."[127] (To ¶175.)

---

[124]  *See* IATA Worldwide Slot Guidelines, 9th Edition (Effective Jan. 1, 2019), Dkt. FAA-2020-0862 (Dec. 17, 2020), Doc. 69, PE-D1 136, Part 3 at 184.

[125]  *Id.*, §9.4 at 185.

[126]  *See* FAA Information Collection Request, OMB Control No: 2120-0524, ICR Reference No: 202108-2120-002, Supporting Statement A (Aug. 26, 2021), Doc. 261, PE-H 283 at 286 (*note* that the details of this calculation vary slightly at each airport to disguise it as a "local rule").

[127]  *See* IATA Worldwide Slot Guidelines, 9th Edition (Effective Jan. 1, 2019), Dkt. FAA-2020-0862 (Dec. 17, 2020), Doc. 69, PE-D1 136 at 193.

173. The IATA WSG does not describe the process Defendant Carriers use to allocate the airspace reservations at the remaining 138 U.S. airports which it calls "level 1." (To ¶217.)

> **p.    The 'Slot Coordinator' sets the season's reservation limit at each airport.**

174.   The DOT/IATA WSG Slot Coordinator issues a Notice of Schedule Submission Deadline to inform the public of the U.S. airports that the DOT will limit the volume of supplier airspace reservations for the next season,[128] and communicates that limit and other pertinent constraints on capacity to carriers via the IATA WSG's private system;[129] this is referred to as the "coordination parameters."[130] This notice informs carriers at which airports the FAA will interfere in the allocation of the market of reservations. (See the communications and messaging service provider, SITA, at ¶201 *et seq.*)

---

[128] *See, e.g.,* FAA Notice of Submission Deadline for Schedule Information for [ORD, JFK LAX, EWR, SFO] for the Winter 2023/2024 Scheduling Season, 88 Fed. Reg. 22514 (Apr. 13, 2023), Doc. 218, PE-B1 194.

[129] *See* IATA, How to get the most out of attending the Slot Conference (March 2022), Doc. 338, PE-J 168 at 169 ("Coordinators please . . . upload any of the following documents or website links to Swapcard . . . Declared airport capacities . . ."). *See also,* PANYNJ Comment, Dkt. FAA-2020-0385-0004 (Aug. 23, 2023) ("The FAA's standards, practices, and procedures for Slot Coordination and Schedule Facilitation, including, but not limited to, the determination of runway capacity and allocation of access to runways at such airports, are not made available to airport operators and prospective new entrants and limited incumbent air carriers.").

[130] Exhaustless Documentation of IATA WSG Calendar of Coordination History, Doc. 14, PE-D1 1. *See also,* FAA Notice of Submission Deadline for Schedule Information for [ORD, JFK, LAX, EWR, SFO] for the Summer 2024 Scheduling Season, 88 Fed. Reg. 64964 (Sep. 20, 2023), Doc. 427, PE-N1 17.

**q.      Each carrier submits its requested schedule.**

175.    (From ¶172.) Each carrier then submits its 'requested' schedule to the

DOT/IATA WSG Slot Coordinator, which is basically its same schedule as the

last equivalent season; this is called the "initial submission."[131]  No other

carrier 'requests' the same reservation for which another IATA carrier has

claimed entitlement because the IATA carriers have agreed not to compete

for airspace reservations claimed by another carrier.  In this way, each

reservation to use the airspace at each airport has largely stayed in the

hands of the carrier, and that carrier's business heir, that received the

reservation in a route certificate from the Civil Aeronautics Board ("CAB")

during the regulatory era.[132]

**r.      The Slot Coordinator then 'grants' the carrier its
schedule.**

176.    The DOT/IATA WSG Slot Coordinator then replies to the carrier's schedule

request with a "K" to 'grant' an exclusive right to that distinct airspace

---

[131]  IATA Worldwide Slot Guidelines, 9th Edition (Effective Jan. 1, 2019), Dkt. FAA-2020-0862 (Dec. 17, 2020), Doc. 69, PE-D1 136, §9.6 at 186.

[132]  *See, e.g.*, Excerpts from CAB Reports Economic Cases Dec 1969 to Apr 1970, OMB Control 2120-0524, ICR 202108-2120-002 (Sep. 20, 2021), Doc. 98, PE-H 121 at 123 (showing an example of a grant of a route certificate, Certificate for Route 54).

reservation, or with a "U" to deny a grant;[133] this is called "initial coordination" and "SAL deadline."[134] (To ¶217.)

### s. The Slot Conference.

177. Delegates of each Defendant Carrier that claimed an 'entitlement' to a reservation to use the public's airspace at an airport in the U.S., delegates of the DOT/IATA WSG Slot Coordinator, and delegates of many U.S. airport operators[135] attend a meeting to negotiate trades, swaps, or adjustments to the airspace reservation and complete their market allocation of the season's airport schedule; this is called the "Slot Conference."[136] (To ¶217.)

178. To trade in airspace reservations at the conference and bind the carrier, the carrier's delegate must be authorized by the "[p]erson in charge of entire organization."[137]

---

[133]  FAA Slot Administration Email (Jan. 29, 2021), Doc. 20, PE-B1 19.

[134]  IATA Worldwide Slot Guidelines, 9th Edition (Effective Jan. 1, 2019), Dkt. FAA-2020-0862 (Dec. 17, 2020), Doc. 69, PE-D1 136, § 9.9 at 187.

[135]  *See* IATA 152nd Slot Conference – Organizations attending (Jun. 11, 2023), Doc. 254, PE-D3 18 (showing the airport operators registered to attend the slot conference scheduled to begin June 13, 2023 — Chicago O'Hare; Newark Liberty, JFK, and LaGuardia (Port Authority of New York and New Jersey); Los Angeles; and Seattle-Tacoma (Port of Seattle) registered to attend; and a carrier joint venture at San Francisco airport (SFOTEC).) *See also*, IATA 150th Slot Conference – Organizations attending (Jun. 13, 2022), Doc. 231, PE-D3 10.

[136]  IATA Worldwide Slot Guidelines, 9th Edition (Effective Jan. 1, 2019), Dkt. FAA-2020-0862 (Dec. 17, 2020), Doc. 69, PE-D1 136, §§ 9.11-9.12 at 189.

[137]  IATA Slot Conference, Form 1 - Accreditation of Head Delegate, Doc. 404, PE-L 53.

**t.    A domestic branch of the trade association manages the domestic slot conference.**

179.   Airlines for America (A4A) hosts the 'slot conference' for the airspace reservations using the U.S. airports at which the FAA limits airspace reservations and that are not allocated at the IATA slot conference.[138]  The so-called domestic slot conference follows the market allocating and price fixing rules of the IATA WSG.[139] (To ¶¶217, 258, 392.)

180.   Defendants Air Canada, Alaska Air, American Airlines, Delta, Frontier, JetBlue, Southwest, Spirit, United Airlines, the United States, and possibly other Defendants, attend the domestic slot conference to claim their 'entitled' airspace reservations at Reagan National and/or LaGuardia airports — for free. (To ¶392.)

181.   A4A is a joint venture of Defendants Alaska Air, American Airlines, Atlas, Delta, FedEx, Hawaiian, JetBlue, Southwest, United Airlines, and UPS.[140] (To ¶392.)

------

[138]  *See* FAA Notice of Submission Deadline for Schedule Information for [ORD, JFK, LAX, SFO] for the Summer 2020 Scheduling Season, 84 Fed. Reg. 51222 (Sep. 27, 2019), Doc. 34, PE-B2 85 at 87 ("The FAA discussed the Level 2 review with airlines and airport operators in meetings at the 144th IATA Slot Conference, the domestic slot conference hosted by Airlines for America, as well as other individual meetings.").

[139]  *See* FAA Notice of limited waiver of the minimum slot usage requirement, 85 Fed. Reg. 16989 (proposed Mar. 25, 2020), Doc. 41, PE-B2 109 ("[F]AA limits operations . . .  via rules at DCA and an Order at LGA that are equivalent to IATA Level 3.")

[140]  *See* Joint Complaint of Members of Airlines for America, Inc., Dkt. DOT-OST-2023-0148-0001 (Sep. 25, 2023), Doc. 405, PE-M 1 at 5.

182.   An executive officer for each of Defendants Alaska Air, American Airlines, Atlas, Delta, FedEx, Hawaiian, JetBlue, Southwest, United Airlines, and UPS is also a current director of A4A.[141] (To ¶392.)

###### u.   Carriers hold on to grandfathered claim even when reservation is not used as agreed.

183.   (From ¶168.) Carriers agree to honor at least 80% of the airspace reservations they obtained for the season to retain 'entitled' status for the next equivalent season.  Carriers also agree to *retain* entitled status when the slots are *not* used 80% of the time when there is an "[i]nterruption of the air services of the airline due to unforeseeable and unavoidable causes outside the airline's control, for example a closure of an airport or airspace or severe weather;" this is referred to as "Justified Non Utilization of Slots," or JNUS.[142]  The FAA has implemented a modified version of this clause, requiring "a highly unusual and unpredictable condition which is beyond the control of the carrier and which affects carrier operations for a period of five consecutive days or more."[143]  (To ¶244.)

---

[141]  *See* A4A Who We Are, Doc. 470, PE-N3 23 from https://web.archive.org/web/20240219003019/https://www.airlines.org/who-we-are/.

[142]  IATA Worldwide Slot Guidelines, 9th Edition (Effective Jan. 1, 2019), Dkt. FAA-2020-0862 (Dec. 17, 2020), Doc. 69, PE-D1 136, §8.8 at 178.

[143]  Order Extending Order Limiting Operations at John F. Kennedy International Airport, 83 Fed. Reg. 46865 (Sep. 17, 2018), Doc. 22, PE-B1 23, Item 9.a.ii. at 25.

### 12. No Non-Party Co-Conspirators

184.   On information and belief, at all relevant times, no other airline, entity, or person willingly conspired with Defendants in their allocation of reservations to use the United States airspace. No averments herein against Defendants are averred against unnamed co-conspirators.

### 13. Relevant Air Transportation Service Providers

185.   Plaintiff addresses only those services involved in the distribution and sale of air transportation related to his instant antitrust and RICO complaint in the jurisdiction of the United States.

### v.      Airline Tariff Publishing Company (ATPCO)

186.   Each Defendant Carrier submitted fare and fare-related information to Airline Tariff Publishing Company ("ATPCO") to act as a tariff repository and to distribute that information to reservation systems.[144] (To ¶394.)

187.   Each Defendant Carrier instructed ATPCO, directly or indirectly, to deny access by Exhaustless to the tariff publishing system, which precluded

---

[144]   *Alitalia v. ATPCO*, Case 1:07-cv-00756, ECF 42, Memorandum and Order (SDNY Sep. 5, 2008), Doc. 442, PE-N1 119 at 120 ("ATPCO maintains a database of airfares and the rules and restrictions pertaining to those airfares and electronically distributes such data to nearly all the world's airfare quotation and airline ticketing systems. . . The entities to which ATPCO distributes data are referred to in the airline industry as Global Distribution Systems ("GDS") or Customer Reservation Systems ("CRS").").

Endres from publishing the Exhaustless market-clearing premium alongside the passenger airfare.[145] (To ¶394.)

188. ATPCO is a joint venture of carriers including Defendants Air Canada, Air France-KLM, Alaska Air, American Airlines, Delta, Hawaiian, ICAG, LATAM, Lufthansa, United Airlines, and possibly other defendants.[146] (To ¶394.)

189. ATPCO's directors include Defendants Air Canada, Air France-KLM, American Airlines, Delta, Hawaiian, ICAG, LATAM, Lufthansa, and United Airlines.[147] (To ¶394.)

190. (See trial at ¶303 *et seq.*) Testimony at the 2022 trial regarding the U.S.'s antitrust complaint against Defendants American Airlines and JetBlue's Northeast Alliance revealed how certain Defendant Carriers coordinated pricing through ATPCO software features.[148] This is the same behavior that

---

[145] *See* Email from ATPCO (Dec. 10, 2019), Doc. 501, PE-N4 350. *See also*, Email from ATPCO (Nov. 11, 2019), Doc. 502, PE-N4 352. *See also*, Email to ATPCO (Nov. 19, 2019), Doc. 503, PE-N4 354.

[146] *See* ATPCO Owners, Doc. 439, PE-N1 111 from https://web.archive.org/web/20180620153257/www.atpco.net/about-us.

[147] *See* ATPCO Directors, Doc. 443, PE-N2 1 from https://web.archive.org/web/20240118002654/https://www.atpco.net/about.

[148] *See, e.g.,* Testimony of JetBlue Pricing Manager, Evan Jarashow, D. Mass. Case 1:21-cv-11558, ECF 300 pp 1-4 and 29-102 (Sep. 29, 2022), Doc. 291, PE-I1 433, line 16 at 461 ("Q. Okay. And there you report that JetBlue canceled the $149 tactical fare for JFK to LAX, right? A. [Y]es. Q. Okay. And then American also canceled that $149 fare, right? A. That's right[.] Q. And then after that, American refiled the $149 fare the following day? A. [Y]es. Q. And JetBlue matched that fare action by

led to a ten-year consent decree with seven defendants from 1993 to 2003.[149] In 2004, the United States charged American Airlines with contempt-of-court for violating the consent decree, and settled with a fine.[150] (To ¶394.)

### w.      Airlines Reporting Corp. (ARC) Contract Repository

191.    Each Defendant Carrier submits its government and company contracts for scheduled air transportation service ("Contracts for Scheduled Service") for domestic fare-related data to Airlines Reporting Corporation ("ARC") or another entity and authorizes ARC or another entity to act as a contract repository and to distribute that information to Distribution Systems.[151] (To ¶¶204, 393.)

192.    ARC is a joint venture of Defendants Air Canada, Alaska Air, American Airlines, Atlas, Delta, Hawaiian, JetBlue, Southwest, United Airlines, and possibly other defendants.[152] (To ¶393.)

---

American, right? A. That's what I see there. Q. So both American and JetBlue would have kept the $149 tactical fare in the JFK to LAX market as a result? A. That seems right.").

[149] See *U.S.A. v. Airline Tariff Publishing Company, et al*, Case 1:92-cv-02854, Order and Final Judgment (D.D.C. Aug. 10, 1994), Doc. 460, PE-N2 254.

[150] *See U.S.A. v. American Airlines Inc.*, Case 1:92-cv-02854, Settlement Agreement and Order, ECF 147 (D.D.C. Sep. 23, 2004), Doc. 459, PE-N2 247 at 250.

[151] *See* ARC Corporate Intelligence, Doc. 465, PE-N2 421 from https://web.archive.org/web/20240210222918/https://www2.arccorp.com/products-participation/products/arc-corporate-intelligence/.

[152] *See* Airlines Reporting Corporation - About ARC, Doc. 461, PE-N1 207 from https://web.archive.org/web/20010104150600/http://www.arccorp.com/aboutarc.htm

193.   An employee of Each Defendant Air Canada, Air France-KLM, Alaska Air, American Airlines, Delta, Hawaiian, JetBlue, Lufthansa, Southwest, and United Airlines is a director of ARC.[153] (To ¶393.)

## x.   Universal Air Travel Plan (UATP) Contract Credit Card

194.   Universal Air Travel Plan, Inc. ("UATP") is a joint venture of Defendants Air Canada, American Airlines, Delta, Lufthansa, Frontier, ICAG, JetBlue, LATAM, Southwest, and United Airlines[154] to operate a 'global' card network that processes travel cards linked to each Contract for Scheduled Service.[155] (To ¶398.)

195.   (From ¶214.) Each Defendant Passenger Carrier authorizes UATP to receive information from the contract repository (ARC or IATA DPC) to collectively bill government agencies and company customers for passenger and cargo

---

("Only passenger carrying, scheduled airline members of the Air Transport Association of America (ATA), that are also party to ARC's Carrier Services Agreement, are eligible to be shareholders. There currently are thirteen shareholders. Total sales processed annually through ARC amount to approximately US$75 billion. As successor to ATA's Air Traffic Conference . . . ARC continues to service the travel industry in accordance with the structure and principals established in 1964 with the creation of the Area Settlement Plan.").

[153] *See* ARC Board of Directors, Doc. 430, PE-N1 69 from https://web.archive.org/web/20240119024130/https://www2.arccorp.com/about-us/leadership-governance/.

[154] *See* UATP Shareholder Airlines (2002), Doc. 453, PE-N1 190 from https://web.archive.org/web/20240128013147/https://uatp.com/wp-content/uploads/2023/12/Merchant-List-December-27-2023.pdf.

[155] *See* UATP Products and Solutions, Doc. 431, PE-N1 76 from https://web.archive.org/web/20220813090211/https://uatp.com/index.php/products-solutions/charge-cards.

transportation services procured by their employees pursuant to a Contract for Scheduled Service.[156] (To ¶¶205, 398.)

### y.    A4A Airlines Clearinghouse (ACH)

196.   ACH is a division of Airlines for America.[157] (To ¶392.)

197.   Each Defendant Carrier uses Airlines Clearinghouse ("ACH") to receive information from, *inter alia*, ATPCO, ARC, UATP, IATA Exchange Rates, and IATA Clearing House regarding its carrier-currency transactions to settle its accounts according to its agreements with other airlines.[158] (To ¶392.)

198.   An executive officer of each Defendant Alaska Air, American Airlines, Atlas, Delta, FedEx, Hawaiian, JetBlue, Southwest, United Airlines, and UPS is a director of A4A.[159] (To ¶392.)

---

[156]   *See* UATP One Merchant Services, ACH Conference (May 16, 2023), Doc. 445, PE-N1 138, step 12 at 144 and 145 from https://web.archive.org/web/20240120230248/https://airlinesclearinghouse.com/wp-content/uploads/2023/05/UATP-One-ACH-Presentation.pdf.

[157]   *Note that* (a) both A4A and ACH's address is 1275 Pennsylvania Ave Suite 1300 Washington D.C.; (b) ACH's contact email is ACH@airlines.org and www.airlines.org is A4A's website; and (c) ACH has filed no business registration in the District of Columbia.

[158]   *See* Airlines Clearinghouse Members, Doc. 432, PE-N1 78 from https://web.archive.org/web/20240119021904/https://airlinesclearinghouse.com/members/. *See also*, Airlines Clearinghouse Net Settlement Website, Doc. 436, PE-N1 93 from https://web.archive.org/web/20240222102615/https://airlinesclearinghouse.com/net-settlement/.

[159]   *See* A4A Who We Are, Doc. 470, PE-N3 23 at 30.

199.    Defendant Air Canada, and each defendant in ¶198, is a member of A4A.[160]

(To ¶392.)

200.    Each Defendant Air Canada, Alaska Air, American Airlines, Delta,

Hawaiian, and United Airlines is a director of ACH.[161] (To ¶392.)

z.    **SITA**

201.    Société Internationale de Télécommunications Aéronautiques SCRL ("SITA")

is a joint venture of Defendant Carriers[162] to provide communication, data

exchange, messaging, and information technology services to airlines,[163]

airports (including total airport management),[164] border control,[165] air

---

[160]  *See id.*

[161]  *See* Airlines Clearinghouse Board of Directors, Doc. 435, PE-N1 90 from
https://web.archive.org/web/20240120210803/https://airlinesclearinghouse.com/the-team/.

[162]  *See* SITA Membership, Doc. 457, PE-N1 197 (a "membership owned
organization") from
https://web.archive.org/web/20240203031018/https://www.sita.aero/about-us/sita-membership/.

[163]  *See* SITA Activity Report 2022, Doc. 455, PE-N2 62, Business Review beginning
at 89 and specifically at 90, from
https://web.archive.org/web/20240202235955/https://www.sita.aero/globalassets/docs/surveys--reports/activity-report-2022.pdf.

[164]  *See id.*

[165]  *See id., e.g.* at 100 ("Driving the digital transformation of borders for air, sea or
rail travel across the world, as well as for major international sporting and cultural
events, and the cargo targeting market to smooth the safe flow of goods
everywhere.").

navigation service providers,[166] aircraft manufacturers,[167] aircraft maintenance providers,[168] motor carrier warehouse operations,[169] rail and ocean service integration,[170] entertainment arenas,[171] and its effort to privatize the public's 5G spectrum.[172] (To ¶397.)

202. Each Defendant Air Canada, Air France-KLM, American Airlines, Delta, Lufthansa, LATAM, Southwest, United Airlines, and UPS is a director for SITA and/or a member of the SITA Council.[173] (To ¶397.)

---

[166] *See id., e.g.* at 106.

[167] *See id., e.g.* at 108 ("17,700+ commercial air transport and business aviation aircraft currently use SITA's services for their daily operations, for over 300 airline customers. 470 customers in every corner of the globe are now served by SITA's Aircraft business, including airlines, airports, Air Navigation Service Providers (ANSPs), and aircraft lifecycle partners, such as Original Equipment Manufacturers (OEMs), Maintenance and Repair Organizations (MROs) and other players.").

[168] *See id.*

[169] *See id., e.g.* at 147.

[170] *See id., e.g.* at 92.

[171] *See id., e.g.* at 100.

[172] *See id., e.g.* at 114 ("SITA also maintained focus in the year on Value Add Services . . . as an emerging area offering customers complementary digital communication solutions, while looking to future offerings for 5G private networks, low orbit satellite, and cybersecurity."). *See also, e.g.,* Mike Robuck, *AT&T targets $10M airport connectivity deal* Mobile World Live (May 5, 2023), Doc. 458, PE-N1 204 from https://web.archive.org/web/20240203170730/https://www.mobileworldlive.com/featured-content/top-three/att-targets-10m-airport-connectivity-deal/.

[173] *See* SITA Activity Report 2022, Doc. 455, PE-N2 62 at 65, 79-80.

203.   SITA, a corporate citizen of Belgium, owns or controls companies in the United States that engage in domestic and foreign commerce.[174] (To ¶397.)

### aa.   Distribution Services[175]

204.   (From ¶¶191, 213.) Each Defendant Carrier used at least one Distribution Service to receive the schedule, fare and booking information pursuant to each Contract for Scheduled Service from the contract repository (ARC and/or IATA DPC) and to distribute that contract information to its sales/ticket agents. (To ¶205.)

205.   (From ¶¶195, 204, 209.) Each Defendant Carrier used at least one Distribution Service to link an employee's purchase of air transportation using a UATP or other travel card attached to the Contract for Scheduled Service to a Card Scheme.[176] (To ¶¶206, 207.)

---

[174] *See, e.g.,* SITA Annual Financial Report for 2022 (Jun. 27, 2023), Doc. 456, PE-N2 148 at 238 from its public filing accessed from the National Bank of Belgium at https://consult.cbso.nbb.be/consult-enterprise/0403150410.

[175] *Note that* Distribution Service providers include but are not limited to **(a)** Sabre, Amadeus, Travelport, and Farelogix; *see* U.S. v. Sabre et al, Case 1:19-cv-01548, Complaint, ECF 1 (D. Del. Aug. 20, 2019), Doc. 449, PE-N1 160 at 165; **(b)** IATA TACT Air Cargo Solutions, Doc. 448, PE-N1 154 from https://web.archive.org/web/20240123203452/https://www.iata.org/en/services/compliance/tact/; **(c)** SITA; *see* Exploring Industry Practices on Distribution and Display of Airline Fare, Schedule, and Availability Information, 81 Fed. Reg. 75481 (Oct. 31, 2016), Doc. 7, PE-B2 35 at 37.

[176] *See* UATP One Merchant Services, ACH Conference (May 16, 2023), Doc. 445, PE-N1 138, step 3 at  144 and 145.

206.   (From ¶205.) Each Defendant Carrier used at least one Distribution Service to issue the consumer ticket or waybill for air transportation pursuant to the Contract for Scheduled Service.[177] (To ¶218.)

### bb.   Card Services and Banks

207.   (From ¶205.) Each Defendant Carrier used a Card Scheme to link the Contract for Scheduled Service to the government agency's or business' account with a Card Issuing Bank.[178] (To ¶209.)

208.   Each Defendant Passenger Carrier used a Card Scheme to process its carrier-currency in addition to the United States Dollar or other sovereign currencies.[179] (To ¶452.)

209.   (From ¶207.) Each Defendant Carrier used a Card Issuing Bank to authorize the UATP or other travel card linked to the Contract for Scheduled Service. (To ¶205.)

---

[177]   *See id.*, steps 2, 7, and 9 at 144 and 145.

[178]   *See id.*

[179]   *See* A4A Unaddressed, Unsigned Letter (Jul. 13, 2023), Doc. 450, PE-N1 181 from https://web.archive.org/web/20240123223933/https://www.airlines.org/wp-content/uploads/2023/11/Durbin-Marshall-Letter-FINAL-.pdf. *See also*, A4A Protect Our Points, Doc. 451, PE-N1 182 ("What is an Airline Affinity Credit Card? Airlines partner with banks, community financial institutions and credit unions to provide consumers with credit options featuring rewards programs that accumulate points/miles every time they use a card.") from https://web.archive.org/web/20240123224921/https://www.airlines.org/protect-our-points/#take-action.

### cc.    International Air Transport Association (IATA)

#### 01.    IATA Clearing House (ICH)

210.    Each Defendant Carrier authorized its agent, IATA — which provides a

service called Clearing House ("ICH"), including acting as depository trustee

to its members — to distribute transaction information to ACH.[180]  (To ¶411.)

#### 02.    IATA Rates of Exchange (IROE)

211.    Each Defendant Carrier has an agreement with at least one other Defendant

Carrier to set the rates of exchange for its carrier-currency against other

carrier-currencies and/or sovereign currencies ("Rate of Exchange

Agreement").  (To ¶411.)

212.    Each Defendant Carrier submitted its Rate of Exchange Agreement to IATA

and authorized the IATA, through its Rates of Exchange service ("IROE"), to

act as an agreement repository and to distribute that information to

Distribution Systems and other parties.[181]  (To ¶411.)

---

[180]  *See* ICH IATA Member Airlines Application (Aug. 2015), Doc. 437, PE-N1 97 at
98 ("The IATA Clearing House requires that a standing deposit of USD5,000 be
deposited to the IATA Clearing House Standing Deposit account [at a bank in
London].") from
https://web.archive.org/web/20240210011800/https://www.iata.org/contentassets/82a
24c7a736142b6bd18e20f77dcef60/ich-iata-member-airline-application-aug2015.pdf.

[181]  *See* IATA Exchange Rates File Comparison, Doc. 454, PE-N1 194 from
https://web.archive.org/web/20240201014059/https://go.updates.iata.org/exchange-
rates-file-comparison?_ga=2.262861900.1179821552.1706751261-
1613296733.1706751261&_gl=1%2A6wasp3%2A_ga%2AMTYxMzI5NjczMy4xNzA2

### 03.   **IATA DPC Contract Repository**

213.   Each Defendant Carrier authorizes the "IATA DPC" to act as its contract repository — which collects its fare and fare-related information for each government and business Contract for Scheduled Service for foreign air transportation — and to distribute that information to at least one Distribution System to be used by its Travel Agents/General Sales Agents in issuing consumer flight reservations.[182]  (To ¶¶204, 411.)

214.   Each Defendant Carrier also uses the IATA DPC to link the purchase of a passenger flight reservation purchased through a Distribution System to the UATP Card associated with the government and business Contract for Scheduled Service and distributes that information to UATP.[183]  (To ¶¶195, 411.)

### 04.   **IATA The Air Cargo Tariff (TACT)**

215.   Each Defendant Carrier submitted fare and fare-related information to IATA The Air Cargo Tariff ("TACT") to act as a tariff repository and to distribute that information to reservation systems.[184]  (To ¶411.)

---

NzUxMjYx%2A_ga_PLLG1EY0X0%2AMTcwNjc1MTI2OS4xLjAuMTcwNjc1MTI2O S42MC4wLjA. _Note that_ the IATA Rates of Exchange service is distinct from the IATA Consolidated Exchange Rates (ICER) service, the latter of which is a service that provides bank exchange rates between sovereign currencies; _see id._

[182]   _See_ UATP One Merchant Services, ACH Conference (May 16, 2023), Doc. 445, PE-N1 138 at 144.

[183]   _See id._

[184]   _See_ IATA TACT Air Cargo Solutions, Doc. 448, PE-N1 154.

### dd.   Other Industry Services

216.   Each Defendant Carrier authorized IATA and/or Airlines for America to transfer carrier-currencies and sovereign-currencies related to supplier payments, customer receipts, and alliance-carrier payments and receipts through various other services, including IATA Simplified Invoice Settlement ("SIS"), Cargo Account Settlement System ("CASS"), IATA Currency Clearance Service ("ICCS"), IATA Financial Gateway ("IFG"), IATA Enhancement and Financing ("E&F"), Aviation Charges Intelligence Center ("ACIC").  (To ¶411.)

## 14. Monetization of Grandfathered Allocation to use the Public's Airspace

### ee.   Carrier Charged its Partner Carrier for Each Airspace Reservation

217.   (From ¶¶173, 176, 177, 179.) After securing reservations to use the public's airspace at 145 domestic airports for each IATA season for $0 by the unlawful grandfathering pursuant to the IATA WSG agreement, each Defendant Carrier transferred certain of its airspace reservations at an airport at a certain time to its alliance partner-carrier, and each receiving Defendant Carrier paid its alliance partner-carrier for using any such airspace reservation — the value of which was determined by its "Block Space

Agreement" or "Air Transport Services Agreement", or by agreement of any

name, as part of its Partner Alliance agreement.[185] (To ¶¶218, 410.)

### ff.    Carrier Sold Airspace Reservations to Consumers

218.    (From ¶¶173, 176, 177, 179, 206, 217.) After securing reservations to use the

public's airspace for each IATA season for $0 by the unlawful grandfathering

of the IATA WSG agreement or by paying its alliance partner-carrier for the

reservation, each Defendant Carrier sold airspace reservations to consumers.

Each Defendant Carrier accomplished this by bundling the consumer's

purchase of a reservation to use the public's airspace with the purchase of a

reservation for space on an aircraft for air transportation service provided by

the carrier.  The consumer had no knowledge that there was a separate price

for clearing excess consumer demand of the public airspace.  In this way,

each Defendant Carrier independently determined and collected the premium

------------------------

[185]   *See* IATA ISPG Block Space Agreement Invoice Example, Doc. 444, PE-N1 136
from
https://web.archive.org/web/20240120182826/https://www.iata.org/globalassets/iata/
services/financial-services/sis/ispg--release-notes/4.2.0.0/misc-invoice-samples-
4.2.0.0.zip (Misc. Invoice Samples 4.2.0.0 > Misc. Input Files and VAL Reports >
Misc. Charge Category > Partner Alliance > Block Space > MXMLF-
A892019010420180131123351.xml). *Note that* the example models (a) an invoice
from seller "A89" to buyer "A55" valued at 1 unit of "EA" carrier-currency at airport
"YUL" (Montreal-Trudeau in Canada) for Flight# ZZ928 at FlightDateTime 2019-
01-28T04:11:18, with the exchange rate of EA to USD of 35,000 pursuant to
Contract No. ZZ7044A; and (b) an invoice from seller "A89" to buyer "A55" valued at
1 unit of "EA" carrier-currency at airport "YUL" for Flight# ZZ928 at
FlightDateTime 2017-01-29T04:11:18, with the exchange rate of EA to USD of
45,000 pursuant to Contract No. ZZ7044B, for (c) a total invoice of USD80,000.

of the consumer reservation to clear the public's airspace, collected a portion
of the consumer airspace reservation market surplus — to which they were
not entitled — and blocked Exhaustless' market from clearing the excess
supplier and excess consumer demand. (To ¶421.)

### gg.   Carrier Allocated Future Capacity to Certain Employers

219.   Each Defendant Carrier allocated access to its claimed future reservation to
the airspace to its preferred consumers — by unlawfully contracting with an
entity to allocate a portion of future cargo aircraft space; and/or by unlawfully
contracting with an employer to allocate a portion of future passenger
aircraft space on a specified future route to its employees.[186]

220.   Defendant United States entered into unlawful Contracts for Scheduled
Service for air freight service.[187]   Defendant United States entered into an
unlawful Contract for Scheduled Service for passenger service it calls the
City Pair Program ("CPP") administered by the General Services
Administration ("GSA").[188]   These contracts are fulfilled outside of the

---

[186]   *See, e.g.*, GSA Press Release, FY23 City Pair Contracts Awarded for Official
Government Travel (Jul. 12, 2022), Doc. 186, PE-H 273.

[187]   *See, e.g.*, the contracts awarded by USTRANSCOM to 22 carriers on Dec. 22,
2022:  Alaska Airlines, Doc. 357; American Airlines, Doc. 358; Atlas Air, Doc. 360;
Delta Air Lines, Doc. 361; Hawaiian Airlines, Doc. 364; JetBlue Airways, Doc. 365;
United Airlines, Doc. 374; and UPS, Doc. 375, PE-H 316 to 358.

[188]   *See* GSA FY23 CPP Request for Proposal (Feb. 17, 2022), Doc. 185, PE-H 153,
Section F, Item F.1 at 191 (requiring the term of the contract to be 12 to 15 months,
whereas an IATA season is approximately 6 months).

Exhaustless public market and thus exclude the market-clearing premium.

Because these seats are not available for purchase in the public market, the

public has fewer seats for which to compete for a given level of market

demand.

### hh.   Carrier Coined its Own Currency

221.   To monetize the value of the air carrier's claimed future passenger

reservation to the airspace beyond the current slot term for which the carrier

has not yet scheduled flights and thus could not sell a consumer reservation,

each Defendant Passenger Carrier coined its own currency, called 'airline

points' or 'airline miles' ("carrier-currency") which it manages through its

'frequent flyer' or 'loyalty' program.[189]   (To ¶439.)

---

[189]   *See, e.g.*, JetBlue Airways Corporation SEC Form 10-K (Feb. 27, 2023)  at 7
("[P]oints can be redeemed for any open seat. . . if the TrueBlue member has enough
points to exchange for the value of an open seat."). *See also*, U.S. et al v. AMEX et
al, Case 1:10-cv-04496, Affidavit of [employee of] Starwood Hotels and Resorts, ECF
393 (EDNY Jun. 2, 2014), Doc. 467, PE-N3 1 ("SPG members can redeem Starpoints
to pay for free nights at Starwood hotels, but they can also use Starpoints as a de
facto currency to purchase other benefits that Starwood, through the SPG Program,
makes available to SPG members. For example, the SPG Program contracts with . .
. Delta Air Lines to enable elite SPG members to receive automatically certain
travel benefits from Delta and Delta members can earn Starpoints for flying with
Delta." (emphasis in original)).

222. Each Defendant Passenger Carrier claimed that it determined the conversion rate of its carrier-currency to U.S. currency,[190] until recently.[191]

223. Each Defendant Passenger Carrier converted its carrier-currency to U.S. currency by (a) selling carrier-currency directly to a consumer with an undisclosed surcharge on the airfare and accruing the carrier-currency in the consumer's personal loyalty account;[192] (b) charged an undisclosed surcharge on the airfare to the consumer's employer as part of its fixed price Contract for Scheduled Service and accrued the carrier-currency in the consumers personal loyalty account;[193] and/or (c) sold carrier-currency to a credit card

---

[190]   *See, e.g.*, JetBlue Airways Corporation SEC Form 10-K (Feb. 27, 2023) at 80 ("We determine the standalone selling price of TrueBlue points issued using the redemption value approach.").

[191]   *See* American Airlines SEC Form 8-K, Investor Presentation (Mar. 4, 2024), Doc. 495, PE-N4 25 at 78 ("Third-party currency valuation" of an undefined currency per undefined mile. *Note that* this 'valuation' excludes American Airlines second currency, which it calls "Loyalty Points;" *see* American Airlines SEC Form 10-K (Feb. 21, 2024) at 11 ("In 2023, we introduced a new business loyalty program, AAdvantage Business, which rewards both eligible companies with AAdvantage miles and their travelers with additional Loyalty Points[.]")).

[192]   *See, e.g., id.* at 80 ("Points Earned From a Ticket Purchase. When a TrueBlue member travels, we recognize a portion of the fare as revenue and defer in air traffic liabilities the portion that represents the value of the points[.]") (*Note that* the consumer does not know the dollar amount they paid for the points).

[193]   *See, e.g.*, National Defense Authorization Act for Fiscal Year 2002, Pub. L. 107-107, div. A, title XI, § 1116, 115 Stat. 1012, 1241 (Dec. 28, 2001), *codified at* 5 U.S.C. § 5702 note, Retention of Travel Promotional Items ("[A] Federal employee, . . any family member or dependent of such an employee or member, or other individual who receives a promotional item (including frequent flyer miles, upgrade, or access to carrier clubs or facilities) as a result of using travel or transportation services obtained at Federal Government expense . . . may retain the promotional item for personal use if the promotional item is obtained under the same terms as those offered to the general public and at no additional cost to the Federal Government.").

company, hotel, car rental, or ride sharing company, which allocated the
carrier-currency to its customers using its own method.[194]

224.   The consumer's personal loyalty account with each Defendant Passenger
Carrier was divorced from the dollar value of the points; the value of the
carrier-currency *purchased by everyone* is instead accrued in one pool.[195]

225.   When a consumer redeemed carrier-currency to purchase a seat reservation,
each Defendant Passenger Carrier claimed to determine the value of the
carrier-currency based on an average conversion rate of the pool —
irrespective of the dollar amount that individual consumer paid for the
carrier-currency, irrespective of which airspace and time the flight was

---

[194] *See, e.g.*, Delta Air Lines, Inc. SEC Form 10-K, 72 (Feb. 10, 2023). *See also*,
JPMorgan Chase & Co., 2022 SEC Form 10-K (Feb. 21, 2023) ("JPMorgan Chase
offers credit cards with various rewards programs which allow cardholders to earn
rewards points based on their account activity and the terms and conditions of the
rewards program. Generally, there are no limits on the points that an eligible
cardholder can earn, nor do the points expire, and the points can be redeemed for a
variety of rewards, including cash . . . gift cards and travel."). *See also*, UATP One
Merchant Services, ACH Conference (May 16, 2023), Doc. 445, PE-N1 138 at 141
("for direct and indirect sales [of] 150+ Global currencies"). *Compare to* Airlines
Clearinghouse Net Settlement Website, Doc. 436, PE-N1 93 at 94 (showing four
sovereign currencies, CAD, EUR, GBP, and USD, in which ACH settles). *Compare
also to* ICH IATA Member Airlines Application (Aug. 2015), Doc. 437, PE-N1 97 at
99 (showing three sovereign currencies, EUR, GBP, and USD, in which ICH settles).

[195] *See, e.g.*, JetBlue Airways Corporation SEC Form 10-K, 80 (Feb. 27, 2023)
("TrueBlue points are combined in one homogeneous pool and are not separately
identifiable. As such, the revenue is comprised of the points that were part of the air
traffic liability balance at the beginning of the period as well as points that were
issued during the period.").

scheduled, and irrespective of the level of overall excess market demand and subsequent congestion delay.[196]

> ### ii.   Carrier Joint Venture Valued Each Carrier Currency Separately for Each Type of Transaction

226.   Although each Defendant Passenger Carrier claimed to determine the value of the carrier-currency based on an average conversion rate of its pool, it used the conversion rate of *each* carrier-currency to U.S. currency supplied by an unknown IATA source identified as "SF".[197]

227.   Each Defendant Passenger Carrier used a different conversion rate for the accrual of carrier-currency than for the redemption of carrier-currency at each airport.[198]

---

[196]   *See, e.g.*, Delta Air Lines, Inc. SEC Form 10-K, 72 (Feb. 10, 2023) ("We . . . recognize loyalty travel awards in passenger revenue as the miles are redeemed and transportation is provided.") (*note that* no carrier discloses a redemption valuation procedure).

[197]   *See* Frequent Flyer Redemption Example, Doc. 438, PE-N1 109 from https://web.archive.org/web/20240120182826/https://www.iata.org/globalassets/iata/services/financial-services/sis/ispg--release-notes/4.2.0.0/misc-invoice-samples-4.2.0.0.zip (folder IATA ISPG > Misc. Invoice Samples 4.2.0.0 > Misc. Input Files and VAL Reports > Misc. Charge Category > Partner Alliance > FF Accrual> MXMLF-125201901042019020 6150701). *Note that* "SF" is identified as the source of the conversion rate of "EA" to "USD."

[198]   *See id.* (*Note that* the Example models an invoice from seller ICAG's British Airways (BA) to buyer Delta (DL) for USD50,000 for sale (accrual) and redemption transactions of the "EA" carrier-currency at airport "AMM" (Queen Alia airport in Amman, Jordan) during the calendar month of February 2019.  The acronym "UOM" is Unit of Money.  When 100 units of "EA" carrier-currency are purchased, the carrier uses a conversion rate to U.S. currency of 200 to charge the buyer $20,000; and when 100 units of "EA" carrier-currency are redeemed, the carrier uses a conversion rate to U.S. currency of 100 to value the revenue at $10,000.).

228.   Each Defendant Passenger Carrier used a different conversion rate for the accrual of carrier-currency at each airport <u>by class</u> of transportation.[199]

229.   Each Defendant Passenger Carrier used a distinct conversion rate for different invoice types, such as the payment of monthly joint venture charges from its carrier-currency or the payment of airspace reservations to its partner-carrier.[200]

---

[199]   *See* IATA Code Share Example, Doc. 440, PE-N1 115 from https://web.archive.org/web/20240120182826/https://www.iata.org/globalassets/iata/ services/financial-services/sis/ispg--release-notes/4.2.0.0/misc-invoice-samples- 4.2.0.0.zip (folder IATA ISPG > Misc. Invoice Samples 4.2.0.0 > Misc. Input Files and VAL Reports > Misc. Charge Category > Partner Alliance > Code Share> MXMLF-A8920190104201901311233352). *Note that* the Example models an invoice from seller A89 to buyer A55 for purchase transactions of the "EA" carrier-currency at airport "YUL" (Montreal-Trudeau in Canada) from Jan. 28 to Jan. 29, 2019. When 100 units of "EA" carrier-currency are purchased by C-Class, the carrier uses a conversion rate to U.S. currency of 200 to charge the buyer $20,000; and when 100 units of "EA" carrier-currency is purchased by Y-Class, the carrier uses a conversion rate to U.S. currency of 100 to charge the buyer $10,000.

[200]   *See* IATA Joint Venture Invoice Example, Doc. 462, PE-N1 209 from https://web.archive.org/web/20240120182826/https://www.iata.org/globalassets/iata/ services/financial-services/sis/ispg--release-notes/4.2.0.0/misc-invoice-samples- 4.2.0.0.zip (folder IATA ISPG > Misc. Invoice Samples 4.2.0.0 > Misc. Input Files and VAL Reports > Misc. Charge Category > Partner Alliance > Joint Venture > MXMLF-A8920190104201901311233352.xml. *Note that* the Example models an invoice from organization "A89" to "A55" for "Joint Venture charges for the month of Jan as per agreement of ZZ/GG" of one unit of "EA" carrier-currency with the exchange rate of EA to USD of 175,000 for a total invoice of USD175,000. *See also*, IATA ISPG Block Space Agreement Invoice Example at footnote 185.

### jj.   Carrier Allocated Future Service to Consumers with Grandfathering

230.   Each Defendant Passenger Carrier allocated a certain portion of seats on each flight to passenger service reservations paid with carrier-currency.[201] Because these seats are not available for purchase in the Exhaustless public market, the public has fewer seats for which to compete with U.S. currency.

231.   Each Defendant Passenger Carrier accepted its carrier-currency as payment for both the reserved use of the public's airspace and for the air transportation service the carrier committed to provide.

### kk.   Carrier Collateralized Private Loans with Public Assets

232.   On August 11, 2002, Defendant American Airlines' predecessor US Airways filed for Chapter 11 federal bankruptcy protection in federal court.[202]  In the case, US Airways claimed ownership of public airspace assets and collateralized those public airspace assets to secure bank loans.[203]  US

---

[201]   *See* Testimony of JetBlue Pricing Manager, D. Mass. Case 1:21-cv-11558, ECF 300 (Sep. 29, 2022), Doc. 291, PE-I1 433, line 13 at 443 ("We'll have a certain number of seats available in each of the booking classes[.]")

[202]   *See* US Airways Group, Inc. SEC Form 10-K, 2 (Mar. 27, 2003).

[203]   *See id.* at 7, ("Under the RSA DIP [Debtor in Possession] Facility, borrowing availability is determined by a formula based on a percentage of eligible assets. The eligible assets consist of certain previously unencumbered . . .  takeoff and landing slots[.]").

Airways emerged from Chapter 11 bankruptcy protection on March 31, 2003.[204]

233.   On December 9, 2002, Defendant United Airlines filed for Chapter 11 federal bankruptcy protection in federal court.[205]  In the case, United claimed ownership of public airspace assets, and collateralized those public airspace assets to secure bank loans.[206]  On February 1, 2006, United Airlines emerged from Chapter 11 bankruptcy protection.[207]

234.   On September 14, 2005, Defendant Delta filed for Chapter 11 federal bankruptcy protection in federal court.[208]  In the case, Delta claimed ownership of public airspace assets, and collateralized those public airspace assets to secure bank loans.[209]  On April 30, 2007, Delta emerged from Chapter 11 bankruptcy protection.[210]

---

[204]   *See* US Airways Group, Inc. SEC Form 10-K, 1 (Mar. 12, 2004).

[205]   *See* UAL Corporation SEC Form 10-K, 2 (Mar. 28, 2003).

[206]   *See id.*, Exhibit 4.7, 79 (showing "Additional DIP [Debtor in Possession] Collateral" includes slots).  *See also, id.*, Note 2(k), 40 ("Slots and gates, like routes, are highly valued assets that do not frequently come into the marketplace. The Company has no intention to sell these assets[.]").

[207]   *See* UAL Corporation SEC Form 10-K, 4 (Mar. 16, 2007).

[208]   *See* Delta Air Lines, Inc. SEC Form 10-K, 1 (Mar. 27, 2006).

[209]   *See id.*, Note 8, F-29 ("Our senior secured debt and our secured debt is collateralized by first liens, and in many cases second and junior liens, on substantially all of our assets, including . . . landing slots[.]").

[210]   *See* Delta Air Lines, Inc. SEC Form 10-K, 1 (Feb. 15, 2008).

235.  On November 29, 2011, Defendant American Airlines' predecessor AMR

Corp. filed for Chapter 11 federal bankruptcy protection in federal court.[211]

In the case, AMR claimed ownership of public airspace assets, and

collateralized those public airspace assets to secure bank loans.[212]  On

December 9, 2013, AMR emerged from Chapter 11 bankruptcy protection by

merging with US Airways.[213]

236.  On March 30, 2020, Defendant Spirit secured financing with public airspace

assets.[214]

237.  On May 26, 2020, Defendant LATAM filed for Chapter 11 federal bankruptcy

protection in federal court. LATAM claimed ownership of the U.S. public's

airspace assets and collateralized those public airspace assets to secure bank

loans.[215]

238.  On March 17, 2023, Defendant Rand, through its affiliate Apollo Global

Management, Inc.,[216] secured $1.1 billion in financing with the consolidated

---

[211]  *See* AMR Corporation SEC Form 10-K, 1 (Feb. 15, 2012).

[212]  *See id.*, Note 7, 71 ("[T]he Senior Secured Notes are secured by certain . . . airport landing and takeoff slots[.]").

[213]  *See* American Airlines Group, Inc. SEC Form 10-K, 5 (Feb. 28, 2014).

[214]  *See* Spirit Airlines, Inc. SEC Form 10-K, 144 (Feb. 6, 2023).

[215]  *See* LATAM Airlines Group S.A., Case 1:20-bk-11254 **(i)** Debtor's Motion, ECF 5669-2 (SDNY Jun. 24, 2022), Doc. 463, PE-N2 272, ¶11(a) at 278; and **(ii)** Exhibit B Omnibus Commitment Letter, ECF 5669-2, Doc. 464, PE-N2 292 at 330 ("'Coverage Assets' means . . . slots, gates and routes in the United States[.]").

[216]  *See* Conyers Dill & Pearman Press Release (Mar 2023), Doc. 500, PE-N4 347.

assets of Rand, including public airspace and public airport assets that Atlas claimed to own.[217]

239.    On February 22, 2024, Defendant United Airlines disclosed loan agreements with a U.S. national bank association of up to $5.3 billion secured by routes, airspace reservations at JFK, LaGuardia and Reagan National airports, and rights to use airport terminal assets.[218]

240.    Each Defendant American Airlines, United Airlines, Delta, JetBlue, Spirit, and LATAM continues to collateralize private loans with public airspace assets, preventing Endres from leveraging his inventions to obtain working capital to operate his airspace reservation market-clearing service for the public.

---

[217]  *See* Atlas Air Worldwide Holdings, Inc. SEC Form 8-K (Mar. 17, 2023). *See also*, *e.g.*, Atlas Air Worldwide Holdings, Inc. SEC Form 10-K, 7 (Feb. 23, 2023) (" Under a 20-year blocked space agreement that expires in 2028 (the "BSA"), Polar provides air cargo capacity to DHL").

[218]  *See* United Airlines SEC Form 8-K (Feb. 22, 2024). *See also, id.* Exhibit 10.1, Section 3.14. ("Ownership of Collateral. Each Grantor has good title to the Collateral owned by it, free and clear of all Liens other than Permitted Liens.").

## VI.   DEFENDANTS' BOYCOTT OF THE MARKET

### A.   Exhaustless v. FAA

241.   Rather than withdraw its market-allocating rules as Endres had petitioned, the FAA reissued its rules on September 17, 2018.[219]  In November 2018, Exhaustless petitioned the court to review the FAA's rules at LaGuardia (LGA) and John F. Kennedy (JFK) airports over Exhaustless' competitive market allocation.[220]  In oral arguments, the court declared that it would *"address the merits of the remaining legal obstacles in our first decision."*[221]

In its ruling, the court declared the Aviation 2.0 market-clearing service:

> Using Aviation 2.0, carriers would compete in semi-annual auctions to purchase slots for a six-month period, with the total number of slots determined by Exhaustless using its proprietary technology. Passengers would then pay demand-calibrated congestion premiums (on top of their airfare) when purchasing tickets.  Both the congestion premiums

---

[219]  *See* Order Extending Order Limiting Operations at John F. Kennedy International Airport, 83 Fed. Reg. 46865 (Sep. 17, 2018), Doc. 22, PE-B1 23.  *See also,* Order Extending Order Limiting Operations at New York Laguardia (*sic*) Airport, 83 Fed. Reg. 47065 (Sep. 18, 2018), Doc. 23, PE-B1 26.

[220]  *See* (a) Exhaustless Inc. v. FAA, D.C. Cir. Case 18-1303, Petitioner's Amended Opening Brief, ECF 1773615 (Feb. 15, 2019), Doc. 25, PE-G1 1; (b) Exhaustless Inc. v. FAA, D.C. Cir. Case 18-1303, Joint Appendix, ECF 1771626 (Feb. 1, 2019), Doc. 243, PE-G3 1; (c) and Exhaustless Inc. v. FAA, D.C. Cir. Case 18-1303, Petitioner's Reply Brief, ECF 1780513 (Apr. 1, 2019), Doc. 242, PE-G1 503.

[221]  *See* Exhaustless Internal Transcript of Oral Argument, D.C. Cir. Case 18-1303, Doc. 255, PE-G1 709, 00:20:54 at 714.  *Note that* the court docketed an official transcript at ECF 1787958, but that document is not accessible by Plaintiff.

and the auction proceeds would go to
Exhaustless.[222]

242. In addition, the court declared that the *"interim rule resembled the High
Density Rule and generally grandfathered the slots held by airlines under the
previous regime," and is "revocable at will."*[223]

243. Although, as cited in the joint brief of the DOT/IATA WSG Slot Coordinator
and the DOJ, the *"United States government has 'exclusive sovereignty' over
U.S. airspace"*[224] the Court found that without carriers added as defendants,
Exhaustless failed to demonstrate traceability and redressability and
therefore dismissed the petition for lack of standing.[225]

## B.   COVID Pandemic

244. (From ¶183.) Beginning in March 2020, passenger demand declined suddenly
and sharply due to the global spread of the COVID-19 virus.  On March 2,
2020, through a trade association, each Defendant Carrier requested the FAA
to waive the terms of their private IATA WSG agreement to minimum
reservation usage requirements through the Summer 2020 carrier scheduling

---

[222] *Exhaustless Inc. v. FAA*, 931 F. 3d. 1209 (D.C. Cir. 2019), Doc. 27, PE-G1 207 at
210.

[223] *Id.* at 212 and 214.

[224] *See* Exhaustless Inc. v. FAA, D.C. Cir. Case 18-1303, Brief for Respondent, ECF
1778181 (Mar. 18, 2019), Doc. 26, PE-G1 87 at 120, *referencing* 49 U.S.C. §
40103(a)(1).

[225] *See Exhaustless Inc. v. FAA*, 931 F. 3d. 1209 (D.C. Cir. 2019), Doc. 27, PE-G1
207 at 208.

season ending on October 24, 2020.[226]  On March 16, 2020, the FAA 'granted' carriers the waiver through May 31, 2020.[227]  On March 25, 2020, the FAA issued a notice to show cause, stating that "*[o]n March 16, 2020, the FAA received a letter addressed to responsible slot authorities from leaders of twenty-three airlines around the world, including United Airlines from the United States, requesting 'a global waiver from standard slot usage rules through summer 2020 to obtain flexibility for capacity reductions in light of diminishing passenger demand, and to help stabilize a very tenuous operational and commercial environment.'*"[228]  The FAA proposed a waiver of the IATA WSG's minimum usage requirements through October 24, 2020 — a seven month freeze of the pre-pandemic market allocation.[229]  This was the moment when Endres realized that the carriers were orchestrating the conspiracy worldwide, and that he had a private antitrust claim against the IATA-member carriers. (To ¶282.)

245.   On March 27, 2020, the D.C. Circuit Court denied Exhaustless' petition to review the FAA's denial of Exhaustless petition for rulemaking (the petition in which Endres had requested the FAA to withdraw its market allocating

---

[226]  *See* FAA Notice of limited waiver of the minimum slot usage requirement, 85 Fed. Reg. 15018, 15019 (Mar. 16, 2020), Doc. 40, PE-B2 106.

[227]  *See id.*

[228]  *See* FAA Notice of limited waiver of the minimum slot usage requirement, 85 Fed. Reg. 16989 (proposed Mar. 25, 2020), Doc. 41, PE-B2 109 (emphasis added).

[229]  *See id.*

orders, see ¶34).[230]  At this moment, Endres suspected that he had a fifth

amendment takings claim.

246.    Also on March 27, 2020, the President of the United States signed the

CARES Act into law, which included provisions for carriers to receive

financial assistance from the public's treasury.[231]  On March 31, 2020, the

Assistant Secretary of Aviation and International Affairs of the DOT/IATA

WSG Slot Coordinator issued a show cause order regarding the regulation of

the required Service Obligation an air carrier must commit to when receiving

financial assistance, pursuant to the CARE Act.[232]  The order stated that

*"These provisions do not authorize any coordination among air carriers that*

*would violate the antitrust laws."*[233]  But the order did not mention how the

antitrust immunity that carriers had been granted by the DOT/IATA WSG

Slot Coordinator under their sealed alliance agreements intersects with the

provision of financial assistance from the public.

247.    On April 2, 2020, Endres objected to the proposed order, stating: *"But the*

*airlines are already coordinating to violate antitrust laws by using the*

*anticompetitive International Air Transport Association's Worldwide Slot*

---

[230]  See *Exhaustless Inc. v. FAA*, Case 19-1158, Judgment, ECF 1835740 (D.C. Cir. 2020), Doc. 225, PE-G1 236.

[231]  *See* Coronavirus Aid, Relief, and Economic Security (CARES) Act, Pub. L. 116-136, Title IV, Subtitle A, 134 Stat. 281, 469 (Mar. 27, 2020).

[232]  *See* Order 2020-3-10 (proposed Mar. 27, 2020), Doc. 339, PE-B1 229.

[233]  *Id.* at 231.

*Guidelines (IATA WSG) to allocate slot and schedule reservations at airports where excess supplier demand and excess passenger demand exist.*"[234] On April 7, 2020, the DOT/IATA WSG Slot Coordinator issued its final order and did not address Endres' comments.[235]

248. The Department of Treasury of the United States issued loans to carriers, which carriers secured with public airspace assets.  In conjunction with its loans to the carriers, and outside of the public stock market on which the shares trade, the Department of Treasury of the United States acquired an interest in the shares of private-sector entities Defendants Alaska Air, American Airlines, Delta, Frontier, Hawaiian, JetBlue, Southwest, Spirit, and United Airlines in the form of warrants to purchase shares.[236]

249. Endres then began delving into public information about the sealed so-called immunized alliance agreements.

---

[234] Exhaustless Objection, Dkt. DOT-OST-2020-0037 (Apr. 2, 2020), Doc. 340, PE-B1 405.

[235] *See* Order 2020-4-2 (Apr. 7, 2020), Doc. 341, PE-B1 407.

[236] *See* Alaska Air SEC Form 10-K (Feb. 14, 2024), Note 11 at 83; American Airlines SEC Form 10-K (Feb. 21, 2024), Note 1 at 134; Delta SEC Form 10-K (Feb. 12, 2024), Note 12 at 92; Frontier SEC Form 10-K (Feb. 20, 2024), Note 8 at 102; Hawaiian SEC Form 10-K (Feb. 15, 2024), Note 9 at 86; JetBlue SEC Form 10-K (Feb. 12, 2024), Note 3 at 82; Southwest SEC Form 10-K (Feb. 6, 2024), Note 2 at 101; Spirit SEC Form 8-K (Feb. 22, 2024); and United Airlines SEC Form 10-K (Feb. 29, 2024), Note 2 at 73.

### C.   Delta/WestJet Alliance Agreement

250.   Rather than compete for airspace reservations in Endres' announced competitive market, Defendant Delta and Canadian citizen WestJet — both members of the IATA — requested antitrust immunity in a "confidential" agreement to pool the respective U.S. and Canada airspace reservations to which they each claimed entitlement.[237]

251.   On October 23, 2020, the DOT/IATA WSG Slot Coordinator proposed to grant the antitrust immunity on condition that the carriers "*divest*" 16 airspace reservations at LaGuardia airport in New York City because "*market entry for services involving NYC airports, particularly for new entrants, is not likely, timely, or sufficient to address our concerns due to the persistent inability of carriers to access slots for new and/or additional services.*"[238] The DOT/IATA WSG Slot Coordinator proposed that Delta/WestJet acquire the services of a third party to administer an auction of the reservations, the proceeds of which would be retained by the <u>carriers</u>.[239]   Endres objected to the proposal because, *inter alia*, "*[a] competitive alternative is available for*

---

[237]   Delta-WestJet Application for Antitrust Immunity for Alliance Agreements, Dkt. DOT-OST-2018-0154 (Oct. 10, 2018), Doc. 326, PE-D2 261 at 265.

[238]   Order 2020-10-13 (proposed Oct. 23, 2020), Doc. 59, PE-D1 14 at 17-18.

[239]   *See id.* at 43.

*airlines to obtain airspace slots without regulatory intervention in the slot market.*"[240]

252.   Delta/WestJet rejected the conditions, withdrew their application, and requested that the administrative proceeding be closed, which the DOT/IATA WSG Slot Coordinator granted.[241]

### D.   U.S. Airport Operators Join the IATA WSG Agreement

#### 1.   Members of Airports Council International

253.   In 2018, when the IATA published the WSG 9th Edition, it informally announced that the Airports Council International (ACI), a trade association for airport operators, had joined the IATA WSG agreement.[242]   On June 3, 2019 (the day after each Defendant Carrier voted at the IATA Annual General Meeting to continue to allocate the market of airspace reservations with the IATA WSG, see ¶164), the IATA announced, but did not disclose, a formal agreement joining the ACI to the IATA WSG agreement.[243]

---

[240] Exhaustless Objection, Dkt. DOT-OST-2018-0154-0053 (Nov. 9, 2020), Doc. 60, PE-D1 52.

[241] *See* Order 2020-12-17 (Dec. 21, 2020), Doc. 63, PE-D1 90.

[242] *See* IATA Worldwide Slot Guidelines, 9th Edition (Effective Jan. 1, 2019), Dkt. FAA-2020-0862 (Dec. 17, 2020), Doc. 69, PE-D1 136 at 139. ("The first changes to the WSG because of the joint work of airports, airlines, and coordinators in the Strategic Review have been accepted and published in this, the 9th edition of the WSG.").

[243] *See* IATA Press Release, Industry Collaboration Brings New Era for Airport Slot Allocation (June 3, 2019), Doc. 32, PE-D1 12.

Defendants PANYNJ and MWAA, both public entities, are members of the private trade association ACI through its North American branch.[244] (To ¶405.)

2.  **SFOTEC**

254.  Defendants Air France-KLM, Alaska Air, Delta, Lufthansa, LATAM, ICAG, United Airlines, and possibly other Defendants[245] co-own the San Francisco Terminal Equipment Company, L.L.C. (SFOTEC) which operates the San Francisco Airport's International Terminal Complex and has attended the IATA WSG slot conference to allocate the public's terminal resources at San Francisco Airport.[246] (To ¶396.)

---

[244] *See* Airports Council International-North America Members (printed Aug. 8, 2023), Doc. 343, PE-J 174.

[245] *See* San Francisco International Airport, Competition Plan Update (Aug. 2001), Doc. 391, PE-J 250 ("SFOTEC, LLC, formed by all 25 airlines operating out of the ITC, operates and maintains the Airport-owned common use equipment related to handling flights and passengers at the ITC."). *See also*, San Francisco Board of Supervisors, Notification of Contract Approval (Aug. 3, 2012), Doc. 392, PE-J 261 (showing the owners of SFOTEC to be Aeromexico, Air China, Air France, Air New Zealand, Alaska Airlines, All Nippon Airways, Asiana, British Airways, Cathay Pacific, China Airlines, Delta Air Lines, Emirates, Japan Airlines, KLM, Korean Airlines, LAN Peru, Lufthansa, Mexicana, Philippine Airlines, Singapore Airlines, Swiss International, TACA International, United Airlines, Virgin Atlantic, and Virgin America). *Note that* several of these airlines, that control a terminal at a U.S. airport, are controlled by a foreign government.

[246] *See* IATA 152nd Slot Conference – Organizations attending (Jun. 11, 2023), Doc. 254, PE-D3 18.

E.   **Airport Owners and Operators Block the Market's Access to the U.S. Air Transportation System**

1.  **Access to a Washington, D.C. Airport**

255.   The Congress prohibited nonstop air transportation between Reagan National Airport (DCA), a Washington, D.C. port, and certain domestic and foreign terminal points.[247]

256.   The Congress 'granted' the MWAA an exception to market competition in acquiring certain supplies or services, or in awarding concession contracts, when approved by most of its directors.[248]

257.   MWAA has relied on terms of its charter and the federal government's 'grant' of an exception to market competition to justify its failure to procure services and supplies by competing in a market, and its failure to allocate its commercial leased space in a competitive market:

> MWAA stated, however, that [GSA's] assessment of its contracting practices using recognized principles of full and open competition was inappropriate because, in its view, these principles do not

---

[247] *See id.*, *codified as amended at* 49 U.S.C. § 49109 ("An air carrier may not operate an aircraft nonstop in air transportation between Ronald Reagan Washington National Airport and another airport that is more than 1,250 statute miles away[.]").

[248] See *id.*, §6005(c)(4), 100 Stat. 1783-376, *codified at* 49 U.S.C. § 49104(a)(4) ("In acquiring by contract supplies or services for an amount estimated to be more than $200,000, or awarding concession contracts, the Airports Authority to the maximum extent practicable shall obtain complete and open competition through the use of published competitive procedures. By a vote of 7 members, the Airports Authority may grant exceptions to the requirements of this paragraph.").

> adequately reflect the unique environment applicable to contracting at commercial airports. MWAA noted that its charter, as reflected in statutes of the District of Columbia and the Commonwealth of Virginia, recognized the need for flexibility in MWAA's contracting and, consequently, granted it expanded commercial discretion in making and entering into contracts. In MWAA's view, it has the power to use contracting practices and procedures that are based upon business needs and "not inherently linked to federal concepts" for maximizing competition.[249]

258.   (From ¶179.) On information and belief, Defendant MWAA attended the domestic slot conference for each carrier scheduling period since May 2018 to allocate the public's air transportation infrastructure with grandfathering.[250] (To ¶405.)

259.   Defendant MWAA, a public entity, has entered into agreements with certain Defendant Carriers to share the public airport system's revenue while at the same time seeking federal grants.[251]

---

[249]   U.S. General Accounting Office Report to Congress, GAO-02-36 Metropolitan Washington Airports Authority, 34 (March 2002).

[250]   *See* FAA Notice of Submission Deadline for Schedule Information for [ORD, JFK, LAX, SFO] for the Summer 2020 Scheduling Season, 84 Fed. Reg. 51222 (Sep. 27, 2019), Doc. 34, PE-B2 85 at 87 ("The FAA discussed the Level 2 review with airlines and airport operators in meetings at the 144th IATA Slot Conference, the domestic slot conference hosted by Airlines for America, as well as other individual meetings.").

[251]   See MWAA 2022 Annual Comprehensive Financial Report (Mar. 29, 2023) ("Key provisions of the Use and Lease Agreement are: . . . • A revised allocation for sharing Airport Net Remaining Revenue (NRR) with airlines at Reagan National (sincluding 100 percent of NRR from 2014-2016, 55 percent in 2017-2018, and 45

260. Defendant MWAA has purportedly issued a new regulation of price, route, and service in air transportation, at Defendant United Airlines' request, to tax a carrier operating a certain flight to Reagan National airport for the benefit of Dulles airport carrier-users.[252]

261. Defendant MWAA has purportedly issued a new regulation of price, route, and service in air transportation to refuse access to Reagan National airport if the flight by a carrier is connecting from an airport of certain U.S. states.[253]

### 2. Access to a New York Airport

262. Since the 1950s, the Port Authority of New York and New Jersey (PANYNJ), a bi-state agency of New York and New Jersey, has established and enforced a regulation prohibiting nonstop air transportation between LaGuardia Airport (LGA), a New York port, and certain terminal points in the world (the

---

percent in 2019 through 2023, to be retained by the Airports Authority for use in the following years), • The Airports Authority can apply NRR from Reagan National at Dulles International, up to certain limitations, • NRR generated at Dulles International will be shared between the Airports Authority and Dulles International airlines (generally 50 percent to airlines and 50 percent to the Airports Authority . . . in 2022, and thereafter 75 percent to airlines and 25 percent to the Airports Authority. . . The Dulles CCP is primarily debt-funded, and the Airports Authority will seek grant funding where available.").

[252] *See* Request for Information from Sen. Ted Cruz, ranking member of the Senate Committee on Commerce, Science, and Transportation, to John Potter, CEO of MWAA (Dec. 19, 2023), Doc. 428, PE-N1 20 at 23.

[253] *See id.* ("But the board has also contemplated creating political litmus tests for which states may or may not get flights to and from DCA.").

"LaGuardia Perimeter Rule").[254] When the Congress passed the Airline Deregulation Act in 1978, it prohibited states from enforcing regulations related to price, route, and service in air transportation.[255] The Supreme Court upheld the preemption of state regulations in 1992.[256] Defendant PANYNJ has not repealed its regulation of routes serving LaGuardia. (To ¶490.)

263.   (From ¶179.) On information and belief, Defendant PANYNJ attended the domestic slot conference for each carrier scheduling period since May 2018 to allocate the public's air transportation infrastructure with grandfathering.[257] (To ¶405.)

264.   Defendant the City of New York knew or should have known of the unlawful restraint of trade of airspace reservations occurring at its airports.

––––––––––––––––––––––––––

[254] *See* The Port Authority of New York and New Jersey, Airport Rules and Regulations, Chapter VIII Aircraft Operations (Jul. 27, 2022), Doc. 335, PE-J 146, U.16 at 167 ("LaGuardia Airport is to be utilized for nonstop domestic flights and international flights pre-cleared by the Federal Inspection Services only to and from points that are located within 1,500 statute miles of LaGuardia Airport, and to and from Denver, CO. The foregoing limitation does not apply to flight operations conducted on Saturdays or to general aviation operations conducted at the Marine Air Terminal.").

[255] See 49 U.S.C. § 41713.

[256] See *Morales v. Trans World Airlines*, 504 U.S. 374 (1992).

[257] *See* FAA Notice of Submission Deadline for Schedule Information for [ORD, JFK, LAX, SFO] for the Summer 2020 Scheduling Season, 84 Fed. Reg. 51222 (Sep. 27, 2019), Doc. 34, PE-B2 85 at 87 ("The FAA discussed the Level 2 review with airlines and airport operators in meetings at the 144th IATA Slot Conference, the domestic slot conference hosted by Airlines for America, as well as other individual meetings.").

265.   Defendants the City of New York and PANYNJ, through their undisclosed

lease agreement, have taxed the revenue from domestic and foreign air

commerce at the two airports by charging rent at 10% of annual gross

revenue of the airports;[258] (To ¶475); and

266.   Defendants the City of New York and PANYNJ, through their undisclosed

lease agreement, diverted $780.2 million of airport revenue to the City of

New York in 2004.[259]  The statute of limitations regarding this violation

expired in 2010 per 49 U.S.C. § 47107(m)(7).  There was reported to be an

amendment to the lease in 2021.[260]

**3.   Access to Airspace at a New Jersey Airport**

267.   Defendant the City of Newark knew or should have known of the unlawful

restraint of trade of airspace reservations occurring at its airports.

---

[258]  *See* New York State Office of the State Comptroller, Division of State Government Accountability, Report 2014-S-28 at 1 (April 2017), Doc. 480, PE-N3 124 at 125.

[259]  *See id.* ("The lease required the Port Authority to pay the City a lump sum of $500 million and an additional lump sum of $280.2 million at execution.").

[260]  *See* Centre for Aviation, "Recovery for All of Us: Mayor de Blasio, Representative Meeks, Borough President Richards Announce Foundation for JFK Airport Construction, Over 20,000 Jobs" (Feb. 23, 2021), Doc. 485, PE-N3 165 from
https://web.archive.org/web/20240229202336/https://centreforaviation.com/members/direct-news/recovery-for-all-of-us-mayor-de-blasio-representative-meeks-borough-president-richards-announce-f-552485.

### 4. Access to New York City Metropolitan Airspace

268. On May 8, 2020, Endres notified PANYNJ that it was violating antitrust laws and Exhaustless' right to allocate the market by *"allowing flights whose reservations were obtained through an anticompetitive allocation process"* and offered to license its Competitive Market Standard to the PANYNJ to rectify this violation.[261]  On July 17, 2020, the PANYNJ responded that Exhaustless should elevate this claim.[262]

269. Defendant PANYNJ attended the IATA WSG Slot Conference to allocate the use of terminals and gates at Newark Liberty and JFK airports based on the grandfathered airspace reservation market allocation.[263]

### 5. Access to U.S. Airports

270. **Exclusive long-term leases:**  Each Defendant PANYNJ and MWAA exclusively leases certain public airport infrastructure to each Defendant Carrier, which holds a public economic certificate to conduct commerce issued by the federal government.  Each Defendant PANYNJ and MWAA and each Defendant Carrier have agreed to exclusively lease gates for terms of decades

---

[261] Exhaustless Notice of Claim (May 8, 2020), Doc. 350, PE-J 220.

[262] *See* Letter from PANYNJ Claims Division (Jul. 17, 2020), Doc. 351, PE-J 222.

[263] *See, e.g.,* IATA 152nd Slot Conference – Organizations attending (Jun. 11, 2023), Doc. 254, PE-D3 18.

— even though the term of the airspace reservation under the IATA WSG is approximately 6-months, or each IATA carrier scheduling season.[264]

271. **PFCs:** Each airport authority that receives passenger facility charge ("PFC") taxes on the air tariff, pursuant to 49 U.S.C. § 40117, applied for financing a airport project from PFCs, and its application was approved by the DOT/IATA WSG Slot Coordinator.[265]

272. Defendant United Airlines retained a credit from an unidentified airport(s) for all or a portion of the amount of passenger facility charge tax collected by carriers from passengers and remitted to the unidentified airport(s).[266] (To ¶472.)

---

[264] *See, e.g.,* United Airlines Holdings, Inc. SEC Form 10-K for 2022 (Feb. 16, 2023), Item 2 at 36 ("United leases gates, hangar sites, terminal buildings and other airport facilities in the municipalities it serves. United has major terminal facility leases at SFO, IAD, ORD, LAX, DEN, EWR, IAH and GUM with expiration dates ranging from 2023 through 2053."). *See also,* Newark Liberty International Airport, Airline Competition Plan Update (Feb. 1, 2013), Doc. 484, PE-N3 151 at 153 ("As of January 1, 2013 EWR consists of 109 gates, 87 are exclusively leased and 22 are common use."). *See also,* MWAA Press Release, Airports Authority and United Airlines Execute Long-Term Lease at Dulles International (Sep. 13, 2017), Doc. 483, PE-N3 149. *See also,* Delta SEC Form 10-K (Feb. 12, 2024), Exhibit 10.7, Amended and Restated Agreement of Lease by and between PANYNJ and Delta dated Sep. 13, 2017, 39  (showing lease termination date of Dec. 30, 2050).

[265] *See, e.g.,* FAA PFC Approved Locations, Collections, and Expiration Dates (as of January 30, 2024), Doc. 466, PE-N2 432 from https://web.archive.org/web/20240211012312/https://www.faa.gov/sites/faa.gov/files/2024-01/arp-pfc-monthly-reports-airports-20240130.pdf.

[266] *See* United Airlines Holdings, Inc. SEC Form 10-K for 2022 (Feb. 16, 2023), Note 10 at 91 ("Certain of these leases include provisions for variable lease payments which are based on several factors, including, but not limited to, relative

273. **ACIPs:** Each Defendant PANYNJ[267] and MWAA[268] acknowledged that it pays carriers pursuant to its Air Carrier Incentive Plan (ACIP) to influence route decisions. (To ¶481.)

## 6. Control of U.S. Airports

274. (From ¶111.) JFK airport is owned by Defendant the City of New York, which purportedly leases the airport to Defendant PANYNJ to operate. PANYNJ subleases a terminal to another operator, JFK International Air Terminal L.L.C. ("JFKIAT"), a joint venture with a foreign government, the Netherlands.[269] JFKIAT has issued a leasehold mortgage to PANYNJ, which is secured by the City of New York's airport assets.[270]

---

leased square footage, available seat miles, enplaned passengers, passenger facility charges, terminal equipment usage fees, departures, and airports' annual operating budgets.").

[267] *See* PANYNJ Comment re ACIP, Dkt. ID. FAA-2022-1204-0012 (Apr. 4, 2023), Doc. 469, PE-N3 20.

[268] *See* MWAA Comment re ACIP, Dkt. ID. FAA-2022-1204-0011 (Apr. 4, 2023), Doc. 468, PE-N3 15 at 18 ("We agree with ACI-NA that Airport sponsors should be able to incentivize service to specific airport destinations.").

[269] *See* PANYNJ, Press Release Number: 131-2021 (Dec. 15, 2021), Doc. 487, PE-N3 177 ("JFKIAT, a U.S. affiliate of Royal Schiphol Group, has been the operator of Terminal 4 at John F. Kennedy International Airport since 1997."). *See also*, Royal Schiphol Group, Corporate Governance Website, Doc. 488, PE-N 184 from https://web.archive.org/web/20240301192830/https://www.schiphol.nl/en/schiphol-group/page/corporate-governance/ ("Royal Schiphol Group N.V. is a public limited liability company with a full two-tier board regime. The State of the Netherlands, the city of Amsterdam, and the city of Rotterdam are joint shareholders.").

[270] *See* New York Transportation Development Corporation, Director's Meeting (Aug. 18, 2020), Doc. 471, PE-N3 34 at 43 ("Mr. Bressette responded and explained

275.   (From ¶67.) LaGuardia airport is owned by Defendant the City of New York,
which purportedly leases the airport to Defendant PANYNJ to operate.
PANYNJ subleases LaGuardia airport assets to Defendant Delta to operate
as well as to use.[271]   Delta's carrier operations are joint ventures with several
foreign governments.  Delta has issued a mortgage to PANYNJ, which it has
secured with the City of New York's airport assets.[272] New York
Transportation Development Corporation has issued public bonds — for the
benefit of Delta Air Lines — to finance LaGuardia airport projects.

276.   (From ¶113.)  Newark Liberty airport is owned by Defendant the City of
Newark, which purportedly leases the airport to Defendant PANYNJ to
operate.  PANYNJ subleases a terminal to another operator, Munich Airport,
an agency of a foreign government, Germany.[273]

―――――――――――――――

that Terminal 4 is leased by JFK International Air from the Port Authority. He
stated that JFK International is pledging those lease payments to the
Corporation[.]").  *See also*, *id.* at 45 ("[T]he Borrower will grant to the Corporation
and the Trustee (for the benefit of the bondholders) a leasehold mortgage in the
Borrower's leasehold interest under the Lease Agreement pursuant to a Leasehold
Mortgage, Assignment of Leases, Security Agreement and Fixture Filing[.]").

[271]  Delta SEC Form 10-K (Feb. 12, 2024), Exhibit 10.7, Amended and Restated
Agreement of Lease by and between PANYNJ and Delta dated Sep. 13, 2017, 39
(*note that* the assets leased are not disclosed, but the operation by Delta of
concessions and the "concessions revenue shar[ing]" with PANYNJ is disclosed).

[272]  *See* New York Transportation Development Corporation, Director's Meeting
(Aug. 18, 2020), Doc. 471, PE-N3 34 at 74 (a "leasehold mortgage").

[273]  *See* PANYNJ Press Release, "Newark Liberty International Airport's Terminal
A Celebrates One-Year Anniversary (Jan. 12, 2024)," Doc. 472, PE-N3 78 from
https://web.archive.org/web/20240223004315/https://www.panynj.gov/port-
authority/en/press-room/press-release-archives/2024-Press-Releases/-newark-
liberty-international-airport-s-terminal-a-celebrates-on.html.

### F.  Winter 2019 and Summer 2020 Seasonal Reservations

### 1.  Allocation with the IATA WSG

277.  On May 9, 2019, each Defendant Carrier sent the DOT/IATA WSG Slot Coordinator a list of the airspace reservations allocated to them the last equivalent season, which it claims entitles them to the future season's reservation.[274]  On May 16, 2019, each Defendant Carrier submitted its schedule 'request' for the Winter 2019 scheduling season to the FAA.[275]  Each Defendant Carrier obtained exclusive reservations no later than June 6, 2019, when the DOT/IATA WSG Slot Coordinator allocated each reservation — for free — to the carrier claiming entitlement and denied Exhaustless its right to hear competitive bids for that reservation from other carriers and to speak market prices (winning bids) to all market participants.[276]

278.  On June 18, 2019, each Defendant IATA Carrier and the DOT/IATA WSG Slot Coordinator attended the IATA Slot Conference in Cape Town, South Africa to finalize the allocation of the season's airspace reservations to carriers.[277]

---

[274] *See* Exhaustless Documentation of IATA WSG Calendar of Coordination History, Doc. 14, PE-D1 1.

[275] *See* id.

[276] *See id.*

[277] *See id.*

279.  On September 26, 2019, each Defendant Carrier sent the DOT/IATA WSG Slot Coordinator a list of the airspace reservations allocated to it the last equivalent season, which it claims entitles it to the future season's reservation.[278]  On October 3, 2019, each Defendant Carrier submitted its schedule 'request' for the Summer 2020 scheduling season to the FAA.[279] Each Defendant Carrier obtained exclusive reservations no later than October 31, 2019, when the DOT/IATA WSG Slot Coordinator allocated each reservation — for free — to the carrier claiming entitlement and excluded that reservation from the market competition thus removing any consideration for bidding by other carriers.[280]

280.  On November 12, 2019, each Defendant IATA Carrier and the DOT/IATA WSG Slot Coordinator attended the IATA Slot Conference in Brisbane, Australia to finalize the allocation of the season's airspace reservations to the carriers.[281]

281.  (From ¶280.) Defendant Port Authority of New York and New Jersey attended the Slot Conference to allocate the market of airport gates according to the outcome of the administrative slot market allocation.

_____

[278]  See id.

[279]  See id.

[280]  See id.

[281]  See id. See also, Exhaustless FOIA Request Use of Government Aircraft (Mar. 6, 2023), Doc. 21, PE-B2 73 at 75.

### 2. Slot Usage Waiver – Reduced Passenger Demand

282. (From ¶244.) In the spring of 2020, the level of passenger demand for
    scheduled service plummeted, and the level of cargo demand spiked, due to
    the COVID-19 pandemic.   Defendant Carriers requested that the DOT/IATA
    WSG Slot Coordinator 'grant' a waiver from the usage terms of their private-
    sector WSG agreement for the seasonal reservations that had previously been
    allocated by grandfathering for the Winter 2019 and Summer 2020 season in
    order to retain their grandfathered status for the future season.[282]   The
    DOT/IATA WSG Slot Coordinator complied and *de facto* waived the required
    usage of reservations for Winter 2019, and carriers voluntarily violated their
    private IATA WSG agreement by continuing to claim entitlement.[283]   The
    FAA issued a notice of proposed rulemaking for the Summer 2020
    reservations.[284]   Endres responded to the proposal, stating:

    _____

    [282]   *See* FAA Notice of limited waiver of the minimum slot usage requirement, 85
    Fed. Reg. 15018 (Mar. 16, 2020), Doc. 40, PE-B Rulemaking 142 ("Several foreign
    airlines have petitioned the FAA to grant a waiver of the 80 percent minimum slot
    usage requirement at JFK through the Winter 2019/2020 scheduling season ending
    on March 28, 2020 and some petitioners have sought relief for portions, or the
    entirety, of the Summer 2020 scheduling season. On March 2, 2020, IATA
    petitioned on behalf of airlines for a slot usage waiver at all constrained airports
    through the Summer 2020 scheduling season ending on October 24, 2020. On March
    6, 2020, Airlines for America petitioned the FAA on behalf of domestic member
    airlines for "a waiver of the minimum slot usage requirement at all slot-controlled
    and schedule facilitated airports for at least Summer 2020.").

    [283]   *See id.*

    [284]   *See* FAA Notice of limited waiver of the minimum slot usage requirement, 85
    Fed. Reg. 16989 (proposed Mar. 25, 2020), Doc. 41, PE-B2 109.

> In the deregulated air transportation market,
> carriers are free to adjust their prices, routes, and
> service in response to market conditions. . . No
> other deregulated industry gets to preserve its
> market share during a crisis—especially not
> through regulation.  For every other market, it's a
> new competition after the crisis. * * * Any airline
> that operates flights in the U.S. whose slot
> reservation was allocated through an
> anticompetitive process risks treble damages for
> price-fixing and market-rigging of airport slots and
> their perpetual right-of-first-refusal — both of
> which are per se violations of U.S. antitrust laws
> (Clayton Act).  * * * Now is the best time to
> introduce a market clearing service — while the
> excess demand and excess supply are low, the
> congestion premiums will be low and will allow
> time for airlines to prepare to better serve the pent-
> up demand when it returns. [285]

283.  No carrier joined the Competitive Market Standard.  The DOT/IATA WSG

Slot Coordinator *de facto* granted a waiver to the carriers' private IATA WSG

agreement, and carriers voluntarily violated the terms of their agreement by

continuing to claim entitlement.[286]

**G.   USPTO Denies Market-Clearing Patent**

284.  On November 25, 2019, after Endres had spent four years of time and

attorney fees prosecuting his market-clearing process patent, the USPTO

rejected the patent under 35 U.S.C. §101, claiming the subject matter was an

---

[285] Exhaustless Objection, Dkt. FAA-2013-0259-2815 (Mar. 28, 2020), Doc. 42, PE-B2 111.

[286] *See* FAA Notice of limited waiver of the minimum slot usage requirement., 85 Fed. Reg. 21500 (Apr. 17, 2020), Doc. 43, PE-B2 116.

unpatentable abstract idea according to its internal guidance documents and without citing any Art. III case law that supported their assertion of judicial exception.[287]  On October 5, 2020, Exhaustless filed a notice of appeal.

### H.   The Public's Access to the Public's Airspace at a NJ Airport

285.   At the request of Defendant United Airlines, the DOT/IATA WSG Slot Coordinator reduced the schedule at the Newark Liberty airport by 16 daily reservations purportedly to reduce delays.[288]

286.   Rather than compete in Endres' announced competitive market for all airspace reservations at all airports, Defendant Spirit Airlines decided to 'compete' within the confines of the IATA WSG — by petitioning the court for a review of a federal agency action that prevented Spirit from 'competing' for a grant from the DOT/IATA WSG Slot Coordinator of 16 out of 1,200 daily reservations at the Newark, NJ airport.[289]  Spirit eventually received its

---

[287]  USPTO, Office Action Summary, Application 15/789,585 (Nov. 25, 2019), Doc. 36, PE-B2 92.

[288]  *See* Spirit Airlines, Inc. v. DOT, D.C. Cir. No. 19-1248, Petition for Review, ECF 1818212 (Nov. 25, 2019), Doc. 234, PE-G1 239. *See also*, *Spirit Airlines, Inc. v. DOT*, No. 19-1248 (D.C. Cir. 2021), Doc. 82, PE-G1 218 at 234 ("[W]e must take with a grain of salt the self-serving views of the regulated entities, such as those offered by United upon which the FAA seems to have relied.") (internal quotations and references omitted).

[289]  *See* Spirit Airlines, Inc. v. DOT, D.C. Cir. No. 19-1248, Petitioner's Final Opening Brief, ECF 1849058 (Jun. 26, 2020), Doc. 235, PE-G1 247 at 257 ("Petitioner Spirit Airlines promptly asked DOT/FAA to reallocate Southwest's peakhour flight authorizations to Spirit.").

'competitive' grant of 16 reservations — after an 18-month court process followed by a 14-month regulatory process, involving dozens of people.[290]

287. Rather than compete for airspace reservations in Endres's announced competitive market, or comply with the terms of its IATA WSG agreement, or comply with the statutory process for reducing schedules to reduce delays,[291] Defendant United and other Defendant Carriers requested and purportedly received a private and unlawful waiver from the DOT/IATA WSG Slot Coordinator of the terms of its private IATA WSG agreement:

> United Airlines will cut about 50 daily flights from Newark Liberty International Airport next month in an effort to reduce delays. . . [W]e reached out to the FAA and received a waiver allowing us to temporarily adjust our schedule there for the remainder of the summer. . . Delta Air Lines, JetBlue Airways, Spirit Airlines, Southwest Airlines and Alaska Airlines are among the carriers that have also trimmed their schedules this year.[292]

## I.   Winter 2020 Seasonal Reservations

## 1.   Competitive Market Allocation Boycott

288. On December 24, 2019, Endres announced an auction by Exhaustless' market-clearing service for airspace reservations for the Winter 2020 carrier

---

[290]  *See* Order 2022-7-1, (Jul. 5, 2022), Doc. 134, PE-F 58.

[291]  *See* 49 U.S.C. § 41722.

[292]  Exhaustless FOIA Request for Information from Schedule Reduction Meetings Held in Private, Dkt. DOT-OST-2021-0103-0049 (Jul. 14, 2022), Doc. 147, PE-B2 195 at 199, referencing an article in the press.

scheduling season.[293]  On December 26, 2019, Airline Information Research

L.L.C.'s service "Daily Airline Filings" broadcast this announcement to its

customers.[294]  No carrier licensed the Competitive Market Standard to

participate in the auction.

### 2.   Allocation with the IATA WSG

289.   On May 7, 2020, each Defendant Carrier sent the DOT/IATA WSG Slot

Coordinator a list of the airspace reservations allocated to it the last

equivalent season, which it claims entitles it to the future season's

reservation.[295]

290.   On May 14, 2020, each Defendant Carrier submitted its schedule 'request' for

the Winter 2020 scheduling season to the FAA.

291.   Each Defendant Carrier obtained exclusive reservations no later than June 4,

2020, when the DOT/IATA WSG Slot Coordinator allocated the reservations

according to the IATA WSG — for free — to the carrier claiming entitlement

and denied Exhaustless its right to hear competitive bids for that reservation

---

[293]  *See* Exhaustless Aviation 2.0 Explained, Dkt. DOT-OST-2019-0144-0019
attachment 4/5 (Dec. 24, 2019), Doc. 37, PE-E 4.

[294]  *See* Airlineinfo.com, OST Docket Filings for December 26, 2019, Doc. 39, PE-E
54 at 57.  *Note that* Airline Information Research L.L.C.'s service 'hears,' or scrapes,
the federal docket system and website activity, then curates and broadcasts that
activity to its customers.

[295]  *See* Exhaustless Documentation of IATA WSG Calendar of Coordination
History, Doc. 14, PE-D1 1.

from other carriers and to speak market prices (winning bids) to all market participants.  No slot conference was held.

### 3.  Slot Usage Waiver – Reduced Passenger Demand

292.  On September 15, 2020, the DOT/IATA WSG Slot Coordinator again proposed a rulemaking in response to Defendant Carrier's requests that the DOT/IATA WSG Slot Coordinator 'grant' a waiver from the usage terms of their private-sector WSG agreement for the Winter 2020 seasonal reservations to retain their grandfathered status for the future season.[296] Endres responded to the proposal, stating, *inter alia*:

> Air carriers must abandon the unlawful grandfathering scheme.  Airlines may adopt the Aviation 2.0 Operating Standard to compete for access to high demand markets.  Or, airlines may choose to abandon those markets.  Those are the choices under current statute.[297]

293.  No carrier joined the Competitive Market Standard, and no carrier petitioned the DOT/IATA WSG Slot Coordinator to change the airports to 'level 1' pursuant to the IATA WSG agreement.  The DOT/IATA WSG Slot

---

[296]  *See* FAA COVID-19 Related Relief Concerning Operations at [ORD, JFK, LAX, EWR, LGA, DCA, SFO] for the Winter 2020/2021 Scheduling Season, 85 Fed. Reg. 57288 (proposed Sep. 15, 2020), Doc. 53, PE-B1 32 ("IATA, Airlines for America (A4A), and multiple U.S. carriers, including American Airlines, Inc., Delta Air Lines, Inc., JetBlue Airways Corporation, and United Airlines, Inc., as well as a coalition of airlines worldwide and the African Airlines Association (AFRAA), have urged the FAA to extend relief through the Winter 2020/2021 scheduling season, which ends on March 27, 2021.").

[297]  Exhaustless Inc. Objection, Dkt. FAA-2020-0862-0018 (Sep. 16, 2020), Doc. 54, PE-B1 37.

Coordinator *de facto* granted a waiver to the carriers' private IATA WSG agreement, and Defendant Carriers voluntarily violated their agreement.[298]

## J.    American/JetBlue Northeast Alliance (NEA)

### 1.  The making of the NEA agreement

294.  On May 19, 2020, Defendant Carrier's IATA published a guide to its products and services which airlines can use to manage bespoke alliances — including joint ventures that coordinate *"capacity, pricing, and schedules."*[299]

295.  On July 17, 2020, Defendants American Airlines and JetBlue (both of whom had executives on the Board of Governors of the IATA) entered into a domestic Northeast Alliance Agreement (NEA), which claimed that each carrier *"owned or otherwise held"* a proprietary right to perpetually lease to each other seasonal reservations to use the public's airspace at certain public airports.[300]

---

[298] *See* FAA COVID-19 Related Relief Concerning Operations at [ORD, JFK, LAX, EWR, LGA, DCA, SFO] for the Winter 2020/2021 Scheduling Season, 85 Fed. Reg. 63335 (Oct. 7, 2020), Doc. 55, PE-B1 39.

[299] IATA Industry restart: Forming new interline partnerships within the multilateral interline framework (May 19, 2020), Doc. 312, PE-J 4 at 5.

[300] JetBlue Airways Corporation SEC Form 10-Q, Exhibit 10.3, Northeast Alliance Agreement between American Airlines, Inc. and JetBlue Airways Corp. (Nov. 9, 2020), Doc. 322, PE-D2 1 at 22 *See also*, *id.* at 21 ("'NEA Airports' means the following airports: Boston Logan International Airport (BOS), John F. Kennedy International Airport (JFK), LaGuardia Airport (LGA) and Newark Liberty International Airport (EWR).").

296. On January 7, 2021, Defendant Spirit Airlines filed a complaint with the
DOT/IATA WSG Slot Coordinator to request an investigation into whether
the NEA was an unfair method of competition.[301]

297. On January 10, 2021, Defendants American and JetBlue agreed to unlawful
regulations of price, route, and service by the Assistant Secretary of Aviation
and International Affairs of the DOT/IATA WSG Slot Coordinator [302] in
exchange for the DOT/IATA WSG Slot Coordinator and the DOJ not to
prosecute the coordination by the carriers that violates antitrust laws.[303]
Defendants American and JetBlue and the DOT/IATA WSG Slot Coordinator
asserted that the carriers had a proprietary right to sell a 'permanent'
seasonal reservation to use the public's airspace by requiring the alliance
carriers to "*divest*" certain airspace reservations within approximately one
year by auctioning the reservations to another certificated carrier and
retaining the proceeds.[304]  Additionally, Defendants American and JetBlue
and the DOT/IATA WSG Slot Coordinator asserted that the carriers had a
proprietary right to lease a 'permanent' seasonal reservation to use the

---

[301] *See* Spirit Airlines Complaint, Attachment 1/2, Dkt. DOT-OST-2021-0001 (Jan. 7, 2021), Doc. 328, PE-D2 503.

[302] *Note that* this was the same person that issued the order in March 2020 that stated carriers may not coordinate under the antitrust laws, *see* Order 2020-3-10 (proposed Mar. 27, 2020), Doc. 339, PE-B Rulemaking 557..

[303] *See* Agreement with the U.S. Department of Transportation Regarding Northeast Alliance Between American Airlines, Inc. and JetBlue Airways Corporation, dated January 10, 2021, Doc. 75, PE-D1 204.

[304] *See id.* at 207.

public's airspace by requiring the alliance carriers to lease a slot for longer than the term defined by the unspoken IATA WSG agreement.[305] (To ¶460.)

## 2. The complaint against the NEA

298. On September 21, 2021, the DOJ Antitrust Division, under a new administration of the Executive branch, and joined by several states, including Florida,[306] filed a complaint in the U.S. District Court for the District of Massachusetts against Defendants American Airlines and JetBlue's NEA agreement for violation of the antitrust laws.[307] The court noted the DOT/IATA WSG Slot Coordinator's public comment published on the same day regarding its agreement with the NEA carriers:

> On September 21, 2022, [*sic*] the same day this lawsuit was filed, the DOT issued a formal Clarification of Departmental Position, noting its review of the NEA had occurred informally and without establishing a docketed proceeding, and explaining the DOT Agreement was not designed to approve or disapprove the alliance.[308]

---

[305] *See id.* at 205 ("[T]he NEA will be amended so that slots will be leased for a minimum of two IATA seasons[.]").

[306] Arizona, California, District of Columbia, Florida, Massachusetts, Pennsylvania, and Virginia. *Note that* Florida was represented by the office of Florida Attorney General Ashley Moody.

[307] *See* U.S. et al v. American Airlines and JetBlue Airways, D. Mass. Case 1:21-cv-11558, Complaint, ECF 1 (Sep. 21, 2021), Doc. 105, PE-I1 1.

[308] *U.S. et al v. American Airlines and JetBlue Airways*, D. Mass. 1:21-cv-11558, Findings of Fact and Conclusions of Law, ECF 344 (May 19, 2023), Doc. 224, PE-I2 320, footnote 32 at 345 (internal quotations and reference omitted). *See also,*

299.  On October 7, 2021, Endres objected to the carriers' agreement with the

DOT/IATA WSG Slot Coordinator over Exhaustless' competitive market

allocation and provided information to the public docket and to the lead DOJ

attorney on the NEA case in the district court:

> The entire NEA — and indeed, every so-called
> immunized alliance — is predicated on the
> allocation of slots according to the WSG agreement,
> but the WSG agreement is not included in the NEA
> Agreement.  While the WSG is mentioned in the
> DOT-AA-JB Agreement, there is no indication that
> it was reviewed with the joint venture or with any
> alliance agreement, nor that the DOJ has any
> knowledge of it. [309]

300.  On January 14, 2022, the DOJ notified Endres that the DOJ is required to

provide the information from Endres to each carrier-defendant's outside

counsel, which will be categorized as confidential and governed by the court's

default protective order.[310]

301.  On May 10, 2022, Endres notified the DOJ of the rulings in *U.S. v. Causby*,

328 U.S. 256 (1946) and *Air Pegasus of D.C., Inc. v. U.S.*, 424 F.3d 1206 (Fed.

Cir. 2005) that only the public has title to the navigable airspace.[311]

---

Clarification of Departmental Position on American Airlines - JetBlue Airways
Northeast Alliance Joint Venture, Dkt. DOT-OST-2021-0001-0023 (Sep. 21, 2021),
Doc. 108, PE-D1 229.

[309] Exhaustless Objection, Dkt. DOT-OST-2021-0001, 3 (Oct. 7, 2021), Doc. 106,
PE-D1 218.

[310] *See* DOJ Email, Notice of Protective Order (Jan. 14, 2022), Doc. 125, PE-I1 43.

[311] *See* Exhaustless Update to DOJ (May 10, 2022), Doc. 148, PE-I2 3. *See also*,
Exhaustless Email to DOJ (May 10, 2022), Doc. 149, PE-I2 7.

302.   On April 20, 2022, the DOJ notified Endres that the district court had issued
       a stipulated protective order for the case, and that the information Endres
       had provided would be treated as *"highly confidential"* as described in the
       order.[312]

### 3.   The trial of the NEA

#### ll.   No questions regarding the procurement of reservations to use public assets.

303.   The district court held a month-long bench trial for the American Airlines –
       JetBlue NEA agreement antitrust case in the autumn of 2022.  Testifying
       witnesses included executives of both defendant carriers and of Spirit and
       Southwest airlines, as well as expert economist witnesses for each side.  The
       court heard evidence that airlines treat 'slots' as both assets and as equity,
       but no witness was questioned about how a renewable asset — the future
       airspace schedule — was treated as a permanent asset.[313]  No party or

---

[312]  DOJ Email, Notice of Stipulated Protective Order (Apr. 20, 2022), Doc. 379, PE-
I1  666.

[313]  See, *e.g.*, Testimony of JetBlue CEO, Robin Hayes, D. Mass. Case 1:21-cv-11558,
ECF 299, pp. 1-90 (Sep. 28, 2022), Doc. 377, PE-I1 511, line 20 at 523, line 22 at
531, and line 24 at 534 ("Q. What did you see as impeding or hindering JetBlue's
growth in New York, in particular[?] A. The number one hindrance to growth we
had was just the lack of slots. * * * THE COURT: So the assets you're pooling are
the slot. THE WITNESS: Yes." * * * Q. Thank you. Then the next bullet says,
"Secures valuable airport access at LaGuardia and gains traction with corporate
accounts. What do you mean by airport access at LaGuardia? A. Well, we touched
on that earlier. You know, we had always had a very, very small slot holding at

witness mentioned the IATA WSG or its allocation of seasonal airspace reservations by grandfathering at the twice-a-year Slot Conference — that every carrier before the court attended on June 21, 2022, in Seattle, Washington to allocate the global Winter 2022 airspace reservations, nor the upcoming slot conference on November 15-18, 2022, in Australia to allocate the global Summer 2023 airspace reservations with grandfathering.[314] No party or witness mentioned the public's title to the navigable airspace, which was declared in binding case precedent in 1946. No party or witness mentioned the Exhaustless market, which was declared in binding case precedent in 2019. (To ¶190.)

---

LaGuardia. . . And for us, being able to add more slots at LaGuardia would've allowed us to be more successful in trying to get more *corporate business* on JetBlue.") (emphasis added)). *See also*, Testimony of Spirit Airlines VP Network Planning, John Kirby, D. Mass. Case 1:21-cv-11558, ECF 301 (Sep. 30, 2022), Doc. 378, PE-I1 601, line 12 at 628 ("THE COURT: Airlines, I take it, are entitled to sell the slots to another airline if they want, or does that have to go through DOT? THE WITNESS: [T]ypically, they have to go through DOT. And the interesting thing about slots, Your Honor, is that technically they're owned by the government. . . Over time, it's evolved into something that's considered a piece of equity for the carrier.").

[314] *See* Exhaustless Documentation of IATA WSG Calendar of Coordination History, Doc. 14, PE-D1 1.

### mm.   Contract for Scheduled Service

304.   In addition, testimony and evidence submitted to the court coupled with

testimony and evidence from other sources[315] revealed that Defendant

Carriers used Distribution Systems to circumvent the air tariff publication

system to allocate part of the market of air transportation to business

'customers' pursuant to a Contract for Scheduled Service at fixed prices or

discounted prices relative to those offered to the public, including a federal

---

[315]   *See, e.g., U.S. Airways v. Sabre*, Case No. 1:11-cv-02725, Opinion and Order, ECF 882 (SDNY Mar. 21, 2017), Doc. 429, PE-N1 31 (remanded on different grounds No. 17-960 (2d Cir. 2019) at 39, ("'Brick and mortar' travel agencies book almost exclusively through the GDSs. These travel agencies' clients are primarily corporate travelers, who are higher value customers for airlines."). *Note that* in the current industry structure, a travel agency (a "ticket agent" per 49 U.S.C. § 40102(a)(45)) is simultaneously an agent of an airline, an agent of a GDS, and is held out to be an agent of the traveler; *see* All Direct Travel Services Inc. et al v. Delta Air Lines Inc. et al, Case 8:01-cv-00902, Delta Statement, ECF 127 (Apr. 29, 2003), Doc. 479, PE-N3 91 at 96 ("The ARC Agreement establishes a principal-agent relationship between each travel agent and Delta."). *See also*, Expedia Group, Inc. SEC Form 10-K (Feb. 10, 2023) at 5 ("We make travel products and services available from a variety of hotel companies, property owners and managers, large and small commercial airlines, car rental companies, cruise lines, destination service providers, and other travel partners. We seek to build and maintain long-term, strategic relationships with travel suppliers and global distribution system ("GDS") partners."). *See also*, NY Contract Award (Feb. 15, 2022), Doc. 187, PE-H 274 at 278 ("The travel management services contractor is a member of the Airlines Reporting Corporation (ARC) and the International Airlines Travel Agent Network (IATAN)." *Note that* the IATAN is a branch of the IATA.).

government "*City Pair Program*" (CPP) fixed-price contract managed by the General Services Administration (GSA).[316] (To ¶491.)

### nn. Provide reduced-delay service — for free — to employees of the government or large businesses that are VIP-A.

305. In addition, testimony and evidence submitted to the court revealed that Defendant Passenger Carrier's business account sales representatives monitor the Contract for Scheduled Service accounts for individual flight reservations booked by very important people to the airline (VIP-A); when a VIP-A is scheduled on a particular flight, the sales representative notifies the airline staff at the airport to prioritize service for that flight.[317] What was

---

[316] *See* GSA FY23 CPP Request for Proposal (Feb. 17, 2022), Doc. 185, PE-H 153 at 167 ("The offeror shall propose a fixed-price fare for scheduled air passenger transportation services as specified herein in accordance with the same services the offeror provides commercially to the general public in scheduled service."). *See also,* 14 C.F.R. § 212.2 ("Charter flight means a flight operated *under the terms of a charter contract* between a direct air carrier and its charterer or lessee. It does not include scheduled interstate air transportation, scheduled foreign air transportation, or nonscheduled cargo foreign air transportation, *sold on an individually ticketed or individually waybilled basis.*" (emphasis added)).

[317] *See* Testimony of JetBlue Corporate Sales Manager, Barry McMenamin, D. Mass. Case 1:21-cv-11558, ECF 299 pp. 1-4 and 204-242 (Sep. 28, 2022), Doc. 184, PE-I1 208 at 236 ("So this is an e-mail you sent to JetBlue's system operations directors; is that right? A. Yes.  Q. And the system operations directors are the people at JetBlue responsible for moving – or for managing airplane activities and movements across JetBlue's network; is that right? A. Yes. That's one of their functions.  Q. Okay. And in this particular e-mail, you were asking them for special attention to a flight between Philadelphia and Boston on which this corporate customer's CEO was then traveling; is that right? A. Yes. I'm highlighting this flight to the system office team. . . But if I can give them some information, highlight a flight is important to us, they will keep their eyes on all the elements that go into getting a flight out on time.").

not said at the trial is that an airline trade association houses one of its
employees in the public's air traffic control tower; the Defendant Carrier
notified their trade association liaison of flights to prioritize, who then
coordinated with the FAA to ensure that the flight with the VIP-A on board
bypassed the queue to the runway.[318]  Business and government employee
VIP-As are provided this premium service ——to bypass the queue — at no
additional charge.  Endres cannot hear bids from the public for the price that
they are willing to pay to avoid delays, nor a way to speak market clearing
prices to all market participants for use in their economic decision-making for
congestion-free transportation.

### oo.    Allocate future airspace capacity to employees of government or large businesses.

306.    In addition, and what was not said in the Court, each Defendant Passenger
Carrier allocates future capacity of the air transportation system – for free –
to an employee of a government agency or business that purchases an
individual flight reservation under a Contract for Scheduled Service.  The
Defendant Passenger Carrier accomplishes this by bundling the price of the
carrier-currency and the airfare in the fixed price Contract for Scheduled
Service and then 'awarding' the carrier-currency to the employee in their

---

[318]  *See* A4A, Job Posting for Airline Traffic Management Coordinator (Oct. 5, 2022),
Doc. 195, PE-D3 1.  *See also*, A4A, Job Posting for Director, Air Traffic Management
(Mar. 22, 2023), Doc. 196, PE-D3 3.

personal airline loyalty program account.  The 'awarded' employee could be a member of the Congress, a federal judge, or staff of the White House;[319] or an executive of an airline vendor such as a wireless carrier, a cargo carrier, an accounting firm, an aircraft manufacturer, a software provider, a hotel, an expert witness from a consulting firm, or a bank.[320]

307.    The Congress has authorized the 'awards' of future airspace capacity to employees of the federal government through law.[321]

308.    On December 2, 2022, the DOJ submitted its proposed findings of fact that "*American owns many valuable slots at JFK and LGA, both of which are slot-constrained airports.*"[322]  The DOJ omitted the IATA WSG, the Exhaustless market-clearing service declared in binding case precedent in *Exhaustless v. FAA*, 931 F.3d. 1209 (D.C. Cir. 2019) and the Supreme Court precedent in

---

[319]  *See* A4A Industry Review: Allocating Capital to Benefit Customers, Employees, and Investors (Jan. 11, 2024), Doc. 446, PE-N2 12 at 23 from https://www.airlines.org/wp-content/uploads/2023/05/A4A-Industry-Review-1.pdf.

[320]  *See id.* at 22.

[321]  *See* National Defense Authorization Act for Fiscal Year 2002, Pub. L. 107-107, div. A, title XI, § 1116, 115 Stat. 1012, 1241 (Dec. 28, 2001), amended by National Defense Authorization Act for Fiscal Year 2020, Pub. L. 116-92, div. A, title VI, § 606(c), 133 Stat. 1198, 1425 (Dec. 20, 2019), *codified at* 5 U.S.C. § 5702 note, Retention of Travel Promotional Items. *See also*, GSA Federal Travel Regulation; Using Promotional Materials and Frequent Traveler Programs, 67 Fed. Reg. 17946 (Apr. 12, 2002), Doc. 197, PE-B2 208.  *See also*, GSA Federal Travel Regulation; Using Promotional Materials; Conference Planning, 68 Fed. Reg. 27936 (May 22, 2003), Doc. 198, PE-B2 210.

[322]  U.S. et al v. American Airlines and JetBlue Airways, D. Mass. Case 1:21-cv-11558, Plaintiff's Proposed Findings of Fact, ECF 332 (Dec. 2, 2022), Doc. 200, PE-I1 255, ¶436 at 383.

*U.S. v. Causby*, 328 U.S. 256 (1946). The DOJ did not mention that in *Air Pegasus of D.C., Inc. v. U.S.*, 424 F.3d 1206 (Fed. Cir. 2005), it had relied on *U.S. v. Causby* when it stated that *"the navigable airspace has always been subject to the exclusive and complete control of the federal government and is consequently not available for private ownership."*[323]  Instead, the DOJ cited sealed evidence to proffer airline ownership of reservations to use the airspace, PX0162, which remains unpublished.

### 4.    Permanent injunction of the NEA

309.    On May 19, 2023, the court permanently enjoined the NEA as a *"naked agreement to not compete"* and *"a straightforward example of market allocation."*[324]  The court's order did not declare that carries owned 'slots' as proffered by the DOJ.

310.    While Defendants American Airlines and JetBlue were in the court negotiating the terms of the injunction — and claiming that they had engaged *"in good faith"* with regulators to craft their joint venture agreement[325] — they did not disclose that the carriers and the DOT/IATA

_____

[323] *Air Pegasus of D.C., Inc. v. U.S.*, 424 F.3d 1206, 1214 (Fed. Cir. 2005).

[324] *U.S. et al v. American Airlines and JetBlue Airways*, D. Mass. 1:21-cv-11558, Findings of Fact and Conclusions of Law, ECF 344 (May 19, 2023), Doc. 224, PE-I2 320 at 323, 392.

[325] U.S. et al v. American Airlines and JetBlue Airways, D. Mass. Case 1:21-cv-11558, American Airlines and JetBlue Response to Plaintiff's Motion for Entry of Final Judgment and Permanent Injunction, Exhibit A, ECF 359-1 (Jun. 14, 2023), Doc. 315, PE-I2 730 at 731.

WSG Slot Coordinator were attending the 152nd slot conference on June 13-15, 2023, in Ireland to allocate the global Winter 2023 airspace reservations with the entire market allocation secured by the IATA WSG agreement.[326]

### 5. American Airlines appeal of the permanent injunction of the NEA

311. On September 25, 2023, solo Defendant American Airlines appealed the district court's ruling enjoining the NEA to the U.S. Court of Appeals for the First Circuit.  On December 6, 2023, American Airlines filed its brief in which it stated that *"The NEA created a new flight network competitive to the larger existing networks of entrenched market leaders, Delta Airlines and United Airlines."*[327]

312. On March 4, 2024, which was after the dissolution of the NEA, American Airlines stated that its partnerships "serve ~ 90% of U.S. long-haul demand."[328]

---

[326] *See* IATA 152nd Slot Conference – Organizations attending (Jun. 11, 2023), Doc. 254, PE-D3 18.

[327] U.S. et al v. American Airlines Group Inc., 1st Cir. Case 23-1802, Brief of Defendant-Appellant American Airlines (Dec. 6, 2023), Doc. 496, PE-N4 148 at 158.

[328] American Airlines SEC Form 8-K, Investor Presentation (Mar. 4, 2024), Doc. 495, PE-N4 25 at 63.

### K.   Summer 2021 Seasonal Reservations

### 1.  Allocation with the IATA WSG

313.   On October 1, 2020, each Defendant Carrier sent the DOT/IATA WSG Slot
Coordinator a list of the airspace reservations allocated to it the last
equivalent scheduling season, entitles it to the future season's reservation.[329]
On October 8, 2020, each Defendant Carrier submitted its schedule 'request'
for the Summer 2021 scheduling season to the FAA.  Each Defendant Carrier
obtained exclusive reservations no later than November 5, 2020, when the
DOT/IATA WSG Slot Coordinator allocated each reservation — for free — to
the carrier claiming entitlement and denied Exhaustless its right to hear
competitive bids for that reservation from other carriers and to speak market
prices (winning bids) to all market participants.[330]  On November 17, 2020,
each Defendant IATA Carrier attended the IATA Slot Conference held online
to finalize the allocation of the season's airspace reservations to carriers.[331]

---

[329]  *See* Exhaustless Documentation of IATA WSG Calendar of Coordination
History, Doc. 14, PE-D1 1.

[330]  *See id.*

[331]  *See id.  See also,* Exhaustless FOIA Request Use of Government Aircraft (Mar.
6, 2023), Doc. 21, PE-B2 73 at 75.

### 2. Slot Usage Waiver – Reduced Passenger Demand

314. On December 18, 2020, the DOT/IATA WSG Slot Coordinator posted

Defendant Carriers IATA WSG agreement to a public docket.[332]

315. On December 22, 2020, at the request of Defendant Carriers, the FAA

proposed a rule to issue carriers a waiver of the airspace reservation

minimum usage requirement agreed to by carriers' private IATA WSG

agreement, through the end of the Summer 2021 scheduling season on

October 30, 2021.[333] On December 28, 2020, Endres objected to the waiver

because:

> The FAA cannot protect airlines from the antitrust
> laws. As the Supreme Court stated: 'The
> assumption that competition is the best method of
> allocating resources in a free market recognizes
> that all elements of a bargain – quality, service,
> safety, and durability – and not just the immediate
> cost, are favorably affected by the free opportunity
> to select among alternative offers.  Even assuming
> occasional exceptions to the presumed
> consequences of competition, **the statutory policy**
> **precludes inquiry into the question whether**
> **competition is good or bad.**'[334]

---

[332] *See* IATA Worldwide Slot Guidelines, 9th Edition (Effective Jan. 1, 2019), Dkt. FAA-2020-0862 (Dec. 17, 2020), Doc. 69, PE-D1 136.

[333] *See* FAA COVID-19 Related Relief Concerning Operations at [ORD, JFK, LAX, EWR, LGA, DCA, SFO] for the Summer 2021 Scheduling Season, 85 Fed. Reg. 83672 (proposed Dec. 22, 2020), Doc. 70, PE-B1 65.

[334] Exhaustless Objection, Dkt. FAA-2020-0862-0255 (Dec. 28, 2020), Doc. 71, PE-B1 69 (*referencing National Soc'y of Prof. Engineers v. U.S.*, 435 U.S. 679, 695 (1978) (emphasis in original).

316. In addition, Endres announced an auction by Exhaustless market-clearing

service of airspace reservations for the Winter 2021 carrier scheduling season

to carriers that license the Competitive Market Standard by January 13,

2021.[335]  No carrier joined the standard.

317. On January 14, 2021, the FAA *de facto* granted the waiver and *de facto*

created a second-class of airline reservations with grandfathered rights, at

the request of Defendant Carriers through their trade association, IATA,

relegating new schedule 'requests' to third-class.[336]

## L.   American/oneworld Alliance Amendment

318. Rather than compete in Endres' announced competitive market for airspace

reservations in the U.S., Aer Lingus, a citizen of Ireland and a subsidiary of

Defendant International Consolidated Airlines Group, joined Defendants

American Airlines and Alaska Airlines Oneworld alliance in a "confidential"

---

[335] *Id.*

[336] *See* FAA Policy Statement: COVID-19 Related Relief at [ORD, JFK, LAX, EWR, LGA, DCA, SFO] for the Summer 2021 Scheduling Season, Dkt. FAA-2020-0862-0302 (Jan. 14, 2021), Doc. 72, PE-B1 71 at 101 ("[T]he FAA has determined to apply a standard similar to paragraph 1.4 of the WASB proposal at all slotcontrolled and designated IATA Level 2 airports in the United States. Slots or schedules operated as approved on a non-historic basis in Summer 2021 will be given priority over new demands for the same timings in the next equivalent season (i.e., Summer 2022) for use on a non-historic basis, subject to capacity availability and consistent with established rules and policies in effect in the United States. . . This priority does not affect the historic precedence or priority of slot holders and carriers with schedule approvals, respectively, which meet the conditions of the waiver during Summer 2021 and seek to resume operating in Summer 2022.").

agreement to use the public's airspace.[337]  In November 2020, the DOT/IATA

WSG Slot Coordinator issued a show cause order for its tentative approval of

this non-public agreement and cited *"serious competitive concerns in the U.S.-*

*London market <u>due to access constraints</u>"* to justify requiring certain carriers

to lease their 'holdings' of certain reservations.[338]

319.   In response to the proposed amended alliance — rather than compete for

airspace reservations in Endres' announced competitive market or honor its

IATA WSG agreement — Defendant JetBlue sought for the government to

take reservations from the existing 'holders' to give to JetBlue:

> JetBlue argues that only government action will
> enable JetBlue to enter the market and compete
> with the existing alliances. JetBlue states that it is
> the best-positioned carrier to enter the U.S.–LHR
> market and provide vigorous competition.  JetBlue
> argues that the existing remedy slot holders have
> more than enough slots to operate their existing
> and planned operations.  Therefore, JetBlue argues
> that the remedy should be modified to allow for the
> reallocation of the remedy slots to JetBlue.[339]

320.   Endres objected to the proposed expansion of antitrust immunity because:

> 1) A competitive alternative is available for
>    airlines to obtain airspace slots without
>    regulatory intervention in the slot market; 2)
>    The fundamental assumption of illiquid slot

---

[337]  American Airlines *et al* Motion for Antitrust Immunity for Amended Joint
Business Agreement, Dkt. DOT-OST-2008-0252 (Dec. 21, 2018), Doc. 325, PE-D2
152, Appendix 1 at 210.

[338]  Order 2020-11-9 (proposed Nov. 16, 2020), Doc. 64, PE-D1 92 at 103 (emphasis
added).

[339]  *Id.* at 99.

> markets by the applicants and the DOT is no
> longer valid; 3) The proposed slot divestiture
> continues the prohibited practice of
> grandfathering slots; . . . Exhaustless will
> blindly auction the Winter 2021/2022 slot, or
> schedule, reservations for Heathrow Airport on
> April 7, 2021.[340]

321.  Defendants International Consolidated Airlines Group, American Airlines
      and Alaska Airlines did not abandon their joint business agreement to join
      the competitive market.

      **M.  Delta/LATAM Alliance Agreement**

322.  In July 2020, rather than compete in Endres' announced competitive market
      for airspace reservations, Defendants Delta Air Lines and LATAM Airlines
      Group, a holding company of eleven foreign carriers that are citizens of seven
      countries (Argentina, Brazil, Chile, Columbia, Ecuador, Paraguay, and Peru)
      — all of whom are members of the IATA — requested that the DOT/IATA
      WSG Slot Coordinator grant approval and antitrust immunity of a
      "confidential" joint venture agreement (JVA) among all of the carriers across
      the two groups.[341]

---

[340]  Exhaustless Objection, Dkt. DOT-OST-2008-0252 (Nov. 30, 2020), Doc. 65, PE-D1 110.

[341]  Delta Air Lines, Inc. and LATAM Airlines Group, S.A., Joint Application for Approval of and Antitrust Immunity for Alliance Agreements, Dkt. DOT-OST-2020-0105-0001 (Jul. 8, 2020), Doc. 151, PE-D1 243 at 253.

323.   On February 7, 2022, Endres opposed this agreement because, *inter alia*, the *"JVA is not the entire agreement as it is predicated on the anticompetitive IATA Worldwide Slot Guidelines agreement. * * * Delta-LATAM's JVA presents pages of market share 'impact' against rivals — data that is meaningless since they have conspired to allocate that market through the WSG."*[342]

324.   Defendants Delta Air Lines and LATAM Airlines Group did not abandoned the joint venture agreement, eventually accepting a grant of antitrust immunity based on their fraudulent application.[343]

### N.   Winter 2021 Seasonal Reservations

#### 1.   Competitive Market Allocation Boycott

325.   As noted in the discussion of American/Aer Lingus application for antitrust immunity,[344] on November 9, 2020, Endres announced an auction by Exhaustless for the Winter 2021 airspace reservations for LaGuardia, JFK, and Newark Liberty airports on April 7, 2021, to eligible carriers that license

---

[342]   Exhaustless Objection to the Delta-LATAM Alliance, Dkt. DOT-OST-2020-0105-0045 (Feb. 7, 2022), Doc. 152, PE-D1 366 at 368.

[343]   *See* Order 2022-9-20 (Sep. 30, 2022), Doc. 155, PE-D1 413.

[344]   *See* VI.L. American/oneworld Alliance Amendment, *supra.*

the Competitive Market Standard by January 13, 2021.[345]  No Defendant

Carrier joined the standard.

### 2.   Allocation with the IATA WSG

326.   On May 6, 2021, each Defendant Carrier sent the DOT/IATA WSG Slot

Coordinator a list of the airspace reservations allocated to it the last

equivalent season, which it claims entitles it to the future season's

reservation.[346]  On May 13, 2021, each Defendant Carrier submitted its

schedule 'request' for the Winter 2021 scheduling season to the FAA.[347]  Each

Defendant Carrier obtained exclusive reservations no later than June 3,

2021, when the DOT/IATA WSG Slot Coordinator allocated each reservation

— for free — to the carrier claiming entitlement and denied Exhaustless its

right to hear competitive bids for that reservation from other carriers and to

speak market prices (winning bids) to all market participants.[348]  On June

15, 2021, each Defendant IATA Carrier attended the IATA Slot Conference

held online to finalize the allocation of the season's airspace reservations to

the carriers[349]

—————————————————

[345]  Exhaustless Objection, Dkt. DOT-OST-2018-0154-0053 (Nov. 9, 2020), Doc. 60,
PE-D Agreement 52.

[346]  *See* Exhaustless Documentation of IATA WSG Calendar of Coordination
History, Doc. 14, PE-D1 1.

[347]  *See id.*

[348]  *See id.*

[349]  *See id.  See also*, Exhaustless FOIA Request Use of Government Aircraft (Mar.
6, 2023), Doc. 21, PE-B2 73 at 75.

### 3. Slot Usage Waiver – Reduced Passenger Demand

327. On September 20, 2021, at the request of Defendant Carriers, the FAA

proposed a rule to issue carriers a waiver of the airspace reservation

minimum usage requirement agreed to by the carrier's private IATA WSG

agreement, through the end of the Winter 2021 carrier scheduling season on

March 26, 2022.[350]  On September 27, 2021, Endres objected to the proposed

waiver because, *inter alia*:

> The waiver seeks to protect the market allocated at
> seven high demand airports to members of the
> carrier cartel that provide foreign air
> transportation, contrary to the air transport
> agreement with the E.U. that requires both
> governments to 'apply their respective competition
> regimes to protect and enhance overall competition
> and not individual competitors.'[351]

328. On October 20, 2021, the DOT/IATA WSG Slot Coordinator *de facto* granted a

waiver to the Defendant Carrier's private IATA WSG agreement.[352]

---

[350] *See* FAA COVID-19 Related Relief Concerning Operations at [ORD, JFK, LAX, EWR, LGA, DCA, SFO] for the Winter 2021/2022 Scheduling Season, 86 Fed. Reg. 52114 (proposed Sep. 20, 2021), Doc. 103, PE-B1 115.

[351] Exhaustless Inc. Objection, Dkt. FAA-2020-0862-0321 (Sep. 27, 2021), Doc. 104, PE-B1 122.

[352] FAA COVID–19 Related Relief Concerning Operations at [ORD, JFK, LAX, EWR, LGA, DCA, SFO] for the Winter 2021/2022 Scheduling Season, 86 Fed. Reg. 58134 (Oct. 20, 2021), Doc. 121, PE-B1 132.

### O.   Summer 2022 Seasonal Reservations

#### 1.   Competitive Market Allocation Boycott

329.   On August 19, 2021, Endres announced a competitive market allocation by

Exhaustless for the airspace reservations for the Summer 2022 carrier

scheduling season at the seven airports which the FAA requires advance

management of airspace demand.[353]  No Defendant Carrier licensed the

Competitive Market Standard to compete for the reservations.

#### 2.   Allocation with the IATA WSG

330.   On September 30, 2021, each Defendant Carrier sent the DOT/IATA WSG

Slot Coordinator a list of the airspace reservations allocated to it the last

equivalent season, which it claims entitles it to the future season's

reservation.[354]  On October 7, 2021, each Defendant Carrier submitted its

schedule 'request' for the Summer 2022 scheduling season to the FAA.[355]

Each Defendant Carrier obtained exclusive reservations no later than

November 4, 2021, when the DOT/IATA WSG Slot Coordinator allocated each

-------------------

[353]  *See* Exhaustless Announcement of Slot Auction for Summer 2022, Dkt. DOT-OST-2001-9849-0187 attachment 1/6 (Aug. 19, 2021), Doc. 94, PE-E 101.  *See also*, Exhaustless Attached Auction Documents, Dkt. DOT-OST-2001-9849-0187 (Aug. 19, 2021) (Aviation 2.0 Licensing Agreement (attachment 2/6), Slot Auction Rules and Procedures (attachment 3/6), Slot Auction Design (attachment 4/6), Prepayment Form (attachment 5/6), and Registration Form (attachment 6/6)).

[354]  *See* Exhaustless Documentation of IATA WSG Calendar of Coordination History, Doc. 14, PE-D1 1.

[355]  *See id.*

reservation — for free — to the carrier claiming entitlement and denied Exhaustless its right to hear competitive bids for that reservation from other carriers and to speak market prices (winning bids) to all market participants.[356] On November 16, 2021, each Defendant IATA Carrier attended the IATA Slot Conference in Rome, Italy to finalize the allocation of the season's airspace reservations to the carriers.[357]

### 3.  Slot Usage Waiver – Reduced Passenger Demand

331.   On March 2, 2022, at the request of Defendant Carriers, the FAA proposed a rule to issue carriers a waiver of certain airspace reservation minimum usage requirements agreed to by carriers' private IATA WSG agreement, through the Summer 2022 carrier scheduling season ending on October 29, 2022.[358] On March 7, 2022, Endres objected to the waiver: *"The DOT/FAA's proposal to elevate the self-declared 'historical rights' of air carriers over an available market is repugnant to the policies of the U.S. Government and to the agreement among its people of a free market economy as enshrined in the Constitution."*[359] Endres also documented the civil penalties that the

---

[356]  *See id.*

[357]  *See id. See also*, Exhaustless FOIA Request Use of Government Aircraft (Mar. 6, 2023), Doc. 21, PE-B2 73 at 75.

[358]  *See* FAA COVID–19 Related Relief Concerning Operations at [ORD, JFK, LAX, EWR, LGA, DCA SFO] for the Summer 2022 Scheduling Season, 87 Fed. Reg. 11805 (proposed Mar. 2, 2022), Doc. 135, PE-B1 155.

[359]  Exhaustless Comment, Dkt. FAA-2020-0862-0354/0351 (Mar. 7, 2022), Doc. 136, PE-B1 161 at 163 (emphasis added).

Congress provides for each flight involving the violation of certain statutes.[360]
On Mar. 29, 2022, the FAA *de facto* granted a waiver to the carriers' private
IATA WSG agreement.[361]

### P.   Winter 2022 Seasonal Reservations

### 1.   Competitive Market Allocation Boycott

332.   On January 7, 2022, Endres announced a competitive market allocation by
Exhaustless for the airspace reservations for the Winter 2022 carrier
scheduling season at the seven airports which the FAA requires advance
management of airspace demand.[362]  The announcement included the
evolution of the Congress' actions to deregulate the industry that *"shows that
the DOT/FAA does not have, and has never had, authority to regulate
routes."*[363]  No carrier licensed the Competitive Market Standard to compete
for the reservations.

---

[360] *Id*. at 164.

[361] *See* FAA COVID–19 Related Relief Concerning Operations at [ORD, JFK, LAX,
EWR, LGA, DCA SFO] for the Summer 2022 Scheduling Season, 87 Fed. Reg. 18057
(Mar. 29, 2022), Doc. 137, PE-B1 166.

[362] *See* Exhaustless Comment, Dkt. FAA-2001-9854-0127 (Jan. 7, 2022), Doc. 124,
PE-E 103.

[363] *Id*. at 109 (emphasis added).

## 2. Allocation with the IATA WSG

333.   On May 12, 2022, each Defendant Carrier sent the DOT/IATA WSG Slot
Coordinator a list of the airspace reservations allocated to it the last
equivalent season, which it claimed entitles them to the future season's
reservation.[364]  On May 19, 2022, each Defendant Carrier submitted its
schedule 'request' for the Winter 2022 scheduling season to the FAA.[365]  Each
Defendant Carrier obtained exclusive reservations no later than June 9,
2022, when the DOT/IATA WSG Slot Coordinator allocated each reservation
— for free — to the carrier claiming entitlement and denied Exhaustless its
right to hear competitive bids for that reservation from other carriers and to
speak market prices (winning bids) to all market participants.[366]  On June
21, 2022, each Defendant IATA Carrier attended the IATA Slot Conference in
Seattle, Washington to finalize the allocation of the season's airspace
reservations to the carriers.[367]

334.   Defendant Port Authority of New York and New Jersey attended the Slot
Conference to allocate the market of airport gates based on the

---

[364] *See* Exhaustless Documentation of IATA WSG Calendar of Coordination
History, Doc. 14, PE-D1 1.

[365] *See id.*

[366] *See id.*

[367] *See id.*  *See also,* Exhaustless FOIA Request Use of Government Aircraft (Mar.
6, 2023), Doc. 21, PE-B2 73 at 75.

administrative airspace reservation market allocation agreed to by Defendant Carriers.[368] (To ¶405.)

335.   As a "member of the slot conference," the DOT/IATA WSG Slot Coordinator attended the IATA WSG Slot Conference and met privately with many Defendant Carriers and also met with OneAlpha Technologies,[369] a "slot coordination and airport capacity management software platform," a joint venture of undisclosed persons.[370]

336.   Defendant PANYNJ contracts with OneAlpha Technologies to provide software at no charge to each Defendant Carrier to further coordinate airspace reservations.[371] (To ¶488.)

**3.   Slot Usage Waiver – Reduced Passenger Demand**

337.   On August 25, 2022 — two months after allocating the airspace reservations according to the IATA WSG — carrier trade associations requested the FAA grant a waiver from the terms of their private IATA WSG agreement for the

---

[368] *See* IATA 150th Slot Conference – Organizations attending (Jun. 13, 2022), Doc. 231, PE-D3 10 at 15.

[369] FAA FOIA Responsive Records for FOIA 2022-09917 (Feb. 23, 2024), Doc. 476, PE-O 4. *See also*, *id.* at 19.

[370] OneAlpha Technologies Webpage, Doc. 477, PE-N3 83 from https://web.archive.org/web/20240229200859/https://onealphatech.com/.

[371] *See id.* *See also*, OneAlpha Technologies, Our Difference webpage, Doc. 478, PE-N3 87 from https://web.archive.org/web/20240223232709/https://onealphatech.com/our-difference/.

Winter 2022 carrier scheduling season beginning October 30, 2022, and ending March 25, 2023.[372] On October 28, 2022, the FAA declined.[373]

### Q.    PTAB Denial of Market-Clearing Patent

338.   On Feb. 8, 2022, the Patent Trial Appeal Board ("PTAB") upheld the USPTO's denial of the patent for the new commerce of the market-clearing process.[374] On March 25, 2022, Exhaustless' patent attorney notified Endres of this decision.

### R.    United/Air Canada Alliance Agreement

339.   On February 10, 2022, rather than compete for Endres' announced competitive market for airspace reservations or follow the regulatory process to submit an alliance agreement,[375] Defendants United Airlines and Air Canada privately requested antitrust immunity of an undisclosed alliance agreement.[376] The contents of the private letter or the agreement are not public.

---

[372] *See* FAA COVID–19 Related Relief Concerning Operations at [ORD, JFK, LAX, EWR, LGA, DCA, SFO] for the Winter 2022/2023 Scheduling Season, 87 Fed. Reg. 65282 (Oct. 28, 2022), Doc. 180, PE-B1 178.

[373] *See id.*

[374] USPTO, Decision on Appeal, Application 15/789,585 (Feb. 8, 2022), Doc. 139, PE-B2 167.

[375] *See* 14 C.F.R. § 303.03.

[376] *See* TRN Letter to United Airlines, Dkt. DOT-OST-2008-0234-0336 (posted Jul. 21, 2022), Doc. 176, PE-D1 424.

### S.     Access to South Africa's Airspace

340.   In early 2022, two U.S. carriers had each requested an administrative

allocation of reservations for service to South Africa; the sum of the request

exceeded the reservation volume agreed to in the bi-lateral air transport

agreement.  On March 30, 2022, Endres announced a competitive market

allocation by Exhaustless to clear the excess demand for airspace

reservations for the rest of the Summer 2022 and the Winter 2022 carrier

scheduling season.[377]  No carrier licensed the Competitive Market Standard

to compete for the reservations in the market, instead accepting a grant from

the DOT/IATA WSG Slot Coordinator.[378]

### T.     Access to Cuba's Airspace

341.   On October 25, 2019, the DOT/IATA WSG Slot Coordinator unilaterally

imposed economic sanctions on Cuba by suspending scheduled service by U.S.

carriers at airports other than the Havana airport,[379] and a year later by

limiting the annual number of round-trip charter flights.[380]  No carrier

challenged these unlawful agency actions.

---

[377]  *See* Exhaustless Auction of Airspace Reservations to South Africa, Dkt. DOT-OST-2001-9849-0188 (Mar. 30, 2022), Doc. 141, PE-E 144.

[378]  *See* Order 2022-7-18 (Jul. 26, 2022), Doc. 174, PE-F 115.

[379]  *See* Notice Suspending US-Cuba Scheduled Services via Non-Havana Points, Dkt. DOT-OST-2016-0021-1410 (Oct. 25, 2019), Doc. 156, PE-F 75.

[380]  *See* Order 2020-11-14 (Nov. 17, 2020), Doc. 157, PE-F 78.

342.  Between March and April 2022, charter air carriers filed applications for more round-trip frequencies to Cuba than the DOT/IATA WSG Slot Coordinator's limit.[381]  On April 19, 2022, Endres announced an auction by Exhaustless to clear the excess demand for these airspace reservations.[382] No carrier joined the Competitive Market Standard to compete for the frequencies in the market, deciding instead to seek a grant from the DOT/IATA WSG Slot Coordinator and denied Exhaustless its right to hear competitive bids for that reservation from other carriers and to speak market prices (winning bids) to all market participants.[383]

343.  On May 5, 2022, Endres announced an auction by Exhaustless to clear excess carrier demand for airspace reservations from any U.S. airport to the Havana, Cuba airport for the Winter 2022 carrier scheduling season.[384]  On June 1, 2022, the DOT/IATA WSG Slot Coordinator removed the administratively imposed flight limits and returned to the limits agreed by the air transport agreement between the U.S. and Cuba.[385]  No carrier joined the Competitive Market Standard to compete for the frequencies in the

---

[381]  *See* Exhaustless Announces Auction of Frequencies to Cuba, Dkt. DOT-OST-2001-9849-0190 (Apr. 19, 2022), Doc. 158, PE-E 148.

[382]  *Id.*

[383]  Order 2022-5-17 (May 19, 2022), Doc. 159, PE-F 81 at 83.

[384]  *See* Exhaustless Announces Auction of Frequencies for Scheduled Services to Havana, Dkt. DOT-OST-2016-0021-1427 (May 5, 2022), Doc. 160, PE-E 153.

[385]  *See* Order 2022-6-1 (Jun. 1, 2022), Doc. 161, PE-F 89.

market, and on September 19, 2022, the DOT/IATA WSG Slot Coordinator administratively allocated the reservations and denied Exhaustless its right to hear competitive bids for that reservation from other carriers and to speak market prices (winning bids) to all market participants.[386]  At the request of carriers, the DOT/IATA WSG Slot Coordinator promptly granted use waivers on the allocated frequencies.[387]

### U.    JetBlue/Spirit Merger Agreement

#### pp.    The making of the merger agreement.

344.    On May 12, 2021, Spirit Airlines stated that the *"blatant actions of [American Airlines and JetBlue NEA] to reshape competition* <u>using publicly-owned but highly-constrained resources</u> *. . . underscore the immediate need for an investigation[.]"*[388]

---

[386] *See* Notice of Action Taken re: American Airlines, Inc. and JetBlue Airways Corp., Dkt. DOT-OST-2016-0021-1436 (Sep. 19, 2022), Doc. 162, PE-F 94. *See also*, Notice of Action Taken re: Mesa Airlines, Inc., Dkt. DOT-OST-2016-0021-1435 (Sep. 19, 2022), Doc. 163, PE-F 97.

[387] *See, e.g.*, Notice of Action Taken re: Delta Air Lines, Dkt. DOT-OST-2016-0021-1442 (Oct. 18, 2022), Doc. 164, PE-F 100.  *See also*, Notice of Action Taken re: JetBlue Airways Corp., Dkt. DOT-OST-2016-0021-1447 (Mar. 17, 2023), Doc. 165, PE-F 104.

[388] Spirit Airlines Supplement to Complaint, Dkt. DOT-OST-2021-0001 (May 12, 2021), Doc. 327, PE-D2 366 at 369 (emphasis added).

345.    On July 28, 2022, JetBlue Airways and Spirit Airlines entered into a merger

agreement.[389]  Spirit represented that it had a "valid and subsisting

ownership interest" in its tangible personal property[390] and a "valid and

subsisting leasehold interest in all Company Leased Real Property."[391]  Yet

JetBlue required no representation, and Spirit made no representation, of

any right to confer the publicly-owned takeoff or landing slots "held by" or

"permanently allocated to" Spirit[392] — even though JetBlue's 2022 $3.5

billion Senior Secured Bridge Facility commitment to consummate the

merger was secured by takeoff and landing slots.[393]  JetBlue claimed that the

value of its assets pledged as security increased to $6.2 billion at the end of

2022[394] — for a public company with shareholder equity market

capitalization of $3.0 billion as of June 30, 2023.[395]

---

[389]  See Spirit Airlines, Inc. SEC Form 8-K/A, Agreement and Plan of Merger, Exhibit 2.1 (filed Aug. 16, 2022), Doc. 323, PE-D2 39.

[390]  *Id.*, §3.21 at 72.

[391]  *Id.*, §3.22 at 72.

[392]  *Id.*, §3.25 at 74.

[393]  *See* JetBlue Airways Corporation SEC Form 10-K, 10 (Feb. 27, 2023) ("We were able to leverage . . . our . . . unencumbered asset base to secure the funding to support the Spirit acquisition."). *See also, id.* at 79 ("Our indefinite-lived intangible assets consist primarily of acquired Slots at certain High Density Airports[.]").

[394]  *See id* at 10.

[395]  *See* JetBlue Airways Corporation SEC Form 10-Q, 1 (Aug. 1, 2023), showing 333,250,321 outstanding shares at June 30, 2023; and *see also*, finance.yahoo.com showing an $8.86 closing price per share on June 30, 2023.

346.   On March 6, 2023, while all three parties were in the same court in the NEA case, Defendants JetBlue and Spirit agreed to preempted State regulations related to price, route, or service of a carrier in air transportation in exchange for Defendant Ashley Moody, acting as Attorney General of the State of Florida, to not prosecute the JetBlue and Spirit merger agreement for antitrust violations.[396] The carriers and Defendant Ashley Moody agreed not to disclose the agreement with the State to a court.[397] Defendant Ashley Moody, as an attorney, had access to the information that Endres had provided to the DOJ in the NEA case.  (To ¶462.)

### qq.   The complaint against the merger agreement

347.   On March 7, 2023, the DOJ Antitrust Division, joined by several states,[398] filed a complaint in the U.S. District Court for the District of Massachusetts against the JetBlue Airways and Spirit Airlines merger agreement for violation of the antitrust laws.[399]

---

[396] *See* Settlement Agreement among Spirit Airlines, Inc., JetBlue Airways Corp., and the Attorney General of Florida (Mar. 6, 2023), Doc. 214, PE-I2 266.  *See also, id.* ¶5 at 268 (specifically regulating traffic that uses "a Florida airport that either JetBlue or Spirit serve as of March 2023[.]").

[397] *Id.* at ¶30 at 275.

[398] Massachusetts, New York, and District of Columbia; amended on March 31, 2023, to join California, Maryland, New Jersey, and North Carolina.

[399] *See* U.S. et al v. JetBlue Airways and Spirit Airlines, Inc., D. Mass. Case 1:23-cv-10511, Complaint, ECF 1 (Mar. 7, 2023), Doc. 215, PE-I2 279.

348.   On March 13, 2023, the DOJ notified Endres that the DOJ is required to provide the information Endres provided in both its current investigation and the NEA case to each defendant's outside counsel, categorized as highly confidential submissions and governed by the Court's default protective order.[400]

349.   On March 22, 2023, the DOJ notified Endres that the information Endres provided is categorized as "highly confidential" and governed by the Court's stipulated protective order.[401]

### rr.   The trial against the merger agreement

350.   The district court held a month-long bench trial for the complaint against the JetBlue-Spirit merger agreement antitrust case in the autumn of 2023. Endres did not have access to the court proceeding because it was not broadcast.  Per the court's public docket, testifying witnesses included executives of Defendants JetBlue, Spirit, Frontier, and United Airlines, as well as expert economist witnesses for each side.

---

[400]   *See* DOJ Email, Notice of Production to Defendants in U.S. v JetBlue and Spirit (Mar. 13, 2023), Doc. 380, PE-I1 668.

[401]   *See* DOJ Email, Notice of Stipulated Protective Order (Mar. 22, 2023), Doc. 381, PE-I1 670.

**ss.   Permanent injunction of the merger agreement.**

351.   On January 16, 2024, the district court enjoined the merger agreement.[402]
The district court's ruling failed to <u>mention the IATA WSG or its allocation of</u>
<u>seasonal airspace reservations by grandfathering at the twice-a-year Slot</u>
<u>Conference — that every carrier before the court attended on June 21, 2022,</u>
<u>in Seattle, Washington to allocate the global Winter 2022 airspace</u>
<u>reservations, nor the upcoming slot conference on November 15-18, 2022, in</u>
<u>Australia to allocate the global Summer 2023 airspace reservations with</u>
<u>grandfathering.</u>[403]   The district court's ruling failed to <u>mention the public's</u>
<u>title to the navigable airspace, which was declared in binding case precedent</u>
<u>in 1946.  No party, witness, nor the court's ruling mentioned the Exhaustless</u>
<u>market, which was declared in binding case precedent in 2019.</u>

**V.   Summer 2023 Seasonal Reservations**

**1.  Competitive Market Allocation Boycott**

352.   On July 29, 2022, Endres announced an auction by Exhaustless of
congestion-free access to the National Airspace System for Summer 2023 at
Reagan National Airport in Washington, D.C., and the three large hub

---

[402]  See *U.S. et al v. JetBlue Airways and Spirit Airlines*, Case 1:23-cv-10511-WGY,
Findings of Fact and Conclusions of Law, ECF 461 (Jan. 16, 2024).

[403]  *See* Exhaustless Documentation of IATA WSG Calendar of Coordination
History, Doc. 14, PE-D1 1.

airports in the New York City metro area airspace; Newark Liberty, JFK, and LaGuardia airports.[404]  On August 24, 2022, Endres notified the public that no carriers licensed the Competitive Market Standard to compete in the market for the airport schedules.[405]

### 2.   Allocation with the IATA WSG

353.   On September 29, 2022, each Defendant Carrier sent the DOT/IATA WSG Slot Coordinator a list of the airspace reservations allocated to it the last equivalent season, which they claimed entitles it to the future season's reservation.[406]  On October 6, 2022, each Defendant Carrier submitted its schedule 'request' for the Summer 2023 scheduling season to the FAA.[407] Each Defendant Carrier obtained exclusive reservations no later than November 3, 2022, when the DOT/IATA WSG Slot Coordinator allocated each reservation — for free — to the carrier claiming entitlement and denied Exhaustless its right to hear competitive bids for that reservation from other carriers and to speak market prices (winning bids) to all market participants.[408]

---

[404]  *See, e.g.*, Exhaustless Airport Slot Auction Notice for Summer 2023, Dkt. DOT-OST-2001-9849-0193 (Jul. 29, 2022), Doc. 177, PE-E 158.

[405]  *See* Exhaustless Notice of Results of Auction of Airport Schedules for Summer 2023, Dkt. DOT-OST-2001-9849-0194 (Aug. 24, 2022), Doc. 178, PE-E 165.

[406]  *See* Exhaustless Documentation of IATA WSG Calendar of Coordination History, Doc. 14, PE-D1 1.

[407]  *See id.*

[408]  *See id.*

354.   On November 15, 2022, each Defendant IATA Carrier attended the IATA Slot
       Conference in Melbourne, Australia to finalize the allocation of the season's
       airspace reservations to the carriers.[409]

### 3. Slot Usage Waiver – Reduced Airport Runway Capacity

355.   Although the Airline Deregulation Act of 1978 and the Open Skies air
       transport agreements require carriers to compete in a market for
       reservations to use the airspace, while there was no reservation market, the
       Congress required a voluntary schedule reduction meeting to reduce delays
       caused by the overscheduling of flights by carriers.[410] The IATA WSG
       requires adherence to the seniority of "historic slots" when there is a
       reduction of capacity.[411]

356.   At the November 15, 2022, IATA WSG slot conference, the FAA disclosed the
       'coordination parameters' of each 'level 2' and 'level 3' airport for the IATA
       Summer 2023 season, including Reagan National in Washington, D.C.
       (DCA).[412]

_____

[409]  *See id. See also,* Exhaustless FOIA Request Use of Government Aircraft (Mar.
6, 2023), Doc. 21, PE-B2 73 at 75.

[410]  *See* Vision 100—Century of Aviation Reauthorization Act, Pub. L. 108–176,
§422, 117 Stat. 2490, 2552 (2003), *codified at* 49 U.S.C. § 41722.

[411]  IATA Worldwide Slot Guidelines, 9th Edition (Effective Jan. 1, 2019), Dkt. FAA-
2020-0862 (Dec. 17, 2020), Doc. 69, PE-D1 136, § 6.9.1 at 169.

[412]  *See* IATA, How to get the most out of attending the Slot Conference (March
2022), Doc. 338, PE-J 168 at 169 ("Coordinators please . . . upload any of the
following documents or website links to Swapcard . . . Declared airport capacities . .
.").

357. On December 27, 2022, the FAA issued a notice that runway construction at DCA would reduce flight capacity and that, at the unpublished request of a carrier trade association, the FAA 'granted' carriers a waiver of the minimum usage requirement for certain airspace reservations — agreed to by carriers' private IATA WSG agreement — at DCA for most of 2023.[413] The waiver does not apply to airspace reservations granted pursuant to statute,[414] so it only applies to 'great-grandfathered' airspace reservations initially allocated by the FAA to carriers according to the grandfathering rules of the carrier scheduling committee agreements from the regulated era.[415] Rather than compete for congestion-free reservations in the Exhaustless market, or follow the statutory policy for a schedule reduction to reduce delays, or uphold the historical hierarchy of reservations pursuant to the IATA WSG, carriers

---

[413] FAA Construction Related Relief Concerning Operations at [DCA, JFK, LGA, EWR], 87 Fed. Reg. 79245 (Dec. 27, 2022), Doc. 201, PE-B1 187.

[414] *Id.* at 409. *See exemptions at*, *e.g.*, Wendell H. Ford Aviation Investment and Reform Act for the 21st Century (AIR-21 Act), Pub. L. 106-181, §231(e)(1), 114 Stat. 61 (2000), *codified at* 49 U.S.C. § 41718.

[415] *See* 14 C.F.R. Part 93, Subpart S, § 93.215(a), Doc. 202, PE-B2 216. *See also*, FAA High Density Traffic Airports; Slot Allocation and Transfer Methods, 50 Fed. Reg. 52180 (Dec. 20, 1985), Doc. 232, PE-B1 200 ("[S]lots at each of the four airports generally have been allocated by . . . scheduling committees composed of the incumbent carriers and interested new entrant carriers in each category at each airport. Each committee meets and operates under a limited grant of antitrust immunity issued under section 414 of the Federal Aviation Act. * * * As a result of this amendment, the role of the scheduling committees in the allocation of slots is eliminated.").

violated their private IATA WSG agreement to the minimum usage requirement.

358.    Because the air carriers guarantee the allocation of capacity and the price for federal and state government employees pursuant to their unlawful Contract for Scheduled Service, this reduced flight capacity to Washington D.C. funnels the rest of the public onto fewer available seats than the total available at the time the GSA contract was negotiated, which will apply upward pressure on published prices even further above the negotiated fixed price of the contract.

### 4.  Slot Usage Waiver – Reduced Airspace Capacity

359.    (From ¶¶356 to 357.)  On March 15, 2023, each Defendant Carrier attended a private "safety summit" held by the DOT/IATA WSG Slot Coordinator.[416]  On March 21 to 22, 2023, rather than compete for reservations in Exhaustless' market, or comply with the statutory schedule reduction meeting, or comply with the IATA WSG and relinquish the less senior reservations from the market, each Defendant American Airlines, Delta, and United Airlines requested that the DOT/IATA WSG Slot Coordinator reduce the schedule at the three New York City area large hub airports by 10% during the calendar summer of 2023 to reduce anticipated delays, and grant the carriers a waiver

---

[416]   FAA Press Release, FAA Aviation Safety Summit Breakout Panels (Mar. 15, 2023), Doc. 382, PA- J 232.

of the minimum usage requirements agreed to by carriers' private IATA WSG agreement.[417]  The DOT/IATA WSG Slot Coordinator *de facto* 'granted' carriers a waiver through September 15, 2023.[418]  The DOT/IATA WSG Slot Coordinator committed not to reallocate any reservations for the NYC area airspace that a carrier cancels but will reallocate those cancelled at the D.C. airport— while it is simultaneously reducing the schedule at Reagan Washington, D.C. airport for runway construction.[419]  No process for setting the reservation volume to capacity levels was described.

360.  Because the air carriers guarantee the allocation of capacity and the price for federal and state government employees pursuant to their unlawful Contracts for Scheduled Service, this reduced flight capacity to NYC funnels the rest of the public onto even fewer seats at above-market prices, further subsidizing the price and service of federal and state government employees from the reservations acquired by the rest of the public.

---

[417] *See* Delta Air Lines letter to FAA re system constraints (Mar. 21, 2023), Doc. 383, PE-J 235. *See also*, American Airlines letter to FAA re system constraints (Mar. 22, 2023), Doc. 384, PE-J 237. *See also*, United Airlines letter to FAA re system constraints (Mar. 22, 2023), Doc. 385, PE-J 238.

[418] *See* FAA PR, Fed. Reg. Notice of Limited Waiver of Slot Usage Requirement for Summer 2023 (Mar. 22, 2023), Doc. 386, PE-J 241. *See also*, FAA Notice of Limited Waiver of the Slot Usage Requirement (Mar. 22, 2023), Doc. 387, PE-J 243. *See also*, FAA Staffing Related Relief Concerning Operations at [DCA, JFK, LGA, EWR], 88 Fed. Reg. 18032 (Mar. 27, 2023), Doc. 210, PE-B1 190.

[419] *See* FAA Staffing Related Relief Concerning Operations at [DCA, JFK, LGA, EWR], 88 Fed. Reg. 18032 (Mar. 27, 2023), Doc. 210, PE-B1 190 at 192.

361.   On August 7, 2023, each Defendant Carrier, through its agent Airlines for America, requested that the DOT/IATA WSG Slot Coordinator grant a waiver of the slot usage term of its carrier-member's private IATA WSG agreement for airspace reservations to New York City's large hub airports through the end of the IATA summer season ending October 28, 2023.[420]  The trade association claimed it is "actively working on additional ideas for the upcoming year and will be in contact with you in the near future," and did not mention the Exhaustless competitive market.[421]  On August 9, 2023, by press release, the DOT/IATA WSG Slot Coordinator granted the requested waiver of the terms of the carriers' private IATA WSG agreement and noted that American Airlines request for a slot usage waiver for the following two IATA seasons would be addressed separately.[422] (To ¶371.)

362.   The carriers that returned airspace reservations for the IATA Summer 2023 season — which they had allocated according to the grandfathering rules of the IATA WSG, in which they agreed to minimum usage requirements to retain entitlement — are poised to violate their private IATA WSG agreement and claim entitlement to those airspace reservations for the IATA

———————————————

[420]  A4A Letter to FAA re Slot Usage Waiver (Aug. 7, 2023), Doc. 342, PA-J 172.

[421]  *Id.*

[422]  *See* FAA Press Release, FAA Extends Flexibility for Airlines (Aug. 9, 2023), Doc. 352, PA-J 223. *See also*, FAA NYC_Waiver_Extension_FAA_8-8-23, Doc. 353, PA-J 224. *See also*, FAA Staffing Related Relief Concerning Operations at [DCA, JFK, LGA, EWR], September 16, 2023, Through October 28, 2023, 88 Fed. Reg. 54873 (Aug. 14, 2023), Doc.

Summer 2024 season based on a non-party's waiver of the terms of their private IATA WSG agreement.

## W.   Winter 2023 Seasonal Reservations

### 1.   Competitive Market Allocation Boycott

363.   On Feb. 17, 2023, Endres announced a competitive market allocation by Exhaustless for the airspace reservations at certain airports for the Winter 2023 carrier scheduling season.[423]  On Mar. 17, 2023, Endres notified the public that no carrier licensed the Competitive Market Standard to be eligible to participate in the competitive market allocation of airspace reservations for access to public airport schedules at four domestic airports.[424]

### 2.   JetBlue Complaint Against The Netherlands

364.   On February 14, 2023, JetBlue filed a complaint with the DOT against the Kingdom of the Netherlands alleging that the government must provide

---

[423]  *See* (a) Exhaustless Airport Slot Auction Notice for Winter 2023, Dkt. DOT-OST-2001-9849-0195 (Feb. 17, 2023), Doc. 203, PE-E 171; (b) Exhaustless Aviation 2.0 Licensing Agreement – Carrier (v8.1), Dkt. DOT-OST-2001-9849-0195 (Feb. 17, 2023), Doc. 204, PE-E 178; (c) Exhaustless Slot Auction Design Winter 2023, Dkt. DOT-OST-2001-9849-0195 (Feb. 17, 2023), Doc. 205, PE-E 193; (d) Exhaustless Slot Auction Rules and Procedures Winter 2023, Dkt. DOT-OST-2001-9849-0195 (Feb. 17, 2023), Doc. 206, PE-E 201; (e) Exhaustless Winter 2023 Auction Registration doc ver. 1.1, Dkt. DOT-OST-2001-9849-0195 (Feb. 17, 2023), Doc. 207, PE-E 215; and (f) Exhaustless Winter 2023 Airport Slot Auction Prepayment Form, Dkt. DOT-OST-2001-9849-0195 (Feb. 17, 2023), Doc. 208, PE-E 218.

[424]  *See* Exhaustless Notice of Results of Auction of Airport Schedules for Winter 2023, Dkt. DOT-OST-2001-9849-0196 (Mar. 17, 2023), Doc. 209, PE-E 219.

JetBlue with slots at Schiphol airport in Amsterdam, a 'level 3' airport, by

requiring a carrier to transfer "a sufficient number of slots" to JetBlue, as

defined by JetBlue.[425]  On March 7, 2023, the Dutch government responded

to the complaint:

> Traffic rights and slots are independent of each
> other. The Agreement assigns traffic rights. In our
> view, the assignment of traffic rights does not
> imply a guarantee to receive slots. This is also laid
> down as one of the "key principles" of a coordinated
> (level 3) airport in the Worldwide Airport Slot
> Guidelines (WASG) from IATA under 1.7.2.j and
> 8.1.1.j: "The allocation of slots is independent from
> the assignment of traffic rights under bilateral air
> service agreements." The Agreement provides for
> traffic rights, not slots. Furthermore, the
> Agreement does not contain any provisions on slots.
> For each airline, the slot allocation process in the
> Netherlands is governed by the EU Slot
> Regulation.[426]

365.   On March 13, 2023, Endres notified the government of the Kingdom of the

Netherlands of Exhaustless' competitive market for slots, that the air

transport agreement calls for a competitive market allocation of reservations,

and that "[t]his conflict is manufactured by Jet Blue to attempt to obtain slots

while seeking *protection* by the U.S. Department of Transportation *from* that

---

[425]  *See* JetBlue Airways Complaint, Dkt. DOT-OST-2023-0028 (Feb. 14, 2023), Doc.
344, PE-J 182.  *See also*, IATA Worldwide Slot Guidelines, 9th Edition (Effective
Jan. 1, 2019), Dkt. FAA-2020-0862 (Dec. 17, 2020), Doc. 69, PE-D1 136, §8.1.1(g) at
174. ("Historic slots may not be withdrawn from an airline to accommodate new
entrants or any other category of aircraft operator.").

[426]  Answer of the Dutch Government, Ministry of Infrastructure and Water
Management, Dkt.  DOT-OST-2023-0028 (Mar. 7, 2023), Doc. 345, PE-J 203.

competition."[427]  Endres further explained the contradictory claims of JetBlue

in the U.S.:

> At airports where JetBlue holds 'grandfathered'
> slot reservations, it claims 'ownership' — of
> reservations to use the public's airspace — and
> then collateralizes the slots against borrowed
> money.  Yet when they have no 'grandfathered
> rights' at an airport, as in this proceeding, JetBlue
> *fabricates a dispute between the U.S. and the*
> *Netherlands* to demand that one sovereign give it
> slots by waiving the allocation of historical rights to
> another carrier — even though the historical rights
> are only declared by an agreement among carriers
> that JetBlue joined, whose agreement is managed
> by an organization that JetBlue co-controls.[428]

366.    On June 5, 2023, JetBlue notified the DOT/IATA WSG Slot Coordinator that

it had been 'granted' slots by the Dutch government for the season but

lamented that the Dutch government had not 'granted' JetBlue a

*"permanent"* ability to provide service — with no mention of its requirement

to compete in the market for its reservations.[429]  Nonetheless, JetBlue

requested that the DOT withdraw its complaint.[430]  On June 27, 2023, the

---

[427]  Exhaustless Response, Dkt. DOT-OST-2023-0028 (Mar. 13, 2023), Doc. 346, PE-J 207 (emphasis in original).

[428]  *Id.* (emphasis in original), *referencing* JetBlue Airways Corporation SEC Form 8-K (Oct. 24, 2022) ("Additional Collateral" shall mean . . . Slots of the borrower[.]").

[429]    JetBlue request to withdraw complaint, Dkt.  DOT-OST-2023-0028 (Jun. 5, 2023), Doc. 347, PE-J 216.

[430]  *See id.*

DOT/IATA WSG Slot Coordinator dismissed the complaint and terminated the proceeding.[431]

### 3.   Allocation with the IATA WSG

367.   On May 4, 2023, each Defendant Carrier sent the DOT/IATA WSG Slot Coordinator a list of the airspace reservations allocated to it the last equivalent season, which they claimed entitles them to the future season's reservation.[432]  On May 11, 2023, each Defendant Carrier submitted their schedule 'request' for the Winter 2023 scheduling season to the DOT/IATA WSG Slot Coordinator.[433]  Each Defendant Carrier obtained exclusive reservations no later than June 1, 2023, when the DOT/IATA WSG Slot Coordinator allocated each reservation — for free — to the carrier claiming entitlement and denied Exhaustless its right to hear competitive bids for that reservation from other carriers and to speak market prices (winning bids) to all market participants.[434]

368.   Each Defendant IATA Carrier and Defendant the United States attended the IATA Slot Conference on June 13, 2023, to allocate the worldwide reservations to use the public's airspace during the Winter 2023 carrier

---

[431]  *See* Order 2023-6-21 (Jun. 27, 2023), Doc. 348, PE-J 218.

[432]  *See* Exhaustless Documentation of IATA WSG Calendar of Coordination History, Doc. 14, PE-D1 1.

[433]  *See id.*

[434]  *See id.*

scheduling season.[435]  Many of these parties were in the U.S. District Court for the District of Massachusetts between September 27 and October 27, 2023, testifying on the American-JetBlue Northeast Alliance agreement, *which was predicated on a right to lease airspace reservations*, yet no Defendant disclosed the IATA WSG and its seasonal airspace reservation market allocation.

369.   Defendant PANYNJ attended the IATA Slot Conference to allocate the airport gates based on the grandfathered airspace reservation market allocation.[436] (To ¶405.)

370.   At the close of the slot conference, each Defendant Carrier as a member of and/or governor of the IATA joined a statement to *"urge governments worldwide to ensure global alignment of slot rules to safeguard the consistent, fair, and transparent allocation of airport slots under the Worldwide Airport Slot Guidelines (WASG)."*[437]

---

[435] *See* IATA 152nd Slot Conference – Organizations attending (Jun. 11, 2023), Doc. 254, PE-D3 18.

[436] *See id.*

[437] *See* IATA Press Release, Airline Associations Join Together to Call for Global Alignment of Slot Regulations (Jun. 15, 2023), Doc. 313, PE-D3 410. *See also,* Airline associations statement on benefit of global alignment of airport slot regulations (Jun. 15, 2023), Doc. 314, PE-D3 411.

### 4.   Slot Usage Waiver – Reduced Airspace Capacity

371.   (From ¶361.)  On September 20, 2023, the DOT/IATA WSG Slot Coordinator
'granted' waivers from the slot usage requirements for a full year, through
October 26, 2024.[438]  (To ¶380.)

### X.   JetBlue/Frontier LaGuardia "Divestiture" Agreement

372.   On June 1, 2023, in another price-fixing and market-allocation scheme,
Defendants JetBlue and Frontier Group Holdings, Inc. announced an
agreement for JetBlue to "divest" all of the "holdings" of Defendant Spirit
Airlines at New York's LaGuardia Airport to Frontier, including "six gates . .
. and 22 takeoff and landing slots," on condition of JetBlue's merger with
Spirit.[439]  Note that LaGuardia is a public airport owned by New York City
and leases the use of gates to carriers.[440]  Neither carrier published the
"divestiture" agreement.

---

[438]  *See* FAA Staffing-Related Relief Concerning Operations at [DCA, JFK, LGA,
EWR] Through October 26, 2024, 88 Fed. Reg. 64793 (Sep. 20, 2023), Doc. 489, PE-
N3 187.

[439]  *See* Frontier Press Release, JetBlue and Frontier Announce Divestiture
Agreement in Connection with JetBlue's Combination with Spirit (Jun. 1, 2023),
Doc. 324, PE-D2 150.

[440]  *See* Spirit Airlines, Inc. SEC Form 10-K, Item 2 Ground Facilities, 44 (Feb. 6,
2023) ("We lease all of our facilities at each of the airports we serve . . . Our leases
for terminal passenger service facilities, which include ticket counter and gate
space, operations support areas and baggage service offices, generally have a term
ranging from month-to-month to 24 years[.]").

**Y.    Summer 2024 Seasonal Reservations**

**1.  Air Carrier Complaints against the Kingdom of the Netherlands
and the E.U**

373.    On September 25, 2023, Defendants Alaska Air, American Airlines, Delta,
FedEx, Hawaiian, JetBlue, Southwest, United Airlines, and UPS filed a joint
complaint with the TRN alleging violations of certain provisions of the U.S. –
EU Open Skies by the government of the Netherlands and the E.U.[441]  The
air carriers complained that the Netherlands planned reduction of the
volume of airspace reservations at one of its airports *"will result in the
permanent confiscation of historic slot rights held by U.S. carriers at AMS
and the foreclosure of new entry by U.S. carriers at the airport."*[442]  The air
carriers concluded that the U.S. Government should protect the air carriers
self-declared "historic slot rights" by *"engag[ing] in consultations with the
Dutch government and the Commission to resolve the issue and explore
reasonable alternatives that are less restrictive on operations and
competition."*[443]

374.    JetBlue filed an additional complaint that it *"is uniquely situated among U.S.
carriers because it faces actual expulsion"* from AMS because it has not

---

[441]  *See* Joint Complaint of Members of Airlines for America, Inc., Dkt. DOT-OST-2023-0148-0001 (Sep. 25, 2023), Doc. 405, PE-M 1.

[442]  *Id.* at 4.

[443]  *Id.* at 12.

operated at AMS long enough to have earned 'historical slots' for the Summer
2024 capacity declaration according to the rules of the IATA WSG.[444]  JetBlue
declared that "*the imminence of that expulsion threat necessitates the
Department's more immediate imposition of targeted and impactful
countermeasures.*"[445]

### 2.  Competitive Market Allocation Boycott

375.  In response to the air carrier complaints, Endres added the airspace
reservations for the Netherlands Amsterdam Schiphol airport (AMS) to the
market-clearing service.  On October 12, 2023, Endres announced a
competitive market allocation by Exhaustless for the airspace reservations at
certain airports for the Summer 2024 carrier scheduling season.[446]  Endres
stated that the "*carrier Complaints manufacture a conflict between the United
States government and the Netherlands government in an attempt to obtain
access to scarce economic airspace resources at Amsterdam Schiphol Airport
while seeking* protection *by the U.S. Department of Transportation* from
competition for the use of those assets. Instead of undermining the market
with protectionism, JetBlue and all carriers should bid for the slots they want*

---

[444]  Complaint of JetBlue Airways Corporation, Dkt. DOT-OST-2023-0028 (Sep. 28,
2023) Doc. 406, PE-M 16 at 17.

[445]  *Id.*

[446]  *See* Exhaustless Slot Auction Notice for Summer 2024, Dkt. DOT-OST- 2023-
0148-0003 (Oct. 12, 2023), Doc. 408, PE-M 82.

*in the auction remedy announced herein."*[447] On Oct. 30, 2023, Endres notified the public that no carrier licensed the Competitive Market Standard to be eligible to participate in the competitive market allocation of airspace reservations for access to public airport schedules.[448]

### 3.   Carriers Respond to their Own Complaint

376.   Defendant Carriers then 'answered' and 'responded to' their own complaint yet did not answer Exhaustless competitive market allocation.[449]

### 4.   The United States Approves Countermeasures Against Carrier-Citizens of the Netherlands

377.   On Nov. 2, 2023, the TRN "approve[d]" the carrier complaints and various 'countermeasures' and said "*[t]he issues raised by Exhaustless are outside the scope of these proceedings and we do not view them as responsive to the matters that the Department must consider in regard to the complaints.*

---

[447] *Id.* at 3.

[448] *See* Exhaustless Notice of Results of Auction of Airport Schedules for Summer 2024, Dkt. DOT-OST-2023-0148-0010 (Oct. 30, 2023), Doc. 420, PE-M 188.

[449] *See, e.g.,* (a) American Airlines Answer, Dkt. DOT-OST-2023-0148-0004 (Oct. 13, 2023), Doc. 414, PE-M 141; (b) KLM Airlines Answer, Dkt. DOT-OST-2023-0148-0005 (Oct. 13, 2023), Doc. 415, PE-M 147; (c) Cargo Airlines Ass'n Answer, Dkt. DOT-OST-2023-0148-0006 (Oct. 13, 2023), Doc. 416, PE-M 162; (d) A4A Consolidated Reply, Dkt. DOT-OST-2023-0148-0008 (Oct. 18, 2023), Doc. 418, PE-M 173; (e) JetBlue Reply, Dkt. DOT-OST-2023-0028-0031 (Oct. 20, 2023), Doc. 419, PE-M 177; and (f) A4A Supplemental Information, Dkt. DOT-OST-2023-0148-0011 (Nov. 2, 2023), Doc. 417, PE-M 165.

*Therefore, we will not address them here.*".[450]  The order required foreign carriers of the Netherlands to file their existing schedule at U.S. airports in the docket.[451]  On November 14, 2023, Defendant Air France-KLM filed its airspace schedule in the docket for both charter service (under carrier Martinair) and for seasonally scheduled air transportation service (under carrier KLM Royal Dutch Airline), which included the airspace schedule of its alliance partners Delta Air Lines (which had over 90% of the 941 page slot schedule), Air France, Virgin Atlantic and WestJet.  This filing was picked up by the Airlineinfo.com service and is still available to anyone with a subscription.  Soon after the filing, the TRN removed the KLM filing from the public docket without amending its order.

### 5.  Allocation with the IATA WSG

378.  On September 28, 2023, each Defendant Carrier sent the DOT/IATA WSG Slot Coordinator a list of the airspace reservations allocated to it the last equivalent season, which they claimed entitles it to the future season's reservation.[452]  On October 5, 2023, each Defendant Carrier submitted its schedule 'request' for the Winter 2023 scheduling season to the FAA.[453]  Each

---

[450] Order 2023-11-6 at 4 (Nov. 2, 2023), Doc. 421, PE-M 196.

[451] *Id.* at 205.

[452] *See* IATA Calendar of Coordination (Nov. 2023), Doc. 426, PE-N1 16.

[453] *See id.  See also*, FAA Notice of Submission Deadline for Schedule Information for [ORD, JFK, LAX, EWR, SFO] for the Summer 2024 Scheduling Season, 88 Fed. Reg. 64964 (Sep. 20, 2023), Doc. 427, PE-N1 17.

Defendant Carrier obtained exclusive reservations no later than November 2, 2023, when the DOT/IATA WSG Slot Coordinator allocated each reservation — for free — to the carrier claiming entitlement and denied Exhaustless its right to hear competitive bids for that reservation from other carriers and to speak market prices (winning bids) to all market participants.[454]

379.   Each Defendant IATA Carrier and Defendant the United States attended the IATA Slot Conference on November 14, 2023, to allocate the worldwide reservations to use the public's airspace during the Summer 2024 carrier scheduling season.[455]

### 6.   Slot Usage Waiver – Reduced Airspace Capacity

380.   (From ¶371.)  Prior to the allocation of Summer 2024 slots with the IATA WSG, Defendant Carriers had already requested, and the DOT/IATA WSG Slot Coordinator had already 'granted', a waiver from the slot usage requirements.

### 7.   Slot Usage Waiver – Reduced Airport Runway Capacity

381.   On December 22, 2023, each Defendant Carrier, inclusive of its partners, through its agent A4A, requested the FAA to 'waive' the terms of its private agreement for minimum slot usage rules at DCA, LGA, EWR, and JFK due to

---

[454]   *See* IATA Calendar of Coordination (Nov. 2023), Doc. 426, PE-N1 16.

[455]   *See* IATA 153rd Slot Conference (Dubai, United Arab Emirates, 14 - 17 November 2023) Program (Nov. 6, 2023), Doc. 422, PE-M 207.

planned runway construction at DCA.[456]  On January 25, 2024, the

DOT/IATA WSG Slot Coordinator 'granted' the waiver for most of 2024.[457]

Rather than compete for congestion-free reservations in the Exhaustless

market, each Defendant Carrier that is a member of A4A violated their

private IATA WSG agreement to a minimum usage.

## VII.   PATENT ISSUED FOR ENDRES' MARKET-CLEARING PROCESS BY CANADA

382.   On December 12, 2023, the Canadian Intellectual Property Office (CIPO)

issued the Canadian Certificate of Grant and Patent Grant Specification for

Endres' invention SYSTEM AND METHOD FOR MANAGING AIR

TRAFFIC DATA as Canadian Patent No. CA2,995,867.  The patent term is

20 years, commencing on August 23, 2016, and expiring on August 23, 2036.

## VIII.   ALLOCATION OF FUTURE SEASONAL RESERVATIONS

### A.   Winter 2024 Seasonal Reservations

383.   Endres plans to allocate the airspace reservations to both suppliers and

consumers with the Exhaustless Market-Clearing Service for the Winter

2024 carrier scheduling season at seven airports:  four U.S. airports — John

F. Kennedy (JFK) and LaGuardia (LGA) in New York, Newark Liberty

(EWR) in Newark, and Reagan National in Washington, D.C. (DCA); one

---

[456]   *See* FAA Construction Related Relief Concerning Operations at [DCA, JFK, LGA, EWR], 89 Fed. Reg. 4802 (Jan. 25, 2024), Doc. 452, PE-N2 59.
[457]   *See id.*

Netherlands airport — Schiphol in Amsterdam (AMS); and two Canadian airports — Toronto Pearson (YYZ) and Vancouver (YVR).  The auction to supplier-carriers is tentatively planned on April 18, 2024, and has not yet been announced.

384.   Each Defendant Carrier plans to allocate the airspace reservations to supplier-carriers with the grandfathering rules of the IATA WSG for the Winter 2024 carrier scheduling season at 145 domestic public service airports (NPIAS hub airports) in the U.S. on May 9, 2024.[458]  The DOT/IATA WSG Slot Coordinator plans to enforce Defendant Carriers' grandfathered allocation at seven large hub airports on May 30, 2024.[459]

385.   In the last three years, in addition to the claims of title to airspace reservations cited *supra*, Defendant Carriers have asserted the right to permanent, exclusive, and priority access to airspace at various airports.[460]

---

[458]   *See* IATA Calendar of Coordination (Nov. 2023), Doc. 426, PE-N1 16.  *Note that* the IATA publishes a list of airports considered 'Level 2 and Level 3' which require the aid of a 'Slot Coordinator' or a 'Schedule Facilitator' pursuant to the IATA WSG but it does not publish a list of airports considered 'Level 1' at which it allocates supplier airspace reservations among carriers unaided by a federal agency.

[459]   *See id.* ("SAL Deadline").  *See also*, FAA Information Collection Request, OMB Control No: 2120-0524, ICR Reference No: 202108-2120-002, Supporting Statement A (Aug. 26, 2021), Doc. 261, PE-H 283 at 285 (showing the process for carriers to obtain supplier airspace reservations at LaGuardia, JFK, Newark Liberty, Reagan National, Chicago O'Hare, San Francisco, and Los Angeles airports).

[460]   *See, e.g.*, **United Airlines** Comment, Dkt. DOT-OST-2021-0103 (Sep. 27, 2021) Doc. 330, PA-J 15 ("[Government action must] ensure that [other carrier operations do] not depriv[e] United of the movements necessary to serve its customers through

386.   Each Defendant Carrier plans to further privatize public information.[461]

## IX.   VIOLATIONS ALLEGED

387.   Plaintiff Endres hereby incorporates the allegations of paragraphs 1 through
386 above as if set forth fully herein.

### A.   Agreements between Horizontal Competitors

388.   (From ¶164.) The International Air Transport Association's Worldwide Slot
Guidelines (IATA WSG) is a contract and a conspiracy of Defendant Carriers
within the meaning of Section 1 of the Sherman Act, 15 U.S.C. § 1. (To ¶389,
503.)

---

its full service global hub at EWR"). *See also*, comments at Docket FAA-2020-0862,
*e.g.,* **United Airlines** Comment, Dkt. FAA-2020-0862 (Dec. 29, 2020), Doc. 331, PA-
J 122 ("Through an administrative structure that has already been designed, built,
and implemented, [the current process] preserves the overall *status quo ante* of the
industry in order to enable airlines to survive the effects of the pandemic."). *See
also*, **Southwest Airlines** Comment, Dkt. FAA-2020-0862 (Dec. 29, 2020), Doc.
332, PA-J 129 (". . . a number of airlines, including Southwest, have made clear
their willingness to operate additional flights . . . *now* if permanent slots were made
available. . . takeoff and landing slots . . . are valuable *public assets*. . . Allowing the
large incumbent carriers . . . to protect the entirety of their existing slot portfolios
while simultaneously barring other carriers from using the slots to add new service
and competition is contrary to the public interest. . .") (italic emphasis in original,
underline emphasis added). *See also*, **Spirit Airlines** Comment, Dkt. FAA-2020-
0862 (Dec. 29, 2020), Doc. 333, PA-J 134 ("With usage well below the caps, now is
the ideal time to permit pro-competitive access at least to slots and authorizations
used for domestic flying."); **JetBlue** Comment, Dkt. FAA-2020-0862 (Sep. 23, 2020),
Doc. 334, PA-J 144 ("We welcome the ability to continue to grow our low-fare
presence at EWR while also receiving FAA recognition for future priority status."
(emphasis added)).

[461] *See* Graham Newton, IATA Airlines Magazine, v2024-01, "Giving airline data
back to the airlines," Doc. 482, PE-N3 147 ("'Data is a key asset and aviation data
belongs to the industry', Macaulay [IATA's Chief Information and Data Officer]
concludes.").

389.   (From ¶¶168, 388.) The IATA WSG is a market-allocating agreement *as admitted by most defendants* and thus a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. (To ¶503.)

390.   (From ¶¶169, 388.) The IATA WSG is a price-fixing and bid-rigging agreement and thus a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. (To ¶505.)

391.   (From ¶36.) The allocation of public airspace reservations with grandfathering pursuant to the IATA WSG by Defendant Carriers every day since June 7, 2018 to today was a group boycott of the multi-sided airspace reservation market that Endres invented, developed, and assigned to his company, and a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. (To ¶506.)

392.   (From ¶¶179 to 182, 196 to 200.) Airlines for America and its Airlines Clearinghouse (ACH) is a combination in the form of trust in service to the IATA WSG conspiracy and thus each Defendant owner violated Section 1 of the Sherman Act, 15 U.S.C. § 1. (To ¶519.)

393.   (From ¶¶191 to 193.) Airlines Reporting Corporation (ARC) is a combination in the form of trust in service to the IATA WSG conspiracy and thus each Defendant owner violated Section 1 of the Sherman Act, 15 U.S.C. § 1. (To ¶521.)

394.   (From ¶¶186 to 190.) Air Tariff Publishing Company (ATPCO) is a combination in the form of trust in service to the IATA WSG conspiracy and

thus each Defendant owner violated Section 1 of the Sherman Act, 15 U.S.C. § 1. (To ¶523.)

395.    (From ¶133.) International Air Transport Association (IATA) is a combination in the form of trust in service to the IATA WSG conspiracy and thus each Defendant owner violated Section 1 of the Sherman Act, 15 U.S.C. § 1. (To ¶526.)

396.    (From ¶254.) San Franciso Terminal Equipment Company, L.L.C. (SFOTEC) is a combination in the form of trust in service to the IATA WSG conspiracy and thus each Defendant owner violated Section 1 of the Sherman Act, 15 U.S.C. § 1. (To ¶528.)

397.    (From ¶¶201 to 203.) Société Internationale de Télécommunications Aéronautiques SCRL (SITA) is a combination in the form of trust in service to the IATA WSG conspiracy and thus each Defendant owner violated Section 1 of the Sherman Act, 15 U.S.C. § 1. (To ¶530.)

398.    (From ¶194 to 195.) Universal Air Travel Plan, Inc. (UATP) is a combination in the form of trust in service to the IATA WSG conspiracy and thus each Defendant owner violated Section 1 of the Sherman Act, 15 U.S.C. § 1. (To ¶532.)

399.    (From ¶38 *et seq*.) Defendant Carriers alliance agreements, joint ventures, and merger agreements, which were all predicated on the IATA WSG, violated Section 1 of the Sherman Act, 15 U.S.C. § 1, including: (To ¶534.)

a. The "West Coast International" Alliance Agreement between Defendants American Airlines and Alaska Air;

b. The "oneworld" Alliance between Defendants Alaska Air, American Airlines, and ICAG;

c. The "SkyTeam" Alliance between Defendants Air France-KLM, and Delta;

d. The alliance between Defendants Delta and LATAM;

e. The "Star" Alliance between Defendants Air Canada, United Airlines, and Lufthansa.[462]

f. The "ATSA" alliance between Defendants Amazon and Hawaiian.

g. The "commercial passenger services" agreement between Defendants Amazon and Hawaiian.

h. The merger agreement between Defendants Alaska Air and Hawaiian.

**B.   Racketeering**

**1.  Primary Allocation of Public Airspace Reservations**

400.   (From ¶¶173, 176, 177, 179) Each Defendant Carrier's receipt or retention of a reservation to use the public's airspace on June 7, 2018, and every day to

---

[462]  *See id.*

today, with the intent to convert it to its own use or gain, such as one administratively allocated with grandfathering by the DOT/IATA WSG Slot Coordinator, knowing it to have been purloined from Endres' competitive multi-sided market, violated section 2 of the law of March 3, 1875, ch. 144, 18 Stat. 479, 18 U.S.C. § 641. (To ¶¶402, 406)

401.    Each Defendant Carrier's disposition of a reservation to use the public's air space by not honoring the reservation — such as by relying on the IATA WSG 80% usage rule or by its request for and acceptance of a waiver by the DOT/IATA WSG Slot Coordinator from its private slot usage agreement — violated the law of June 18, 1934, ch. 587, 48 Stat. 996, 18 U.S.C. § 641. (To ¶402.)

402.    (From ¶¶400 and 401.) The daily violations of 18 U.S.C. § 641 were a "*specified unlawful activity*" within the meaning of section 1352(a) of the Money Laundering Control Act of 1986, 18 U.S.C. § 1956(c)(7)(D). (To ¶403.)

403.    (From ¶402.) Each Defendant Carrier traveled in interstate or foreign commerce, used the mail, the telephone system, the wireless communication system, or another facility in interstate or foreign commerce, with intent to distribute the proceeds of unlawfully grandfathered airspace reservations and did distribute the proceeds of unlawfully grandfathered airspace reservations, such as at the IATA WSG Slot Conference twice a year, from June 2018 to today in violation of Pub. L. 87-228, 75 Stat. 498 (Sep. 13, 1961), 18 U.S.C. § 1952(a)(1). (To ¶404.)

404.   (From ¶403.) Each occurrence of travel or use of a facility in interstate of
       foreign commerce that violated 18 U.S.C. § 1952 was a racketeering activity
       within the meaning of section 901(a) of the Organized Crime Control Act of
       1970, 18 U.S.C. § 1961(1)(B). (To ¶511.)

405.   (From ¶253, 258, 263, 334, 369.) Each Defendant PANYNJ and MWAA
       conspired with each Defendant Carrier to violate 18 U.S.C. § 1952(a) when it
       traveled in interstate or foreign commerce or used another facility in
       interstate or foreign commerce to attend either the domestic or foreign IATA
       WSG Slot Conference to allocate the use of public airport assets based on the
       unlawful grandfathering of airspace reservations, and then when it allowed a
       flight operation whose airspace reservation was obtained by unlawful
       grandfathering, and so violated 901(a) of the Organized Crime Control Act of
       1970, 18 U.S.C. § 1962(d). (To ¶512.)

   2.   **Management of the Primary Allocation of Public Airspace
        Reservations**

406.   (From ¶¶130, 164, 400.) Each Defendant IATA Carrier traveled in interstate
       or foreign commerce, used the mail, the telephone system, the wireless
       communication system, or another facility in interstate or foreign commerce,
       to promote, manage, establish, carry on, or facilitate the promotion,
       management, establishment, or carrying on, of the unlawful IATA WSG, from
       ¶, and did promote, manage, establish, carry on, or facilitate the promotion,
       management, establishment, or carrying on, of the unlawful IATA WSG, at

the IATA Annual General Meeting once a year from June 7, 2018 to today which violated Pub. L. 87-228, 75 Stat. 498 (Sep. 13, 1961), 18 U.S.C. § 1952(a)(3).

407.    (From ¶406.) Each violation of 18 U.S.C. § 1952 was a racketeering activity within the meaning of section 901(a) of the Organized Crime Control Act of 1970, 18 U.S.C. § 1961(1)(B). (To ¶408, 511.)

408.    (From ¶407.) Consequent to the twice annual violations of 18 U.S.C. § 1961(1)(B) each Defendant Carrier engaged in a pattern of racketeering activity within the meaning of section 901(a) of the Organized Crime Control Act of 1970, 18 U.S.C. § 1961(5). (To ¶409.)

409.    (From ¶408.) Each Defendant Carrier's acquisition or maintenance, directly or indirectly, of any interest in or control of A4A, ARC, ATPCO, IATA, SFOTEC, SITA, or UATP from the patterns of racketeering activity or any other enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce violated section 901(a) of the Organized Crime Control Act of 1970, 18 U.S.C. § 1962(b). (To ¶537.)

C.    **Money Laundering**

3.    **Secondary Allocation of Supplier Airspace Reservations**

410.    (From ¶217.) Since June 7, 2018, each Defendant Carrier knowingly engaged in at least one transaction per carrier scheduling season in an unlawfully grandfathered supplier airspace reservation of a market value greater than

$10,000 — pursuant to a sale, lease, alliance block space, or other agreement — that was derived from specified unlawful activity; and (To ¶¶413, 417, 538.)

411.   (From ¶¶210 to 216.) IATA is a business engaged in the exchange of currency, funds, or value that substitutes for currency or funds (carrier-currency), and so is a *"financial institution"* within the meaning as amended by section 6102(d)(1)(B)(i) of the Anti-Money Laundering Act of 2020, 31 U.S.C. § 5312(a)(2)(J); and (To ¶¶412, 537.)

412.   (From ¶411.) Because IATA is a financial institution within the meaning of 31 U.S.C. § 5312(a)(2), IATA is a *"financial institution"* within the meaning of section 318 of the USA PATRIOT Act of 2001, 18 U.S.C. § 1956(c)(6)(A); and (To ¶¶413, 537.)

413.   (From ¶¶410, 412) Each transaction involved the use of the financial institution IATA, the activities of which affect domestic and foreign commerce in supplier airspace reservations — and so was a *"financial transaction"* within the meaning of section 1352(a) of the Money Laundering Control Act of 1986, 18 U.S.C. § 1956(c)(4)(B); and (To ¶414.)

414.   (From ¶413.) Each financial transaction was a *"monetary transaction"* within the meaning of section 1527(b) of the Annunzio-Wylie Anti-Money Laundering Act (1992), 18 U.S.C. § 1957(f)(1); and (To ¶418.)

415.   (From ¶129.) Each Defendant Carrier that is an air carrier is a "person within the United States" and therefore a "United States person" within the

meaning of section 101(a) of the 1986 Act to Combat International Terrorism, 18 U.S.C. § 3077(2)(C), by virtue of its certificate of public convenience and necessity issued pursuant to section 401 of the Federal Aviation Act of 1958, as amended, 49 U.S.C. § 41101 *et seq*; (To ¶417.)

416.   (From ¶129.) Each Defendant Carrier that is a foreign air carrier is a "person within the United States" and therefore a "United States person" within the meaning of section 101(a) of the 1986 Act to Combat International Terrorism, 18 U.S.C. § 3077(2)(C), by virtue of its foreign air carrier permit issued pursuant to section 7 of the International Air Transportation Competition Act of 1979, 49 U.S.C. § 41302; (To ¶417.)

417.   (From ¶¶414 to 416.) Each Defendant Carrier's transaction either occurred in the U.S. or occurred outside the U.S. by a United States person pursuant to section 1352(a) of the Money Laundering Control Act of 1986, 18 U.S.C. § 1957(d); and (To ¶418.)

418.   (From 417.) Therefore, each Defendant Carrier violated section 1352(a) of the Money Laundering Control Act of 1986, 18 U.S.C. § 1957(a) two times each year; and (To ¶419.)

419.   (From ¶418.) Each violation of 18 U.S.C. § 1957(a) was a racketeering activity within the meaning of section 1365(b) of the Money Laundering Control Act of 1986, 18 U.S.C. § 1961(1)(B). (To ¶420, 511.)

420.   (From ¶419.) Pursuant to the twice a year violation of 18 U.S.C. § 1957(a), each Defendant Carrier engaged in a pattern of racketeering activity within

the meaning of section 901(a) of the Organized Crime Control Act of 1970, 18 U.S.C. § 1961(5). (To ¶541.)

### 4.  Allocation of Consumer Airspace Reservation

421.  (From ¶218.) Each Defendant Carrier sold (a) consumer airspace reservations tied to the (b) consumer aircraft reservation as one item, the (c) Consumer Reservation; and

422.  Each Defendant Carrier sold Consumer Reservations that involved the proceeds of *"specified unlawful activity"* because those sales were part of a set of parallel or dependent transactions with A4A, ARC, ATPCO, IATA, SITA, UATP, Distribution Services, Card Services, and banks, any one of which involved the receipt or retention of the supplier airspace reservation in ¶400 and all of which were part of the IATA WSG, within the meaning of section 405 of the USA PATRIOT Improvement and Reauthorization Act of 2005 (2006), 18 U.S.C. § 1956(a)(1)(B)(i).

423.  Each Defendant Carrier, knowing that the supplier reservation to use the public's airspace — which was involved in the sale of consumer airspace reservations in air transportation — represented the proceeds of some form of unlawful activity,  conducted a sale transaction which in fact involved the proceeds of specified unlawful activity within the meaning of 18 U.S.C. § 1956(c)(7)(D), as from ¶402, and knowing that the sale of Consumer Reservations was designed in part to conceal the ownership of the proceeds of

the allocation of the consumer airspace reservations, violated section 1352(a) of the Money Laundering Control Act of 1986, 18 U.S.C. § 1956(a)(1)(B)(i).

424. The daily sale of consumer reservations in air transportation by each Defendant Carrier that violated 18 U.S.C. § 1956, described at ¶423 was a racketeering activity within the meaning of section 1365(b) of the Money Laundering Control Act of 1986, 18 U.S.C. § 1961(1)(B).

425. Pursuant to the daily violations of 18 U.S.C. § 1961(1)(B), from ¶424, each Defendant Carrier engaged in a pattern of racketeering activity within the meaning of section 901(a) of the Organized Crime Control Act of 1970, 18 U.S.C. § 1961(5).

426. Each Defendant Carrier's use or investment, directly or indirectly, of any part of the income or the proceeds of the income derived from the pattern of racketeering activity from ¶425 in the operation of its carrier business that is engaged in interstate or foreign commerce violated 901(a) of the Organized Crime Control Act of 1970, 18 U.S.C. § 1962(a).

427. Each Defendant Carrier's use or investment, directly or indirectly, of any part of the income or the proceeds of the income derived from the pattern of racketeering activity from ¶425 in the acquisition or maintenance, directly or indirectly, of any interest in or control of another air carrier, railroad, motor carrier, insurance carrier, refinery, biofuel manufacturer, airport jet fuel infrastructure, airport gate, airport terminal, airport terminal operator, travel agency, or any other enterprise which is engaged in, or the activities of

which affect, interstate or foreign commerce violated section 901(a) of the Organized Crime Control Act of 1970, 18 U.S.C. § 1962(a).

### 5.   Unallocated Supplier Airspace Reservations

428.   Each Defendant Carrier and Defendant Rand falsely represented to a financial institution — within the meaning of section 318 of the USA PATRIOT Act of 2001, 18 U.S.C. § 1956(c)(6) — that it had title to an unallocated future supplier reservation to use the public's airspace, which it collateralized as security for a loan; and

429.   Each Defendant Carrier's and Defendant Rand's collateralization of an unallocated future supplier reservation to use the public's airspace, knowingly converted the unallocated future supplier airspace reservation to its own use and violated section 1 of the March 3, 1875, ch. 144, 18 Stat. 479, 18 U.S.C. § 641; and

430.   Each Defendant Carrier's and Defendant Rand's violation of 18 U.S.C. § 641 from ¶429 was "*specified unlawful activity*" within the meaning of section 1352(a) of the Money Laundering Control Act of 1986, 18 U.S.C. § 1956(c)(7)(D); and

431.   Each Defendant Carrier and Defendant Rand received one or a series of deposits of sovereign currency from the financial institution as part of a loan agreement and thus involved the movement of funds; and

432.   Each Defendant Carrier's and Defendant Rand's loan agreement affected the interstate and foreign commerce in supplier airspace reservations and

involved the movement of funds, and was thus a *"financial transaction"* within the meaning of section 1527 of the Annunzio-Wylie Anti-Money Laundering Act (1992), 18 U.S.C. § 1956(c)(4)(A)(i); and

433. Each Defendant Carrier's and Defendant Rand's loan agreement involved the use of a financial institution, the activities of which affect interstate and foreign commerce and was thus a *"financial transaction"* within the meaning of section 1352(a) of the Money Laundering Control Act of 1986, 18 U.S.C. § 1956(c)(4)B); and

434. (From ¶¶428 to 433.) Each Defendant Carrier and Defendant Rand, knowing that the supplier airspace reservation involved in the loan transaction was the proceed of specified unlawful activity, conducted the loan transaction with the intent to promote the carrying on of the conversion of the public's airspace reservations to its use and thus violated section 1352(a) of the Money Laundering Control Act of 1986, 18 U.S.C. § 1956(a)(1)(A)(i).

435. (From ¶434.) The violation of 18 U.S.C. § 1956 was a racketeering activity within the meaning of section 1365(b) of the Money Laundering Control Act of 1986, 18 U.S.C. § 1961(1)(B).

436. (From ¶435.) Pursuant to the violations of 18 U.S.C. § 1961(1)(B), each Defendant Carrier and and Defendant Rand engaged in a pattern of racketeering activity within the meaning of section 901(a) of the Organized Crime Control Act of 1970, 18 U.S.C. § 1961(5).

437.   (From ¶436.) Each Defendant Carrier's use or investment, directly or indirectly, of any part of the income or the proceeds of the income derived from the pattern of racketeering activity in the operation of its carrier business or in the acquisition or maintenance, directly or indirectly, of any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce violated section 901(a) of the Organized Crime Control Act of 1970, 18 U.S.C. § 1962(a).

438.   (From ¶437.) Each Defendant PANYNJ and MWAA conspired with each Defendant Carrier to violate 18 U.S.C. § 1962(a) to control airport jet fuel infrastructure, airport gate, or an airport terminal which violated 901(a) of the Organized Crime Control Act of 1970, 18 U.S.C. § 1962(d).

### 6.   Unallocated Consumer Airspace Reservations

439.   (From ¶221.) Each Defendant Passenger Carrier coined its own monetary instrument, and regulated the value thereof, to trade in air commerce in the U.S. monetary system, knowing that the legal tender of the U.S. monetary system is United States currency pursuant to section 102 of the Coinage Act of 1965, 31 U.S.C. § 5103, and so violated the U.S. Const. art. I, § 8, cl. 5. (To ¶535.)

440.   Each Defendant Passenger Carrier knowingly converted to its use or the use of another carrier a portion of unallocated consumer reservations to use the public's airspace, by converting the value of a portion of unallocated

consumer airspace reservations to its carrier-currency, and so violated the Law of June 18, 1934, ch. 587, 48 Stat. 996, 18 U.S.C. § 641.

441.   Each Defendant Passenger Carrier's violation of 18 U.S.C. § 641 per ¶440 was a *"specified unlawful activity"* within the meaning of section 1352(a) of the Money Laundering Control Act of 1986, 18 U.S.C. § 1956(c)(7)(D).

### tt.   Bulk Sale of Carrier-Currency

442.   Each Defendant Passenger Carrier, in one or a series of transactions, sold a volume of its carrier-currency to a credit-card company or a hotel in exchange for U.S. currency, and which each transaction represented a portion of unallocated consumer airspace reservations of a market value greater than $10,000 (a "Bulk Sale"); and

443.   (From ¶442.) Each Defendant Passenger Carrier's Bulk Sale of its carrier-currency involved the deposit, transfer, or exchange of U.S. currency or a foreign sovereign's currency; and

444.   (From ¶443.) Each Defendant Passenger Carrier's deposit, transfer, or exchange of a sovereign's currency was by, through, or to a financial institution within the meaning of section 318 of the USA PATRIOT Act of 2001, 18 U.S.C. § 1956(c)(6); and

445.   Each Defendant Passenger Carrier that is an air carrier is a "person within the United States" and therefore a "United States person" within the meaning of section 101(a) of the 1986 Act to Combat International Terrorism, 18 U.S.C. § 3077(2)(C), by virtue of its certificate of public convenience and

necessity issued pursuant to section 401 of the Federal Aviation Act of 1958, as amended, 49 U.S.C. § 41101 *et seq*;

446.   Each Defendant Passenger Carrier that is a foreign air carrier is a "person within the United States" and therefore a "United States person" within the meaning of section 101(a) of the 1986 Act to Combat International Terrorism, 18 U.S.C. § 3077(2)(C), by virtue of its foreign air carrier permit issued pursuant to section 7 of the International Air Transportation Competition Act of 1979, 49 U.S.C. § 41302; and

447.   (From ¶¶442 to 446.) Each Defendant Passenger Carrier's Bulk Sale of its carrier-currency either occurred in the U.S. or occurred outside the U.S. by a United States person pursuant to section 1352(a) of the Money Laundering Control Act of 1986, 18 U.S.C. § 1957(d); and

448.   (From ¶¶439 to 447.) Each Defendant Passenger Carrier's Bulk Sale of its carrier-currency violated section 1352(a) of the Money Laundering Control Act of 1986, 18 U.S.C. § 1957(a); and

449.   (From ¶448.) The violations of 18 U.S.C. § 1957 were a racketeering activity within the meaning of section 1365(b) of the Money Laundering Control Act of 1986, 18 U.S.C. § 1961(1)(B); and

450.   (From ¶449.) Pursuant to the violations of 18 U.S.C. § 1961(1)(B) each Defendant Carrier engaged in a pattern of racketeering activity within the meaning of section 901(a) of the Organized Crime Control Act of 1970, 18 U.S.C. § 1961(5); and

451.   (From ¶450.) Each Defendant Carrier's use or investment, directly or indirectly, of any part of the income or the proceeds of the income derived from the pattern of racketeering activity in the operation of its carrier business or in the acquisition or maintenance, directly or indirectly, of any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce violated section 901(a) of the Organized Crime Control Act of 1970, 18 U.S.C. § 1962(a).

### uu.   Individual Sale of Carrier-Currency

452.   (From ¶208.) Each Defendant Passenger Carrier sold a volume of its carrier-currency to a consumer in exchange for a sovereign's currency; and/or

453.   Each Defendant Passenger Carrier sold a volume of its carrier-currency to a consumer or a consumer's employer in exchange for a sovereign's currency by (a) tying a volume of its carrier-currency with the purchase of a reservation for a seat on the aircraft, (b) recording internally a value in sovereign currency for each the carrier-currency and for the aircraft seat reservation, and (c) representing to the consumer or the consumer's employer that the transferred volume of its carrier-currency was a free loyalty reward to the consumer; and

454.   (From ¶¶452 and 453.) Each Defendant Passenger Carrier made the sale of carrier-currency knowing that the carrier-currency represented the proceeds of specified unlawful activity as from ¶441; and

455.   Each Defendant Carrier's sale of carrier-currency involved the proceeds of *"specified unlawful activity"* within the meaning of section 405 of the USA PATRIOT Improvement and Reauthorization Act of 2005 (2006), 18 U.S.C. § 1956(a)(1)(B)(i) because that sale was part of a set of parallel or dependent transactions with IATA, A4A, Air Tariff Publishing Company (ATPCO), Airline Reporting Corporation (ARC), Universal Air Travel Plan (UATP), Société Internationale de Télécommunications Aéronautiques SCRL (SITA), Distribution Services, Card Services, and banks, any one of which involved the carrier-currency and all of which were part of the IATA WSG; therefore,

456.   (From ¶¶439 to 441 and ¶¶452 to 455.) Each Defendant Passenger Carrier, knowing that the sale of carrier-currency was designed in part to conceal the ownership of the proceeds of the allocation of the passenger airspace reservation, violated section 1352(a) of the Money Laundering Control Act of 1986, 18 U.S.C. § 1956(a)(1)(B)(i); and

457.   (From ¶456.) The violations of 18 U.S.C. § 1956 were a racketeering activity within the meaning of section 1365(b) of the Money Laundering Control Act of 1986, 18 U.S.C. § 1961(1)(B); and

458.   (From ¶457.) Pursuant to the violations of 18 U.S.C. § 1961(1)(B) each Defendant Carrier engaged in a pattern of racketeering activity within the meaning of section 901(a) of the Organized Crime Control Act of 1970, 18 U.S.C. § 1961(5); and

459.   (From ¶458.)Each Defendant Carrier's use or investment, directly or indirectly, of any part of the income or the proceeds of the income derived from the pattern of racketeering activity in the operation of its carrier business or in the acquisition or maintenance, directly or indirectly, of any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce violated section 901(a) of the Organized Crime Control Act of 1970, 18 U.S.C. § 1962(a).

## D.   Carrier Agreements with Government Agency or Other Employers

### 1.  Agreement with United States Government Agency

460.   (From ¶297.) Defendants the United States, American Airlines, and JetBlue, by their Agreement between the U.S. DOT and Defendants American Airlines and JetBlue dated January 10, 2021, made false claims to a proprietary right to airspace reservations that were allocated by the DOT/IATA WSG Slot Coordinator with unlawful grandfathering and so violated the law of June 18, 1934, ch. 587, 48 stat. 996, 18 U.S.C. § 1001. (To ¶546.)

461.   Defendant the United States, by its Agreement between the U.S. DOT and Defendants American Airlines and JetBlue dated January 10, 2021, regulated carrier routes and service at two airports in New York (LaGuardia and JFK) and a Washington, D.C. airport (Reagan National), and so violated

section 3 of the Airline Deregulation Act of 1978, 49 U.S.C. § 40101(a)(12),
which requires market competition to decide matters related to price, route,
and service in air transportation, and in so doing violated the Congress'
exclusive power to regulate domestic and foreign commerce, U.S. Const. art.
I, § 8, cl. 8. (To ¶567.)

## 2.   Agreement with State Agency

### vv.   Florida Attorney General's Unlawful Regulation of Air Transportation

462.   (From ¶346.) Defendant Ashley Moody, by her Settlement Agreement
between Defendants JetBlue, Spirit Airlines, and Ashley Moody, the Attorney
General of the State of Florida dated March 6, 2023, (the "Moody
Agreement"), regulated routes and service through airports in Florida and so
violated preemption of authority over price, route, and service in air
transportation, section 4(a) of the Airline Deregulation Act of 1978, 49 U.S.C.
§ 41713(b); and (To ¶463.)

463.   (From ¶462.) Defendant Ashley Moody's violation of 49 U.S.C. § 41713(b)
violated the Congress' exclusive power to regulate domestic and foreign
commerce, U.S. Const. art. I, § 8 cl. 3; and (To ¶¶464, 559.)

464.   (From ¶463.) Defendant Ashley Moody violated Endres' right to conduct
commerce pursuant to his right to freedom of speech under U.S. Const.
amend. I; and (To ¶¶465, 560.)

465. (From ¶464.) The Moody Agreement was a transaction affecting interstate or foreign commerce in airspace reservations and required the movement of $300,000 by wire or other means, and therefore was a *"financial transaction"* within the meaning of section 1527 of the Annunzio-Wylie Anti-Money Laundering Act (1992), 18 U.S.C. § 1956(c)(4)(A); and (To ¶466.)

466. (From ¶¶402, 465.) Each Defendant Ashley Moody, JetBlue and Spirit, knowing that the supplier airspace reservations involved in the Moody Agreement involved the proceeds of specified unlawful activity conducted the Moody Agreement with the intent to promote the carrying on of the grandfathering of supplier airspace reservations, and violated section 1352(a) of the Money Laundering Control Act of 1986, 18 U.S.C. § 1956(a)(1)(A)(i); and (To ¶467.)

467. (From ¶466.) Defendant Ashley Moody, by conducting the Moody Agreement, conspired with Defendants JetBlue and Spirit to violate 18 U.S.C. § 1956 and so violated section 1530 of the Annunzio-Wylie Anti-Money Laundering Act (1992), 18 U.S.C. § 1956(h); and (To ¶¶468, 515, 562.)

468. (From ¶467.) By their agreement to exclude the Moody Agreement from discovery in a court proceeding, Defendants Ashley Moody, JetBlue, and Spirit obstructed the due administration of justice by their agreement to exclude the Moody Agreement from discovery in a court proceeding, and so violated section the law of June 10, 1872, ch. 420, v.17, p. 378, 18 U.S.C. § 1503; and (To ¶¶469, 563.)

469.   (From ¶468.) Defendants Ashley Moody, JetBlue, and Spirit's violation of 18
U.S.C. § 1503 was a *specified unlawful activity* within the meaning of
section 901(a) of the Organized Crime Control Act of 1970, 18 U.S.C. §
1956(c)(7)(A). (To ¶¶515, 559.)

### ww.   Airport's Unlawful Diversion of Revenue

### 01. Credit PFC's to Carrier

470.   (From ¶272.) An unidentified airport authority charged a passenger facility
charge ("PFC") tax to passenger-users of one or more airport it operates,
which revenue the airport authority represented it would use for eligible
airport-related projects, pursuant to a federal program at section 9110 of the
Aviation Safety and Capacity Expansion Act of 1990, 49 U.S.C. § 40117. The
PFC tax was collected by carriers from passengers, and remitted by carriers
to the unidentified airport; and

471.   The federal program prohibits a contract between an air carrier and the
public agency of a commercial service airport from regulating the use of the
tax, section 9110 of the Aviation Safety and Capacity Expansion Act of 1990,
49 U.S.C. § 40117(f); and

472.   (From ¶272.) Defendant United Airlines, including its business trusts,
partnerships, joint ventures, or other alliances, agreed with the unidentified
airport to reduce the amount it pays for use of public airport assets by all or a
portion of the amount of PFC tax the unidentified airport collected from
passengers; and by so doing

473.   Defendant United Airlines knowingly converted public funds to its own use, and so violated section 2 of the law of March 3, 1875, ch. 144, 18 Stat. 479, 18 U.S.C. § 641; and

474.   (From ¶¶470 to 473.) Defendant United Airlines violation of 18 U.S.C. § 641 was a *specified unlawful activity* within the meaning of section 1352(a) of the Money Laundering Control Act of 1986, 18 U.S.C. § 1956(c)(7).

## 02.   Revenue Sharing Agreement – Airport Owner

475.   (From ¶265.)  Defendants the City of New York and PANYNJ negotiated rent of the airports based on the value of the revenue of the airport rather than the value of the facilities provided to the airport, in violation of section 112(a) of the Federal Aviation Administration Authorization Act of 1994, 49 U.S.C. § 47107(k)(2); and in so doing,

476.   Defendant PANYNJ knowingly converted to the use of another public airport funds when it diverted airport revenue with a revenue sharing agreement as part of its lease agreement with the City of New York and so and so violated section 1 of the law of March 3, 1875, ch. 144, 18 U.S.C. § 641; (To ¶553.) and

477.   Defendant the City of New York retained the payment in excess of the value of the facilities, knowing it to have been purloined from the airport revenue, and so violated section 2 of the law of March 3, 1875, ch. 144, 18 U.S.C. § 641; (To ¶570.) and

478.   (From ¶¶475 to 477.) PANYNJ and the City of New York's violations of 18 U.S.C. § 641 were a *specified unlawful activity* within the meaning of

section 1352(a) of the Money Laundering Control Act of 1986, 18 U.S.C. §
1956(c)(7). (To ¶512.)

### 03.   Revenue Sharing Agreement – Carriers

479.   (From ¶259.)  Defendant MWAA knowingly converted to the use of each
Defendant Carrier public airport funds when it diverted airport revenue with
a revenue sharing agreement and so and so violated section 1 of the law of
March 3, 1875, ch. 144, 18 U.S.C. § 641; and (To ¶569.)

480.   (From ¶479.) MWAA's violation of 18 U.S.C. § 641 was a *specified unlawful
activity*" within the meaning of section 1352(a) of the Money Laundering
Control Act of 1986, 18 U.S.C. § 1956(c)(7).

### xx.   Airport's Unlawful Economic Regulation of Air Transportation

### 04.   Airport's Air Carrier Incentive Plan

481.   (From ¶273.)  The agreement between each Defendant PANYNJ and MWAA,
on the one hand, and each Defendant Carrier, on the other hand, to pay each
Defendant Carrier, directly or indirectly, to influence route decisions
pursuant to an Air Carrier Incentive Plan be adjudged to violate (i)
preemption of regulatory authority related to price, route, and service of
carriers in air transportation, section 4(a) of the Airline Deregulation Act of
1978, 49 U.S.C. § 41713(b); (ii) the delegation to market competition to decide
on routes, section 3(a) of the Airline Deregulation Act of 1978, 49 U.S.C. §
40101(a)(12)(B); (iii) the right of the people to consistent economic regulation

at all airports, section 502(a)(5) of the Airport and Airway Improvement Act of 1982, 49 U.S.C. § 47101(d); and (iv) the prohibition on diverting airport revenue pursuant to section 804(a) of the Airport Revenue Protection Act of 1996, 49 U.S.C. § 47133(a); and

482.   A 'route' referred to in the statutory economic regulations represents the combination of supplier airspace reservations at each terminal airport and intermediate airport, if any, between which the air carrier's flight is scheduled;[463] and

483.   (From ¶481.) Each Defendant Carrier's agreement with an airport operator related to a route decision and its retention of the airport operator's direct or indirect payment related to the allocation of a route in domestic and foreign commerce knowingly converted the supplier airspace reservations to use the public's airspace to its use, and violated section 1 of the law of March 3, 1875, ch. 144, 18 Stat. 479, 18 U.S.C. § 641; and

484.   (From ¶483) Each Defendant Carrier's violation of 18 U.S.C. § 641 was a "*specified unlawful activity*" within the meaning of section 1352(a) of the Money Laundering Control Act of 1986, 18 U.S.C. § 1956(c)(7); and

---

[463]   See, *e.g.*, prior to deregulation, the Federal Aviation Act of 1958, Pub. L. 85-726, Sec. 401(e), 72 Stat. 731, 755 (1958) ("Each certificate issued under this section shall specify the terminal points and intermediate points, if any, between which the air carrier is authorized to engage in air transportation and the service to be rendered[.]").

485.   (From ¶375.) Each Defendant Carrier, knowing that the supplier airspace reservation involved in the payment from airport operators represented the proceeds of unlawful grandfathering, and in fact involved the proceeds of specified unlawful activity received the payment with the intent to promote the carrying on of the specified unlawful activity, and violated section 1352(a) of the Money Laundering Control Act of 1986, 18 U.S.C. § 1956(a)(1)(A)(i); and

486.   (From ¶481.) Each Defendant PANYNJ's and MWAA's violation of 49 U.S.C. § 41713(b) violated the Congress' exclusive power to regulate domestic and foreign commerce, U.S. Const. art. I, sec. 8, cl. 3; and

487.   (From ¶403.) Each Defendant PANYNJ's and MWAA's agreement with each Defendant Carrier, knowing that the supplier airspace reservations involved in the payment for a route to each Defendant Carrier represented the proceeds of unlawful grandfathering conspired with each Defendant Carrier with the intent to promote the carrying on of the money laundering, from ¶485 and violated section 1530 of the Annunzio-Wylie Anti-Mondy Laundering Act (1992), 18 U.S.C. § 1956(h). (To ¶552.)

## 05.   Airport's Coordination of Carriers

488.   (From ¶336.) The indirect agreement between Defendant PANYNJ and each Defendant Carrier, through a software provider (OneAlpha Technologies), to further coordinate unlawfully grandfathered airspace reservations violated (a) preemption of regulatory authority related to price, route, and service of

carriers in air transportation, section 4(a) of the Airline Deregulation Act of 1978, 49 U.S.C. § 41713(b); (b) the delegation to market competition to decide on service, section 3(a) of the Airline Deregulation Act of 1978, 49 U.S.C. § 40101(a)(12)(B); and (c) the right of the people to consistent economic regulation at all airports, section 502(a)(5) of the Airport and Airway Improvement Act of 1982, 49 U.S.C. § 47101(d). (To ¶489.)

489.   (From ¶488.)  The indirect agreement between Defendant PANYNJ and each Defendant Carrier, through a software provider (OneAlpha Technologies) was in furtherance of the conspiracy to grandfather airspace reservations.

### 06.   Airport's Exclusion of Flights

490.   (From ¶262.) Defendant PANYNJ's perimeter rule is a regulation of carrier routes and service and violates 49 U.S.C. § 41713, and so violates U.S. Const. art. I, § 8, cl.3. (To ¶566.)

### 3.   Contracts for Scheduled Air Service

491.   (From ¶304.) Each Defendant Carrier's Contract for Scheduled Service with a state or local government entity or business to provide scheduled air transportation is a contract, combination, or conspiracy within the meaning of Section 1 of the Sherman Act, 15 U.S.C. § 1; (To ¶492.)

492.   (From ¶491.) Each Defendant Carrier's Contract for Scheduled Service with a government entity or business to provide scheduled air transportation to its employees or for its shipping outside of the market — which is individually

ticketed or individually waybilled — is a market-allocating agreement and a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1; and (To ¶507.)

493.   (From ¶491.) Each Defendant Carrier's Contract for Scheduled Service with a government entity or business to provide scheduled air transportation to its employees at prices that discriminate between different purchasers violates Section 2 of the Clayton Act, 15 U.S.C. § 13(a). (To ¶508.)

494.   Defendant the United States' Contracts for Scheduled Service with each Defendant Carrier was a regulation of price, route, and service and so violated 49 U.S.C. § 40101(a), which usurped the Congress' exclusive power to regulate commerce, and so violated U.S. Const. art. I, § 8, cl.3. (To ¶571.)

### E.   Separation of Powers

495.   Defendant the City of New York's airport lease agreement to Defendant PANYNJ that requires payment of a percentage of revenue on domestic and foreign air transportation is a regulation of domestic and foreign commerce, and violated U.S. Const. art. I, § 8, cl.3.

496.   Defendant the City of New York's collection of a percent of airport revenue through its lease agreement with Defendant PANYNJ violated U.S. Const. art. I, § 10, cl. 2, which prohibits states from taxing imports or exports.

497.   Each Defendant PANYNJ and MWAA joined the Airports Council International, and so violated U.S. Const. art. 1, §10, cl.1 ("No State shall enter into any Treaty, Alliance, or Confederation[.]").

498. Defendant PANYNJ has unlawfully delegated its bi-state authority, which was constitutionally authorized by the Congress, over the operation and development of airports to JFKIAT and to Delta, and so violated U.S. Const. amend. X.

499. The USPTO and its Patent Trial and Appeal Board usurped the Congress' exclusive power to promote progress in maximizing market competition in transportation by elevating its internal guidance document over the law to deny the patent for Endres' market-clearing process, in violation of U.S. Const. art. I, § 8, cl. 8.

### F.    Unconstitutional Statutes

500. United States statute 49 U.S.C. § 49104(a)(4), which 'grants' Defendant MWAA an exception to competing in markets for its supplies, services, and concession contracts (a) violates the U.S. Const. art. I, § 9, cl. 6 by preferencing a port in the regulation of commerce of those supplies, services, and concessions, and (b) violates Endres' right to a free market for those supplies, services, and concessions, U.S. Const. amend. I.

501. United States statute 49 U.S.C. § 49106(e), which 'authorizes' Defendant MWAA to regulate carrier service in air transportation at two airports in Washington, D.C., (a) delegates the Congress' power to regulate domestic and foreign commerce to a state government's agent, in violation of U.S. Const. art. I, § 8, cl. 3; and (b) preferences a port, in violation of the U.S. Const. art. I, § 9, cl. 6.

502. United States statute 49 U.S.C. § 49109, the 'perimeter rule' regulates carrier service at Reagan National Airport (DCA), in violation of the U.S. Const. art. I, § 9, cl. 6 ("No Preference shall be given by any Regulation of Commerce or Revenue to the Ports of one State over those of another[.]").

## X.   REQUEST FOR RELIEF

Plaintiff Endres requests that:

### A.   Carrier Antitrust Remedies

503. (From ¶388.) The International Air Transport Association's Worldwide Slot Guidelines (IATA WSG) be adjudged to be a contract and a conspiracy of Defendant Carriers within the meaning of Section 1 of the Sherman Act, 15 U.S.C. § 1. (To ¶504.)

504. (From ¶389, 503.) The Worldwide Slot Guidelines of the International Air Transport Association be adjudged to be a *per se* market allocation agreement among Defendant Carriers to restrain trade in reservations to use the public's airspace in domestic and foreign commerce *as admitted to* by Defendants Air Canada, Air France-KLM, Alaska Air, American Air, Delta, Lufthansa, FedEx, Frontier, Hawaiian, ICAG, JetBlue, LATAM, Southwest, Spirit, United Airlines, UPS, Ashley Moody, City of Newark, MWAA, PANYNJ, and the United States, in violation of section 1 of the Sherman Act, 15 U.S.C. § 1; (To ¶509.)

505. (From ¶390.) The Worldwide Slot Guidelines of the International Air Transport Association be adjudged to be a *per se* price fixing and a *per se* bid-

rigging agreement among Defendant Carriers to restrain trade in

reservations to use the public's airspace in domestic and foreign commerce in

violation of section 1 of the Sherman Act, 15 U.S.C. § 1; (To ¶509.)

506.   (From ¶391.) The allocation of airspace reservations with grandfathering by

Defendant Carriers since June 7, 2018 be adjudged to be a group boycott of

the multi-sided airspace reservation market that Endres invented, developed,

and assigned to his company, a *per se* violation of Section 1 of the Sherman

Act, 15 U.S.C. § 1; (To ¶509.)

507.   (From ¶492.) The International Air Transport Association's Worldwide Slot

Guidelines (IATA WSG) be adjudged to be a contract and a conspiracy of

Defendant Carriers within the meaning of Section 1 of the Sherman Act, 15

U.S.C. § 1. Each Defendant Carrier's Contract for Scheduled Service be

adjudged to be a market-allocating agreement and a *per se* violation of

Section 1 of the Sherman Act, 15 U.S.C. § 1. (To ¶509.)

508.   (From ¶493.) Each Defendant Carrier's Contract for Scheduled Service to

provide service at prices that discriminate between different purchasers be

adjudged to violate Section 2 of the Clayton Act, 15 U.S.C. § 13(a). (To ¶509.)

509.   Consequent to ¶¶503 to 508, compensation from Defendant Carriers for

threefold the revenue, pursuant to section 4 of the Clayton Act, 15 U.S.C. §

15(a), that Endres was entitled to earn from Exhaustless Inc.'s proprietary

right to allocate the supplier airspace reservation market with its market-

clearing service since June 7, 2018.  The value of the property is difficult to

estimate because there has never been a competitive market for reservations. The most recent study of the economic impact of air transportation delays valued the annual cost to suppliers of domestic passenger service delays— based on a DOT value of time — at $8,300,000,000 in 2007;[464] the study also proposed that the market price to avoid delays was likely higher.[465]  This cost equates to $71,593,000,000 over 2,113 days through March 20, 2024 (approx. five-and-three-quarter years) at a February 2024 dollar value, and treble damages brings the value to $214,779,000,000, multiplied by Endres' personal interest of 95.192% in Exhaustless equals $204,452,426,000. Endres does not have access to a reliable study of the cost of domestic and foreign cargo and mail service delays or foreign passenger service delays, so the estimate of damages excludes a valuation of that portion of the market;

510.   Consequent to ¶¶503 to 508, Defendant Carriers be permanently enjoined from continuing and restrained from further implementing the IATA Worldwide Slot Guidelines.

_____

[464]  *See* Michael Ball, et al., Total Delay Impact Study, National Center of Excellence for Aviation Operations Research ("NEXTOR") (Nov. 3, 2010), Doc. 2, PE-A InfoCongress 38 at 49 and 62 ("We focus on domestic data, since airline on-time performance records are only for domestic flights. In our study, the selected airlines are all passenger service focused, with only a small portion of their traffic undertaking cargo, mail, and other types of business.").

[465]  *Id.* at 57 ("In general, passengers are willing to pay a higher price for less delayed flights[.]").

**B.   RICO Remedies**

**1.  Monetary Remedy**

511.   (From ¶¶404, 407, 419.) That each Defendant Carrier be adjudged to have engaged in racketeering activity pursuant to section 1365(b) of the Money Laundering Control Act of 1986, 18 U.S.C. § 1961(1)(B); (To ¶516.)

512.   (From ¶405, 478.) That each Defendant PANYNJ and MWAA be adjudged to have engaged in racketeering activity pursuant to section 1365(b) of the Money Laundering Control Act of 1986, 18 U.S.C. § 1961(1)(B); (To ¶516.)

513.   (From ¶478.) That Defendant City of New York be adjudged to have engaged in racketeering activity pursuant to section 1365(b) of the Money Laundering Control Act of 1986, 18 U.S.C. § 1961(1)(B); (To ¶516.)

514.   (From ¶115.) That Defendant City of Newark be adjudged to have engaged in racketeering activity pursuant to section 1365(b) of the Money Laundering Control Act of 1986, 18 U.S.C. § 1961(1)(B); (To ¶516.)

515.   (From ¶467, 469.) That Defendant Moody be adjudged to have engaged in racketeering activity pursuant to section 1365(b) of the Money Laundering Control Act of 1986, 18 U.S.C. § 1961(1)(B); (To ¶516.)

516.   Consequent to ¶¶511 to 514, that each named Defendant be adjudged to be engaged in a pattern of racketeering pursuant to 18 U.S.C. § 1961(5); (To ¶517.)

517.   Consequent to ¶516, that each Defendant except the United States be adjudged to have violated 18 U.S.C. § 1962(a); and (To ¶518.)

518. Consequent to ¶517, compensation from all Defendants except the United
States for threefold the revenue, pursuant to section 901(a) of the Organized
Crime Control Act of 1970, 18 U.S.C. § 1964(c), that Endres was entitled to
earn from Exhaustless Inc.'s proprietary right to allocate the public airspace
reservation market with its market-clearing service since June 7, 2018.  The
value of the property is difficult to estimate because there has never been a
competitive market for the public's reservations.  The most recent study of
the economic impact of air transportation delays valued the annual cost of
domestic passenger service delays to the public — based on a TRN value of
time — at $31,200,000,000 in 2007;[466] the study also proposed that the
market price to avoid delays was likely higher.[467]  This cost equates to
$269,121,000,000 over 2,113 days through March 20, 2024 (approx. five-and-
three-quarter years) at a December 2023 dollar value, and treble damages
brings the value to $807,363,000,000, multiplied by Endres' personal interest
of 95.192% in Exhaustless equals $768,544,987,000.  Endres does not have
access to a reliable study of the cost of domestic and foreign cargo and mail
service delays or foreign passenger service delays, so the estimate of damages

---

[466] *See* Michael Ball, et al., Total Delay Impact Study, National Center of
Excellence for Aviation Operations Research ("NEXTOR") (Nov. 3, 2010), Doc. 2,
PE-A1 35 at 49 and 62 ("We focus on domestic data, since airline on-time
performance records are only for domestic flights. In our study, the selected airlines
are all passenger service focused, with only a small portion of their traffic
undertaking cargo, mail, and other types of business.").

[467] *Id.* at 57 ("In general, passengers are willing to pay a higher price for less
delayed flights[.]").

excludes a valuation of that portion of the market.  Combined with the

antitrust claim at ¶509, the total claim by Endres is $972,997,413,000.

## 2.  Structural Remedies

519.  (From ¶392.) Airlines for America be adjudged to be a corporate trust in
service to the conspiracy to not compete, in violation of section 1 of the
Sherman Act, 15 U.S.C. § 1; and (To ¶520.)

520.  (From ¶519.) Defendant Carriers be ordered to dissolve Airlines for America,
pursuant to 18 U.S.C. § 1964(a).

521.  (From ¶393.) Airline Reporting Corporation be adjudged to be a corporate
trust in service to the conspiracy to not compete, in violation of section 1 of
the Sherman Act, 15 U.S.C. § 1; and (To ¶522.)

522.  (From ¶521.) Defendant Carriers be ordered to dissolve Airline Reporting
Corporation, pursuant to 18 U.S.C. § 1964(a).

523.  (From ¶394.) Air Tariff Publishing Company be adjudged to be a corporate
trust in service to the conspiracy to not compete, in violation of section 1 of
the Sherman Act, 15 U.S.C. § 1; and (To ¶524.)

524.  (From ¶523.) Defendant Carriers be ordered to forfeit ownership of Air Tariff
Publishing Company to the United States, pursuant to 18 U.S.C. § 1962; and
(To ¶525.)

525.  (From ¶524.) Defendant United States be ordered to divest Air Tariff
Publishing Company, at the market price, to Endres' company, Exhaustless
Inc., to publish the full price of air transportation, including the reservation

to use the airspace and the reservation for carrier service, as required by 49 U.S.C. § 41712, per 14 C.F.R. § 399.84(a).

526. (From ¶395.) International Air Transport Association be adjudged to be a corporate trust in service to the conspiracy to not compete, in violation of section 1 of the Sherman Act, 15 U.S.C. § 1; and (To ¶527.)

527. (From ¶526.) Defendant Carriers be ordered to forfeit ownership of International Air Transport Association to the United States, pursuant to 18 U.S.C. § 1962.

528. (From ¶396.) San Francisco Terminal Equipment Company, L.L.C. (SFOTEC) be adjudged to be a corporate trust in service to the conspiracy to not compete, in violation of section 1 of the Sherman Act, 15 U.S.C. § 1; and (To ¶529.)

529. (From ¶528.) Defendant Carriers be ordered to dissolve SFOTEC, pursuant to 18 U.S.C. § 1964(a).

530. (From ¶397.) Société Internationale de Télécommunications Aéronautiques SCRL (SITA) be adjudged to be a corporate trust in service to the conspiracy to not compete, in violation of section 1 of the Sherman Act, 15 U.S.C. § 1; and (To ¶531.)

531. (From ¶530.) Defendant Carriers be ordered to forfeit ownership of SITA to the United States, pursuant to 18 U.S.C. § 1962.

532. (From ¶398.) Universal Air Travel Plan, Inc. (UATP) be adjudged to be a corporate trust in service to the conspiracy to not compete, in violation of section 1 of the Sherman Act, 15 U.S.C. § 1; and (To ¶533.)

533. (From ¶532.) Defendant Carriers be ordered to dissolve UATP, pursuant to 18 U.S.C. § 1964(a).

534. (From ¶399.) Defendant Air Carriers and Foreign Air Carriers be permanently enjoined from continuing and restrained from further implementing air carrier alliance agreements that fraudulently stated there were no other agreements, whereas they were predicated on the IATA WSG, including:

      a. The "West Coast International" Alliance Agreement between Defendants American Airlines and Alaska Air;

      b. The "oneworld" Alliance between Defendants Alaska Air, American Airlines, and ICAG;

      c. The "SkyTeam" Alliance between Defendants Air France-KLM, and Delta;

      d. The alliance between Defendants Delta and LATAM;

      e. The "Star" Alliance between Defendants Air Canada, United Airlines, and Lufthansa.[468]

---

[468] *See id.*

     f. The "ATSA" alliance between Defendants Amazon and Hawaiian.

     g. The "commercial passenger services" agreement between Defendants Amazon and Hawaiian.

     h. The merger agreement between Defendants Alaska Air and Hawaiian.

535. (From ¶439.) Each Defendant Passenger Carrier be adjudged to have violated the U.S. Const. art. I, § 8, cl. 5, by coining its own currency and regulating the value thereof to trade in the U.S. monetary system every day since June 7, 2018; and (To ¶536.)

536. (From ¶535.) Each Defendant Carrier be ordered to dissolve its loyalty programs and cease trade in non-sovereign currencies.

**3. Civil Forfeiture of Private Assets**

537. (From ¶409.) Each Defendant Carrier be adjudged to have violated 18 U.S.C. § 1962(b) in the acquisition or maintenance, directly or indirectly, of any interest or control of A4A, ARC, ATPCO, IATA, SFOTEC, SITA, or UATP from the patterns of racketeering activity or any other enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce, every day from June 7, 2018 to today; and

538. (From ¶¶410 to 419.) Each Defendant Carrier be adjudged to have violated 18 U.S.C. § 1957(a) and 18 U.S.C. § 1962(a) in the secondary allocation of supplier airspace reservations every day from June 7, 2018, to today; and

539.   (From ¶¶421 to 427.) Each Defendant Carrier be adjudged to have violated 18 U.S.C. § 641 and 18 U.S.C. § 1962(a) in the allocation of consumer airspace reservations every day since June 7, 2018; and

540.   (From ¶¶428 to 438.) Each Defendant Carrier be adjudged to have violated 18 U.S.C. § 641, 18 U.S.C. § 1956(a)(1)(A)(i), and 18 U.S.C.  § 1962(a) in the receipt of a loan of sovereign currency secured by public assets every day since June 7, 2018; and

541.   (From ¶¶537 to 540.) Each Defendant Carrier be adjudged to have engaged in a pattern of racketeering;

542.   Each Defendant Passenger Carrier be adjudged to have violated 18 U.S.C. § 1957(a) and 18 U.S.C. § 1962(a) in the conversion of public assets to its private currency, and the sale of its private currency for sovereign currency, from ¶¶440 to 451, every day since June 7, 2018; and

543.   (From ¶¶452 to 459.) Each Defendant Passenger Carrier be adjudged to have violated 18 U.S.C. § 1956(a)(1)(B)(i) and 18 U.S.C. § 1962(a) in the conversion of public assets to its private currency, and the concealed sale of its private currency for sovereign currency every day since June 7, 2018; and

544.   (From ¶¶537 to 543.) Each Defendant Carrier's use or investment, directly or indirectly, of any part of the income or the proceeds of the income derived from the pattern of racketeering activity in the acquisition or maintenance, directly or indirectly, of any interest in or control of an enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce be

adjudged to violate section 901(a) of the Organized Crime Control Act of 1970, 18 U.S.C. § 1962(a). (To ¶545.)

545. Consequent to ¶544, the forfeiture by each Defendant Carrier of the property to the United States which is (i) property involved in or traceable to money laundering transactions in violation of 18 U.S.C. § 1956 pursuant to section 1366(a)(1) of the Money Laundering Control Act of 1986, 18 U.S.C. § 981(a)(1)(A); and/or (ii) property which constitutes proceeds traceable to specified unlawful activity within the meaning of section 20(b) of the Civil Asset Forfeiture Reform Act of 2000, 18 U.S.C. § 981(a)(2)(A), pursuant to section 20(a) of the Civil Asset Forfeiture Reform Act of 2000, 18 U.S.C. § 981(a)(1)(C):

      **yy.**    **Investments in:**

          (i)      Air carrier, motor carrier, water carrier, railroad.

          (ii)     Air navigation service provider.

          (iii)    Airport operator.

          (iv)    Freight forwarder, freight broker.

          (v)     Ticket agent, travel agency.

          (vi)    Insurance carrier.

          (vii)   Realtor, mortgage broker, residential housing.

          (viii)  Payment processor.

          (ix)    Refinery, sustainable aviation fuel producer, fuel farm, or fuel cooperative.

(x)     Hotel, motel, or casino.

(xi)    Dealer or leasing enterprise for aircraft or any craft used
        in transportation.

(xii)   Maintenance or servicing enterprise for aircraft.

546.   The Agreement between the USDOT and Defendant American Airlines (the
       merged company) dated November 12, 2013, be adjudged to violate section 3
       of the Airline Deregulation Act of 1978, 49 U.S.C. § 40101(a), which requires
       market competition to decide matters related to price, route, and service in
       air transportation;

547.   (From ¶460.) The Agreement between the USDOT and Defendant American
       Airlines (the merged company) dated November 12, 2013, be adjudged to
       violate 18 U.S.C. § 1001 by making a false claim to a proprietary right to
       airspace reservations allocated by unlawful grandfathering.

548.   (From ¶469.) The Settlement Agreement between Defendants JetBlue
       Airways, Spirit Airlines, and the Attorney General of the State of Florida
       dated March 6, 2023, be declared to violate the U.S. Const. art. I, § 8, cl. 3,
       art. IV, § 3, cl. 2, and art. I, § 10, cl. 1;

549.   Defendants JetBlue Airways, Spirit Airlines, and the Attorney General of the
       State of Florida be permanently enjoined from continuing and restrained
       from further implementing the Settlement Agreement dated March 6, 2023;

550.    Each Defendant Carrier has violated Section 2 of the Clayton Act, 15 U.S.C. § 13(a) by its contracts for scheduled air transportation at discriminatory prices and levels of service between different purchasers;[469]

551.    Defendant Carriers be permanently enjoined from continuing and restrained from further implementing contracts for scheduled air transportation.

### 4.    Civil Forfeiture of Public Assets

### zz.    Airports within the Port of New York and New Jersey and Related Airport

552.    (From ¶473.) Defendant PANYNJ be adjudged to have violated 18 U.S.C. § 641 in crediting PFC's to a carrier.

553.    (From ¶475.) Defendant PANYNJ be adjudged to have violated 18 U.S.C. § 641 in diverting airport revenue pursuant to a revenue sharing agreement with Defendant the City of New York.

554.    (From ¶477.) Defendant the City of New York PANYNJ be adjudged to have violated 18 U.S.C. § 641 in retaining airport revenue received by a direct payment in addition to rents pursuant to an agreement with Defendant PANYNJ, and therefore,

---

[469]  *See* e.g., GSA City Pair Program (CPP) FY24 Contract Awards (Jul. 2023), Doc. 354, PE-H CarrierInfo 315. *See also*, the USTRANSCOM list of contracts at footnote 187.

555.   (From ¶¶552 to 554.) Defendants PANYNJ and the City of New York be adjudged to have engaged in specified unlawful activity in the meaning of 18 U.S.C. § 1956(c)(7)(D); and

556.   (From ¶487.) Defendant PANYNJ be adjudged to have violated 18 U.S.C. § 1956(h) in diverting airport revenue to carriers pursuant to an Air Carrier Incentive Plan, and therefore,

557.   (From ¶556.) Defendant PANYNJ be adjudged to have engaged in specified unlawful activity in the meaning of 18 U.S.C. § 1956(c)(7)(A); and therefore,

558.   (From ¶¶552 to 557.) The forfeiture of the following property to the United States which is (i) property involved in or traceable to money laundering transactions in violation of 18 U.S.C. § 1956 pursuant to section 1366(a)(1) of the Money Laundering Control Act of 1986, 18 U.S.C. § 981(a)(1)(A); and/or (ii) property which constitutes proceeds traceable to specified unlawful activity within the meaning of section 20(b) of the Civil Asset Forfeiture Reform Act of 2000, 18 U.S.C. § 981(a)(2)(A), pursuant to section 20(a) of the Civil Asset Forfeiture Reform Act of 2000, 18 U.S.C. § 981(a)(1)(C):

      a.   Newark Liberty airport in Newark, New Jersey;

      b.   Teterboro airport in Teterboro, New Jersey;

      c.   John F. Kennedy airport in New York, New York;

      d.   LaGuardia airport in New York, New York;

      e.   Stewart airport in New Windsor, New York, without the Port District but operated by Defendant PANYNJ;

### aaa. Airports in Florida that JetBlue or Spirit Served as of March 2023

559. (From ¶463.) Defendant Ashley Moody be adjudged to have violated U.S. Const. art. I, §8, cl. 3 by regulating air commerce pursuant to the Moody Agreement; and (To ¶565.)

560. (From ¶464.) Defendant Ashley Moody be adjudged to have violated Endres' right to free speech under U.S. Const. amend. I pursuant to the Moody Agreement; and (To ¶565.)

561. (From ¶465.) Defendants Ashley Moody, JetBlue, and Spirit be adjudged to have violated 18 U.S.C. § 1956(a)(1)(A)(i) with the intent to promote the carrying on of the grandfathering of supplier airspace reservations; and (To ¶565.)

562. (From ¶467.) Defendant Ashley Moody be adjudged to have conspired with Defendants JetBlue and Spirit to violate 18 U.S.C. § 1956 and so be adjudged to have violated 18 U.S.C. § 1956(h); and (To ¶565.)

563. (From ¶468.) Defendants Ashley Moody, JetBlue, and Spirit be adjudged to have violated 18 U.S.C. § 1503 by agreeing to not disclose their Moody Agreement to a court; and therefore, (To ¶565.)

564. (From ¶469.) Defendants Ashley Moody, JetBlue, and Spirit be adjudged to have engaged in specified unlawful activity within the meaning of 18 U.S.C. § 1956(c)(7)(A). (To ¶565.)

565. (From ¶¶559 to 564.) The forfeiture of the following property in Florida to the United States which is (i) property involved in or traceable to money

laundering transactions in violation of 18 U.S.C. § 1956 pursuant to section 1366(a)(1) of the Money Laundering Control Act of 1986, 18 U.S.C. § 981(a)(1)(A); and/or (ii) property which constitutes proceeds traceable to specified unlawful activity within the meaning of section 20(b) of the Civil Asset Forfeiture Reform Act of 2000, 18 U.S.C. § 981(a)(2)(A), pursuant to section 20(a) of the Civil Asset Forfeiture Reform Act of 2000, 18 U.S.C. § 981(a)(1)(C):

      a. Fort Lauderdale-Hollywood airport (FLL);

      b. Jacksonville airport (JAX);

      c. Key West airport (EYW);

      d. Miami airport (MIA);

      e. Orlando airport (MCO);

      f. Palm Beach airport (PBI);[470]

      g. Pensacola airport (PNS);

      h. Sarasota Bradenton airport (SRQ);

      i. Southwest Florida airport (RSW);

      j. Tallahassee airport (TLH); and

      k. Tampa airport (TPA).

---

[470] *Note that* the Palm Beach airport has allocated one of its three concourses to the Bahamas government through its wholly owned airline.

### C.   Unlawful Economic Regulation of Air Transportation

566.   (From ¶490.) The Port Authority of New York and New Jersey (PANYNJ) regulation regarding a perimeter rule at LaGuardia airport be declared to violate 49 U.S.C. § 41713, and so violates U.S. Const. art. I, § 8, cl.3, and Defendant PANYNJ be enjoined from enforcing it.

567.   (From ¶¶460 to 461.) The Agreement between the USDOT and Defendants American Airlines and JetBlue Airways dated January 10, 2021 be adjudged to violate (a) section 3 of the Airline Deregulation Act of 1978, 49 U.S.C. § 40101(a), which requires market competition to decide matters related to price, route, and service in air transportation; (b) 18 U.S.C. § 1001 by making a false claim to a proprietary right to airspace reservations allocated by unlawful grandfathering; and in so doing, (c) Endres' first amendment right to free speech to discover and broadcast the market-clearing price of airspace reservations and to engage in commerce, U.S. Const. amend. I; and therefore, Defendants American Airlines, JetBlue Airways, and the United States be permanently enjoined from continuing and restrained from further implementing the Agreement with the USDOT dated January 10, 2021.

568.   (From ¶473.)  Defendant PANYNJ's crediting of PFCs to carriers be adjudged to violate 49 U.S.C. § 47133(a) and the PANYNJ be ordered to repay the diverted revenue to the airports pursuant to 49 U.S.C. § 47107 (m)(2)(B).

569.   (From ¶479.)  MWAA's revenue sharing agreement with carriers be adjudged to violate 49 U.S.C. § 47133(a) and the MWAA be ordered to repay the diverted revenue to the airport pursuant to 49 U.S.C. § 47107 (m)(2)(B).

### D.   Remedies to the U.S. Constitution

570.   (From ¶477.)  Defendant the City of New York's collection of a percent of airport revenue be adjudged to be an Impost or Duty on Imports or Exports in violation of U.S. Const. art. I, § 10, cl. 2, requiring compensation of the amount collected by the City of New York to the U.S. Treasury.

571.   (From ¶494.) Defendant the United States agency's Contracts for Scheduled Service with each Defendant Carrier be adjudged to violate U.S. Const. art. I, § 8, cl.3 and the United States be enjoined from enforcing them.

572.   United States statute 49 U.S.C. § 49104(a)(4) be declared to violate U.S. Const. art. I, § 9, cl. 6 and U.S. Const. amend. I and Defendant United States be enjoined from enforcing it.

573.   United States statute 49 U.S.C. § 49106(e) be declared to violate U.S. Const. art. I, § 8, cl. 3, and U.S. Const. art. I, § 9, cl. 6 and Defendant United States be enjoined from enforcing it.

574.   United States statute 49 U.S.C. § 49109 be declared to violate the U.S. Const. art. I, § 9, cl. 6, and Defendant U.S. be enjoined from enforcing it.

575.   United States statute 49 U.S.C. § 49111 be declared to violate the U.S. Const. art. I, § 9, cl. 8, and Defendant United States be enjoined from enforcing it.

### E.    Patents

576.  A declaratory judgment be issued that there is no judicial exception to the patentability of Plaintiff Endres' patent application 15/789,585 for his multi-sided demand-calibrated market clearing process, pursuant to 35 U.S.C. § 101, and that therefore, the patent was unlawfully withheld; and

577.  Consequent to ¶576, a mandamus be issued to the Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office to issue the patent to: (a) protect competition among suppliers and competition among consumers in airspace reservations in air commerce as required by section 3 of the Airline Deregulation Act of 1978, 49 U.S.C. § 40101(a)(6)(A), (9), and (12); (b) enforce the Public's constitutional right to progress in the art of preventing congestion delays in transportation through a multi-sided market-clearing process, U.S. Const. art. I, § 8, cl. 8; (c) secure the Public's title to the navigable airspace pursuant to 49 U.S.C. § 40103(a)(2); and (d) to further aid the courts' jurisdiction in future bankruptcy and antitrust cases involving domestic and foreign air carriers, airport operators, and airport owners.

578.  Patent Number US9,156,564 (2015) for Endres' assisted takeoff system and Patent Number US9,920,695 (2018) for Endres' controlled descent system be extended to 18 years after the issuance of the patent in the ¶577.

### F.   Other

579.   Plaintiff be awarded such other relief as the Court may deem necessary and

proper.

## XI.   OATH

I declare under penalty of perjury that the foregoing is true and correct.

Signed March 21, 2024.


Steven P. Endres — PRO SE

4338 Hillside Dr
Ann Arbor, Michigan 48105
steve@exhaustless.com
1-(734) 945-9231